## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| In re: | Case No. 26-20761-JRS |
| Waikoloa Village Lofts West, LLC., *et al.*, | Chapter 11 |
| Debtors.[1] | Waipahu Properties, LLC<br>Waipahu, LLC<br>Willow Plaza, LLC |
| | Jointly Administered |

**DEBTORS' MOTION FOR ORDER ((I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED FINANCING; (II) GRANTING ADEQUATE PROTECTION; (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

MP Elk Grove, LLC, MP Elko II LLC, 5425 Pau A Laka LLC, the Gary & Janice Pinkston Family Trust and Gary L. Pinkston, debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned proposed counsel, file this motion ("Motion") pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507(b) and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004(h), and 9014, of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Local Rules" or "BLR") for entry of an order (the "DIP Order") granting the following relief:

  i.   authorizing MP Elk Grove, LLC, MP Elko II LLC, and 5425 Pau A Laka LLC (collectively, the "Borrowers") to obtain secured postpetition

---

[1] The non-operating Debtors are **5425 PAU A LAKA, LLC, FLETCHER K, LLC, GARY L. PINKSTON, HAWAII REAL ESTATE DEVELOPMENT, LLC, KUKUIULA VISTAS, LLC, MP ELK GROVE, LLC, MP ELKO II, LLC, MP KAUAI HH DEVELOPMENT FUND, LLC, MP KAUAI QOZ FUND, LLC, MP MODESTO, LLC, TC CLOVIS, LLC, THE GARY & JANICE PINKSTON FAMILY TRUST, WAIKOLOA VILLAGE HOTEL CWS, LLC, WAIKOLOA VILLAGE HOTEL HIE, LLC,** and **WAIKOLOA VILLAGE LOFTS SOUTH, LLC.**

13772646.1

financing in the form of a superpriority senior secured credit facility (the "DIP Facility"), pursuant to which loans (the "DIP Loans") in a maximum amount not to exceed $45,000,000 (the "Maximum DIP Facility Amount"), subject to the terms and conditions of the senior secured Debtor-in-Possession Credit Agreement ("DIP Credit Agreement")[2] to be entered into by the Borrower and American Savings Bank, National Association ("ASB"), as Agent (in such capacity, the "Agent") for itself and on behalf of Finance Factors ("FF" and together with ASB in such capacity, the "DIP Lenders") and authorizing Gary L. Pinkston and the Gary L. and Janice C. Pinkston Family Trust (collectively, the "Guarantors") to guarantee the DIP Loans;

ii.   authorizing the Debtors to execute, enter into and deliver the DIP Credit Agreement and all other documents relating thereto (collectively, the "DIP Loan Documents"), including without limitation, definitive pledge and security agreements granting priority liens to secure the obligations under the DIP Credit Agreement, and to perform such other acts as may be reasonably necessary, desirable, or appropriate in connection with the DIP Loan Documents;

iii.   granting the DIP Lenders fully-perfected, priming, first priority security interests in the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, subject to the Carve-Out and Permitted Priority Liens (each as defined below);

iv.   granting the DIP Lenders (i) superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, (ii) liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on the Prepetition Collateral, subject to the Permitted Priority Liens, and (iii) priming liens pursuant to section 364(d) of the Bankruptcy Code, on the DIP Collateral and all proceeds thereof;

v.   waiving the Debtors' right to surcharge the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

vi.   finding that neither of the DIP Lenders shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, as applicable;

vii.   authorizing and directing the Debtors to make non-refundable, irrevocable, unavoidable, and final payments on account of the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents, each

---

[2] The DIP Credit Agreement includes non-Debtor pledges of collateral.

as applicable, as such become due and payable, all to the extent provided in, and in accordance with, the applicable DIP Loan Documents;

viii. subject to the restrictions set forth in the DIP Loan Documents and the DIP Orders, authorizing the Debtors to use the proceeds of the DIP Facility and Cash Collateral in accordance with both the Budget (as defined below) and the DIP Loan Documents;

ix. providing Adequate Protection to the Prepetition Junior Lender for any diminution in the value of the Prepetition Collateral and the granting of priming, first-priority liens to the DIP Lenders;

x. permitting the Borrowers to enter into that certain Extension Agreement and Payment Forbearance Agreement (the "Junior Loan Extension Agreement"), attached as Exhibit B to the proposed DIP Order, with the Prepetition Junior Lender, pursuant to which the maturity date of the Prepetition Junior Loan will be extended to June 30, 2027 to correspond with the maturity date of the DIP Loans under the DIP Credit Agreement;

xi. modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the this DIP Order and the DIP Loan Documents;

xii. providing for the immediate effectiveness of the Court's DIP Order and waiving any applicable stay, including under Bankruptcy Rule 6004, to permit such immediate effectiveness; and

xiii. granting related relief.

## CONCISE STATEMENT OF RELIEF SOUGHT

| | |
|---|---|
| **Borrowers**: <br> *Bankruptcy Rule 4001(c)(1)(B)* | MP Elk Grove, LLC, MP Elko II LLC, and 5425 Pau A Laka LLC ("Borrowers") |
| **Guarantors** <br> *Bankruptcy Rule 4001(c)(1)(B)* | Gary Pinkston, the Gary L. and Janice C. Pinkston Family Trust and the Estate of Janice Pinkston[3] |
| **Relief Sought:** | Authority to obtain postpetition financing secured by a priming, senior lien on the same Prepetition Collateral held by the Prepetition Senior Lenders, including real and personal property and fixtures of the Borrowers, plus any post-petition proceeds and profits of such |

---

[3] Additional non-debtor parties will guarantee the DIP Loan.

collateral, as set forth in the DIP Loan Documents.

**DIP Lenders**
*Bankruptcy Rule 4001(c)(1)(B)*

American Savings Bank, National Association and Finance Factors

**Amount and Facility**
*Bankruptcy Rule 4001(c)(1)(B)*

The Debtors and the Prepetition Senior Lenders are parties to a pre-petition Acquisition & Development Term Loan in the amount of $26,000,000 (the "A&D Loan") and a $7,000,000 Vertical Construction Revolving Line of Credit (the "Construction Line of Credit") on Phase I of the development known as Kauanoe O Koloa on the Island of Kauai, State of Hawaii (the "Project").

The DIP Facility shall be a non-revolving credit facility for a maximum commitment of $45,000,000, restricted to and comprised of the following components: (i) Roll-up of the $26,000,000 A&D Loan; (ii) Roll-up of the $7,000,000 Construction Line of Credit; and (iii) up to $12,000,000 in New Money to complete construction of buildings 8, 7, 6, 5 on Phase I of the Project.

**Purposes for the Use of DIP Proceeds:**

The $12 million in New Money shall be solely be used to finance the remaining site work and vertical construction of the first four (4) buildings totaling 36 units in Phase I (Buildings 8, 7, 6, and 5) of the Project consisting of 72 units, of an overall total of 279 condominium units in a townhome golf course community in Koloa on the Island of Kauai, State of Hawaii pursuant to a construction budget (the "Budget"). Phase I is partially completed with Buildings 8, 7, 6, and 5 at various stages of completion ranging from 40-95%, and with 28 of the 36 units under binding presale agreements, totaling $39,700,000 in sales prices. There are 8 spec units in the partially constructed buildings.

The DIP Facility will allow the Borrowers to complete and sell and close the units in the first four buildings. Completion and closing of

4

|  |  |
|---|---|
| | presold units is expected to occur within 6 months of the closing date of the DIP Facility. |
| **DIP Budget and Related Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility is subject to the Budget and the terms and conditions of the DIP Loan Documents and the terms of the DIP Order.<br><br>The DIP Term Sheet provides that the Debtors shall provide DIP Lenders with a detailed construction budget by building and scope, agreed to by the Borrower and DIP Lenders before closing.  It is contemplated that the commencement of construction on each building shall be subject to conditions from a timing and closing of units in the prior building perspective.  There shall also be a detailed timeline that will be an integral part of this DIP Facility.<br><br>All construction financed within the scope of this financing is expected to be completed by 12/31/26.<br><br>Any changes to the budget or timeline shall require the approval and consent of the DIP Lenders. |
| **Reporting**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loan Documents require compliance with certain periodic reporting covenants that are usual and customary for debtor-in-possession financing like the DIP Facility. |
| **Interest Rate**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The interest rate of the DIP Facility shall float at 1-Month Term SOFR plus an Interest Rate Margin of 4.50%.   For illustrative purposes, 1-Month Term SOFR is currently 3.62%, therefore the all-in interest rate today would be 8.12%.<br><br>Upon Event of Default the Interest Rate shall be 4.00% higher than the rate in effect under the Note which would be charged in the absence of default |
| **Maturity Date:**<br>*Bankruptcy Rule 4001(c)(1)(B)* | June 30, 2027 |

**Security and Priority**
*Bankruptcy Rule 4001(c)(1)(B)(i)*

The DIP Lenders shall be granted super priority liens on the same collateral securing the existing A&D Loan and Construction Line of Credit, and post-petition proceeds and profits thereof, including, but not limited to, ~27.886 acres of fee simple real property and all existing and future improvements of the real property located at 5425 Pau A Laka Street, Koloa, HI 96756 and is further identified by TMK (4) 2-8-014-032 & 041 (the "Secured Property"), plus an assignment of any and all escrow agreements, purchasers' deposits, sales contracts, leases, rents, other contracts etc. related to the Project, assignment of all construction and architectural contracts, reciprocal easement agreements, consultant and professional agreements, bonds, permits and governmental approvals, and other material licenses and agreements relating thereto, as customary, and as otherwise required by the DIP Lenders, as set forth in the DIP Loan Documents (the "DIP Collateral").

The foregoing liens and security interests in favor of the DIP Lenders will be duly perfected, first priority liens and security interests and will be subject to no other liens, security interests, or claims, except the fees of the Office of the United States Trustee pursuant to 28 U.S.C. §1930 ("US Trustee Fees").

Additionally, the liens and security interests in favor of the DIP Lenders will be subject to a carve-out (the "Carve Out") for fees and expenses incurred prior to the Maturity Date by professional persons retained by the Debtor or any Committee and approved by the Bankruptcy Court in the maximum aggregate amount of $100,000.00, which shall not be used for litigation against DIP Lenders or Prepetition Junior Lender (defined *infra*).

**Proposed Adequate Protection
To Prepetition Junior Lender**
*Bankruptcy Rules 4001(b)(1)(B)(iv) &
4001(c)(1)(B)(ii)*

The Debtors propose the following (collectively, the "Adequate Protection Obligations") as adequate protection for the interests of SWCPT HI KAUANOE LLC (the "Prepetition Junior Lender"):

1.      The Debtors shall be authorized to grant, and as of entry of the DIP Orders shall be deemed to have granted, to the Prepetition Junior Lender, solely to the extent of any diminution in value of the collateral securing its prepetition obligations (the "Prepetition Junior Collateral"), valid, binding, enforceable, non-avoidable, and automatically perfected, nunc pro tunc to the Petition Date, replacement liens on and security interests in (the "Adequate Protection Liens") the Prepetition Collateral, with a priority subject and subordinate only to the DIP Liens, payment of the Carve-Out, and the Permitted Priority Liens.

2.      Moreover, the Adequate Protection Liens shall not be subject or subordinate to or made pari passu with any lien or security interest granted in the chapter 11 cases or any Successor or converted Cases.

3.      The Prepetition Junior Lender shall be granted, subject only to the Carve-Out and the DIP Financing and DIP Liens, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claims"), payable from and having recourse to all prepetition and postpetition property of the Debtors and the proceeds thereof. Subject only to the Carve-Out and the DIP Financing and DIP Liens, the Adequate Protection Superpriority Claims granted to the Prepetition Lenders will not be junior to any administrative expense claims (other than the superpriority administrative expense claim granted to the DIP Lenders) and will have priority over all administrative expense claims against each of the Borrowers

7

and Guarantors,  of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

4.      The Debtors shall pay the fees, costs and expenses of the Prepetition Junior Lender in these chapter 11 cases.

5.      The Debtors shall provide the Prepetition Junior Lender with (i) monthly financial reports within thirty (30) days after the end of each calendar month, (ii) such other information as may from time to time be requested by the Prepetition Junior Lender consistent with the Prepetition Junior Loan Documents, and (iii) the Budget and variance reporting by the Debtors.

6.      The continued accrual of interest on the secured claim of the Prepetition Junior Lender at the applicable default rate set forth in the Prepetition Junior Loan Documents.

7.      The Loan to Prepetition Junior Lender shall have a new Maturity Date of June 30, 2027

**Administrative Priority:**    The DIP Lenders will be entitled to an allowed superpriority administrative priority under Sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the US Trustee Fees and the Carveout.

**Events of Default:**    In addition to customary events of default set out in the DIP Credit Agreement, the following shall constitute Events of Default which, upon occurrence, shall allow the DIP Lenders to terminate the DIP Credit Agreement and demand immediate repayment of all amounts

8

owed to under the DIP Facility: (i) conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code, (ii) appointment of an examiner or a trustee in the Cases, (iii) failure of the Borrowers to comply with the terms of the DIP Orders, (iv) failure of the Debtors or non-debtor borrowers and guarantors to comply with the terms of the DIP Credit Agreement, (v) payments by the Debtors of amounts other than as provided in the Budget, or within a 10% variance thereof, (vi) failure of the Debtors to the amounts owed to the DIP Lenders on or prior to the Maturity Date or (vii) failure to file Monthly Operating Reports by the end of any calendar month.

Upon an Event of Default, the DIP Lenders shall have the rights to, among other things, (i) seek foreclosure of the DIP Collateral, (ii) seek the appointment of a Chapter 11 trustee; and (iii) seek to convert the Debtors' bankruptcy cases to chapter 7.

**Conditions Precedent:**    Funding is subject to a satisfactory inspection and review of the Project, including the construction Budget, the construction contracts, and all related materials and documentation by the DIP Lenders and DIP Lenders' engineer, who shall document construction progress.

Acceptable Budget and monthly cash flow showing all costs associated with the Project, to a level satisfactory to the DIP Lenders, including details of all hard and soft costs.

The DIP Lenders shall receive and review the approved building permit for the unit(s) being built/funded.

Entry of DIP Orders by the Bankruptcy Court in forms acceptable to the DIP Lenders, including, but not limited to, a finding and determination that the DIP financing has been extended by the DIP Lenders in "good faith" within the meaning of section 364(e) of the

|  | Bankruptcy Code and, therefore, the DIP Lenders are entitled to the protections afforded thereby. |
|---|---|
| **Repayment and DIP Lender Adequate Protection:** *Bankruptcy Rules 4001(b)(1)(B)(iv) & 4001(c)(1)(B)(ii)* | The Debtors shall paydown the DIP Facility with a portion of the proceeds of sales of the vertical construction of the first four (4) buildings build in the Project, which totals 36 units in Phase I (Buildings 8, 7, 6, and 5). |
|  | Monthly interest-only payments will be made via established interest reserve included as an undisbursed budged amount within the DIP Facility. The DIP Lenders will be irrevocably authorized to disburse funds from the interest reserve monthly to pay the interest as due, so long as availability within the interest reserve exists. |
|  | Principal of the DIP Facility shall be paid with the closing of each condo unit, subject payment of 100% of "net sales proceeds" for each unit. "Net sales proceeds" is defined as gross sales proceeds less customary and reasonable out-of-pocket closing costs (including delinquent real property taxes) and escrow closing costs, which in the aggregate, shall not exceed 8.0% of the contractual sale price. For the avoidance of doubt, a minimum of 92% of each condominium sale shall be applied to reduce the principal under the DIP Facility. |
|  | On June 30, 2027 (the "Maturity Date"), the Borrowers will be liable to repay the entire outstanding balance of the DIP Facility |
| **Fees** *Local Bankruptcy Rule 4001-5(a)(2)(A)* | Loan Fee: 1.0% of the DIP Facility |
| **Stipulations as to Prepetition Claims and Liens** *Bankruptcy Rule 4001(c)(1)(B)(iii)* | The DIP Order shall contain provisions and findings of fact that bind the Debtors' Estates with respect to the validity, perfection and amount of the Prepetition Senior Lender's claims and liens and include a waiver of claims against the Prepetition Senior Lenders. |

| | |
|---|---|
| **Automatic Stay Waiver/Modification**<br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The DIP Orders will modify the automatic stay imposed by section 362 of the Bankruptcy Code as necessary to permit the Debtors to perform their obligations under the DIP Order and the DIP Loan Documents, and to permit the DIP Lenders to enforce their rights, in connection with the DIP Facility |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>*Bankruptcy Rule 4001(c)(1)(B)(vii)* | The DIP Orders shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and Adequate Protection Liens, without the necessity of filing or recording any financing statement, deed to secure debt, deed of trust, mortgage, UCC, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or Adequate Protection Liens, or to entitle the DIP Liens or Adequate Protection Liens to the priorities granted herein. |
| **Releases**<br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | Upon entry of the DIP Order, the Debtors and their respective estates shall waive, discharge, and release any right to challenge any of the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Senior Loan Documents, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lenders and the Prepetition Senior Lenders. |
| **Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)* | 1. On or before June 6, 2026, the Borrower shall have filed a motion seeking approval of the DIP Facility in form and substance reasonably acceptable to the DIP Lenders; |

11

2.      No later than July 2, 2026, the Debtors shall upload a form of DIP Order to the Bankruptcy Court in a form acceptable to the DIP Lenders and expedite the Court's entry of the Order..

**Carve-Out**

*Bankruptcy Rules 4001(b)(1)(B)(iii) & 4001(c)(1)(B)*

The DIP Liens, DIP Superpriority Claim, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject only to the right of payment of the following expenses, to the extent provided in the DIP Order: (i) statutory fees payable to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) with respect to the Debtors (the "Case Administration Fees"); (ii) unpaid professional fees and expenses payable to any the Carveout Professionals[4] (collectively, the "Professional Fees") that are incurred or accrued prior to the date on which the DIP Lenders provide written notice to the Debtors, Debtors' counsel, the U.S. Trustee and counsel to the Creditors' Committee (if any) of the occurrence of either an Event of Default or the Termination Date (such notice, the "Carve-Out Notice", and the date of a delivery of such notice, the "Carve-Out Effective Date"), but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Effective Date) to the extent allowed whether by interim order or procedural order and have been provided for in, and are consistent with, the Budget (subject to the Permitted Variances), in an aggregate amount not to exceed $100,000, to the extent allowed at any time, whether by interim order or procedural order (collectively, the "Carve-Out").   Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee or similar payment to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset

---

[4]"Carveout Professionals" means professionals retained by the Debtors and authorized by the Court to be retained by any statutory Committee

disposition with respect to the Debtors unless agreed to in writing by the DIP Lenders.  The Carve-Out shall not be used in any manner for any action against DIP Lenders or prepetition Junior Lender.

The Debtors shall maintain a segregated account (the "Carve-Out Reserve Account") for the payment of Professional Fees of the Debtor's counsel and counsel for any Committee approved by the Court (the "Carve-Out Reserve Professionals"), which account shall be funded by the Debtors in accordance with the Budget on a weekly basis, until the occurrence of the Carve-Out Effective Date.  No funding shall be provided over and above the amounts set forth in the Budgets proposed by the Debtors and approved by the DIP Lenders.

**Challenge Period**

The DIP Order shall contain provisions or findings of fact that bind the estates with respect to the validity, perfection or amount of the claims of the Prepetition Senior Lenders and include waivers of claims against them. The Stipulations and admissions contained in the DIP Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Committee (if any) or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless and to the extent that (a) a Committee (if any), a Trustee appointed prior to the Challenge Period Termination Date (as defined below), or any other party in interest (other than any Debtor), after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part any such stipulations, releases and admissions, including the Debtors' Stipulations, or has otherwise asserted an Estate Claim (each, a "Challenge") by no later than (1) sixty (60) days after entry of the DIP Order, and (2) any such later date agreed to in writing by the Debtors and the Prepetition Senior Lenders (the time period established by the later of the foregoing clauses, the "Challenge Period" and

13

the date of expiration of each Challenge Period being a "Challenge Period Termination Date"), or (3) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly-filed adversary proceeding.

**Section 506(c) Waiver**

The DIP Order shall provide that all costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Cases shall not be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lenders.

**No Liens on Avoidance Actions**

The DIP Lenders shall not have liens on the proceeds of and property received from such claims and causes of action, under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (the "Avoidance Actions").

**"Roll Up" Provisions**

The amount borrowed by Debtors under the DIP Loans is sufficient to pay in full the amount due to the Prepetition Secured Lenders. Immediately following entry of the DIP Order, the proceeds of the DIP Facility shall be remitted to the Prepetition Senior Lenders to pay down the A&D Loan and the Construction Line of Credit (the "Roll-Up").

The Roll-Up is an integral part of the DIP Facility terms. The Prepetition Senior Lenders are intimately familiar with the Project. Without the Roll-Up, the Debtors would not receive the DIP Loans that are necessary for the Debtors to complete construction on Phase I of the Project, maintain their operations and maximize the value of their assets during these chapter 11 cases. Accordingly, the Debtors believe that the Roll-Up of the Prepetition Senior Lenders' prepetition debt is necessary and reasonable under the circumstances. Furthermore, by facilitating the completion of

14

|  |  |
|---|---|
|  | this phase of the project, a benefit is being create for the estate at large. |
| **Consensual Priming Liens** | The Prepetition Junior Lender consents to the DIP Liens priming the Prepetition Junior Lenders' validly attached and properly perfected Prepetition Liens. |
| **Relief from Automatic Stay** | The DIP Orders shall provide that the automatic stay imposed by section 362 of the Bankruptcy Code shall be modified as necessary to permit the Debtors to perform their obligations, and to permit the DIP Lenders to enforce its rights, in connection with the DIP Facility. |

### Jurisdiction

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

### Background Facts

2. On May 14, 2026 (the "Petition Date"), the above-captioned Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued in possession of their property and have operated and managed their affairs as debtors-in-possession pursuant to the provisions of §§ 1107 and 1108 of the Bankruptcy Code. No creditors' committee, trustee, or examiner has been appointed in these cases.

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors consent to the entry of final orders and judgments by the Bankruptcy Court.

4. Debtors' majority member is, The Gary & Janice Pinkston Family Trust dated January 18, 2008 (the "Trust"). Mr. Gary Pinkston ("Mr. Pinkston") is a trustee of the Trust and manages the Debtors' affairs. Mr. Pinkston also is the manager of Debtor's affiliated entities. Mr.

15

Pinkston and/or the Trust hold the majority of ownership in the affiliates of the Debtors and controls the Debtors.

**I.      The Debtors' Prepetition Secured Indebtedness to the Senior Prepetition Lenders**

5.       On or about December 29, 2023, ASB, as Lender, and MP Elk Grove, LLC, as Borrower, entered into that certain 2023 Loan Agreement (as amended, the "2023 Loan Agreement") for an acquisition and development loan to the Borrower in the principal amount of up to $26,000,000.00 (the "A&D Loan").  The A&D Loan was made for the purpose of financing a portion of Phase 1 of the "Kauanoe o Koloa" condominium project (the "Project") on the Island of Kauai, State of Hawaii, to be developed on the real property owned by 5425 Pau A Laka LLC and MP Elko II, LLC (the "Accommodation Mortgagors").[5]  The A&D Loan is guaranteed by parties including Mr. Pinkston and the Trust.

6.       Phase 1 of the Project consists of (i) the refinancing of that certain acquisition and development loan made by ASB, as Lender to MP Elk Grove LLC, as Borrower, in the principal amount of $14,690,000.00 in 2021 (the "2021 A&D Loan"); (ii) the refinancing of that certain line of credit made by ASB to MP Elk Grove in the principal amount of $9,000,000.00 in 2021 (the "2021 Line of Credit"); (iii) certain sitework and development costs to be incurred by the Borrower in connection with the development of the Project; and (iv) the construction of 72 condominium units in the Condominium Project (the "Phase 1 Units").

7.       On or about December 29, 2023, ASB, as Lender and MP Elk Grove, LLC, as Borrower, entered into that certain 2023 Revolving Construction Line of Credit Agreement (as amended, the "2023 Line of Credit Agreement") pursuant to which ASB agreed to make available to the Borrower a revolving construction line of credit in the principal amount of up to

---

[5] MP Elk Grove, LLC is the sole member of 5425 Pau A Laka LLC and of MP Elko II, LLC.  The "developer" of the Condominium Project is non-debtor Kauai Hale, Inc.

$7,000,000.00, with an "Aggregate of Advances" of up to $28,100,000.00 (the "Construction Line of Credit") for the construction of 72 condominium units in the Project.

8.      The Construction Line of Credit is evidenced by that certain Promissory Note dated December 29, 2023 (the "Line of Credit Note"), payable to the order of ASB, in the principal amount of $7,000,000.00.  The Construction Line of Credit is guaranteed by parties including Mr. Pinkston and the Trust.

9.      Both the A&D Loan and Construction Line of Credit were to be repaid from the sales of the Phase 1 Units after construction was completed as units were sold.  The Debtors project that construction and sales could be completed by the end of 2026.  Thus far, 53 sales contracts have been entered to purchase units in the Project.  There are 19 units where sales contracts have not been secured.  Approximately $4.3MM in deposits are being held in escrow at ASB and are a part of the Prepetition Collateral of the Prepetition Senior Lenders.

10.      The A&D Loan and the Construction Line of Credit are evidenced by, among other things, (i) 2023 Loan Agreement dated December 29, 2023 relating to the A&D Loan, (ii) 2023 Revolving Construction Line of Credit Agreement relating to the Construction Line of Credit; (iii) a Promissory Note dated December 29, 2023, payable to the order of ASB, in the principal amount of $26,000,000.00, (iv) a Promissory Note dated December 29, 2023, payable to the order of ASB, in the principal amount of $7,000,000.00; (v) a Real Property Mortgage and Financing Statement dated as of May 27, 2021, executed by 5425 Pau A Laka LLC, as mortgagor, in favor of the Mortgagee, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii (the "Land Court") as Land Court Document No. T-11474217, and also recorded in the Bureau of Conveyances of the State of Hawaii (the "Bureau") as Document No. A-78220763, as modified by that certain Consent; Reaffirmation; Assumption of Mortgage, dated as of August 9, 2023, by and

17

among Pau A Laka LLC, MP Elko II, LLC, and ASB, recorded in the Bureau as Document No. A-86210379 through Document No. A-86210381 (the "Original Mortgage"), as amended by that certain 2023 Amendment to Real Property Mortgage and Financing Statement dated December 29, 2023 by and between ASB, as Mortgagee, and 5425 Pau A Laka LLC, MP Elko II, LLC, as Mortgagors, and Kauai Hale, Inc., as Manager, recorded on December 29, 2023 in the Bureau as Document No. A-87630206, relating to the real property described in Tax Map Key No. (4) 2-8-014-032 (the "Land")[6]; (vi) a 2023 Amendment to and Complete Restatement of Security Agreement dated December 29, 2023, by and between ASB, as Secured Party, and MP Elk Grove LLC, 5425 Pau A Laka LLC, MP Elko II, LLC, MP Financial Group, Ltd. and Kauai Hale, Inc., as Debtors, and (vii) a UCC-1 Financing Statement dated December 29, 2023 recorded in the Bureau on December 29, 2023 under Document No. A-87630208. All of the foregoing, including all other documents evidencing the A&D Loan and the Construction Line of Credit, shall collectively be referred to as the "Prepetition Senior Loan Documents."

11.    As of the Petition Date, the total principal outstanding under the Prepetition Senior Loan Documents is approximately $32,600,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses owing under or in connection therewith (collectively, the "Prepetition Secured Obligations").

**II.    The Debtors' Prepetition Junior Secured Lender**

12.    On or about April 11, 2024, SWCPT HI KAUANOE LLC ("SWCPT" or the "Prepetition Junior Lender") made a loan to 5425 Pau A Laka LLC and MP Elko II, LLC in the amount of $12,000,000, evidenced by, among other things, (i) a Promissory Note, (ii) a Loan

---

[6] The Land consists of approximately 27.886 acres of fee simple land with proposed development of 279-unit for-sale condominium project known as Kauanoe O Koloa consisting of 30 garden-style apartment buildings each containing 9-12 units.

18

Agreement, and (iii) a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated April 11, 2024, and recorded in the Bureau on April 15, 2024 as Document No. A-88710146 (the "Junior Mortgage") encumbering the Land, which is expressly subordinate and junior to the mortgage granted to ASB on the same real property set forth therein.[7]   The Promissory Note, the Loan Agreement, the Mortgage and all other documents evidencing the Junior Loan shall be referred to as the "Prepetition Junior Loan Documents."

13.     The Prepetition Junior Loan matured on December 29, 2025. Pursuant to the terms of the Junior Loan Extension Agreement, the Junior Lender has agreed to extend the maturity date of the Junior Loan to June 30, 2027 so that the Junior Loan will be coterminous with the DIP Credit Agreement. The Debtors' seek authorization to enter into the Junior Loan Extension Agreement extending the maturity date of the Junior Loan.

### III.    The Debtors' Need for Post-Petition Financing

14.     Given the Debtors' liquidity constraints and financial struggles, the Debtors urgently need access to debtor-in-possession financing and use of cash collateral to continue to operate their businesses, complete Phase I of the Project, and complete sales of Phase I Units pursuant to section 363 of the Bankruptcy Code, and fund the administration of these chapter 11 cases.  Absent the relief requested herein, the Debtors likely will not have sufficient liquidity to continue to operate their business, complete construction of Phase I, pay vendors of necessary goods and services, and satisfy other operational requirements during their restructuring.  The

---

[7] On or about April 11, 2024, the Junior Lender entered into a *Intercreditor, Standstill, and Subordination Agreement* with ASB in which, among other things, the Junior Lender acknowledged and agreed that all rights, liens and privileges, vested in it as the owner and legal holder of the Prepetition Junior Loan Documents are expressly "subordinate and inferior to the rights, Liens and privileges vested in [ASB], as the owner and legal holder of the [Prepetition] Senior Loan Documents, all advances to be made thereunder and all Liens created thereby in and to the Collateral." A *Memorandum of Intercreditor, Standstill, and Subordination Agreement* was recorded in the Bureau on April 15, 2024 under Document No. A-88710148.

foregoing expenditures are necessary to preserve the value of the Debtors' estates as a going concern.

**IV.     The Debtors' DIP Financing Negotiations**

15.     The Debtors have engaged in extensive, arm's-length negotiations with the DIP Lenders about the terms of the postpetition financing and use of Cash Collateral.  As a result of those negotiations, the Debtors and DIP Lender reached agreement on the terms of a DIP Facility and use of Cash Collateral, as set forth herein.  Ultimately, the DIP Facility proposed was the best financing proposal available to the Debtors, the Debtors are familiar with the DIP Lenders since they provided the Prepetition Secured Financing on Phase I of the Project and the DIP Facility will provide the necessary liquidity to complete the construction of additional Phase I Units.

16.     In the sound exercise of their business judgment, the Debtors concluded that entering into the DIP Facility with the DIP Lenders is in the best interests of the Debtors, their estates and their creditors.

**V.     The DIP Facility is In the Best Interests of the Estates**

17.     The DIP Facility, as proposed herein, will provide the liquidity needed for the Debtors to complete a substantial portion of Phase I of the Project and will help to stabilize and fund the Debtors' operations during the course of these chapter 11 cases as the Debtors seek to preserve and maximize the value of their estates for the benefit of all parties in interest.  The Debtors believe that approval of the DIP Facility is critical to assuring parties in interest, such as the Debtors' critical vendors, of the Debtors' ability to maintain their operations during these chapter 11 cases.

18.     For these reasons and those set forth below, the Debtors believe that the DIP Facility will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court approve the DIP Facility.

**BASIS FOR RELIEF**

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

    A.    **The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Facility.**

19.    Provided that an agreement to obtain postpetition credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("[Courts generally] defer to a debtor's own business judgment so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.") (internal citation omitted); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

20.    Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action appears to enhance the debtor's estate." *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566

n.16 (8th Cir. 1997) (internal alterations and quotations omitted)); *In re Pittsburgh Sports Assocs. Holdings Co.*, 239 B.R. 75, 87 (Bankr. W.D. Pa. 1999).  Courts require only that the debtors "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

21.     Under the circumstances, the Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment.  Most importantly, without access to the DIP Facility, the Debtors will not be able to pay expenses necessary to sustain their operations, which would irreparably impair the value of the Debtors' estates during these chapter 11 cases. The DIP Facility is the only viable source of liquidity to make such payments.  In addition, the Debtors negotiated the terms of the DIP Facility with the DIP Lenders in good faith, at arm's length, and with the assistance of the Debtors' advisors. Debtors do not have any basis to believe that any alternative funding on similar or better terms is available on as quick a basis to allow them to complete this phase of the project on such reasonable terms.  Based on such negotiations, the Debtors believe the terms of the DIP Facility are fair, reasonable, reflective of the market for financings of this type, offers a significant benefit to the Debtors' estates, and is the best financing available under the circumstances.  Moreover, the Budget prepared in connection with the DIP Facility is tailored to comport with the timeline of the construction and sales process for the Phase I Units in the Project.  Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a reasonable exercise of the Debtors' sound business judgment.

> **B.      The Debtors Meet the Conditions Necessary Under Section 364(d)(1) To Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

22.     The Debtors propose to obtain financing under the DIP Facility by providing the DIP Lender the DIP Liens and DIP Superpriority Claims pursuant to sections 364(c) and (d)(1) of

the Bankruptcy Code. Specifically, the Debtors propose to provide the DIP Lenders priming, first priority DIP Liens on all DIP Collateral, together with any proceeds, products or profits of the DIP Collateral, whether arising under section 552(b) of the Bankruptcy Code or otherwise (subject in each case only to the Carve-Out and Permitted Priority Liens).

23. The Debtors meet the requirements for relief under section 364(c) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property. Specifically, section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether (a) unencumbered credit or alternative financing without superpriority status is available to the debtor, (b) the credit transactions are necessary to preserve assets of the estate, and (c) the terms of the proposed credit agreement are fair, reasonable, and adequate. *See, e.g.*, *In re Los Angeles Dodgers*, 457 B.R. at 312; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549-51 (Bankr. E.D. Pa. 1987); *see also Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *In re Ames Dep't Stores*, 115 B.R. at 37–40.

24.     Further, the Debtors meet the requirements for relief under section 364(d) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain post-petition financing secured by liens that are senior to the Prepetition Liens of the Prepetition Junior Lender. Specifically, section 364(d) of the Bankruptcy Code provides as follows:

> (1)     The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2)     In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Junior Lender has consented or (b) the Prepetition Junior Lender's interests in collateral are adequately protected.

25.     Here, the Debtors satisfy the necessary conditions under section 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Loan Documents.  Given the circumstances, the Debtors could not obtain credit on an unsecured, junior secured, or administrative expense basis.  Moreover, the Prepetition Junior Lender has consented to the DIP Liens priming its respective Prepetition Liens.  For all the reasons discussed further below, the Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Loan Documents pursuant to section 364(c) and (d) of the Bankruptcy Code.

1.     <u>The Debtors are unable to obtain financing on more favorable terms than the DIP Facility</u>.

26.     In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c)

24

or 364(d) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *In re Pearl-Phil GMT (Far East Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c), to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders). This is especially true where time is of the essence. *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

27.    Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor on an unsecured or administrative priority basis, "it would be unrealistic or unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

28.    The Debtors communicated with the Prepetition Senior Lenders and other parties about their willingness to provide financing, including financing on a junior basis. However, none of these parties were willing to provide financing on an unsecured, non-superpriority or junior basis. As the Debtors' existing senior secured lender, DIP Lenders were the natural candidates to

25

serve as the postpetition lenders on a superpriority basis, while the other parties failed to present a financing option that was actionable. Among other issues, any alternative lender funding on a super-priority basis would have had to either (i) gain the consent of the Prepetition Senior Lenders and Preptition Junior Lender to prime the Prepetition Obligations or (ii) attempt to undertake (or cause the Debtors to undertake) a priming fight at considerable cost and with little practical likelihood of success. In addition, given the circumstances facing the Debtors' businesses, the Debtors have not had any realistic prospects for raising alternative capital.

29.     After carefully evaluating their options in light of such circumstances, the Debtors engaged in extensive, good faith, and arm's-length negotiations with the Prepetition Senior Lenders to obtain the best financing terms available. Because the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available, the Debtors have concluded that the DIP Facility represents the Debtors' best (and only) viable option for post-petition financing for Phase I of the Project. For these reasons, the Debtors submit that they have met the standard for obtaining the proposed DIP Financing.

2.     <u>The DIP Facility is necessary to preserve the value of the Debtors' estates</u>.

30.     The Debtors, as debtors in possession, have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The Debtors' access to postpetition financing is essential to their ability to effectively carry out that duty. Without the proceeds of the DIP Facility, the Debtors will be unable to fund critical payments in the ordinary course of business that are essential to the Debtors' continued operations, which could have irreparable consequences to the Debtors' estates and stakeholders. The DIP Facility will provide the Debtors with sufficient liquidity to fund their operations and maximize the value of their assets as they work to complete construction on Phase I of the Project and work toward sales of the Phase I Units.

26

3.      The terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.

31.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See Transcript of Record* at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [debtor-in-possession financing] pricing terms are, I find the provisions [of the financing] reasonable here and now.").

32.     Here, the terms of the DIP Facility are fair, appropriate, reasonable, and adequate under the circumstances, and in the best interests of the Debtors, their estates and their creditors. The covenants and milestones proposed by the DIP Lenders are reasonable and are not designed to make the Debtors disproportionately susceptible to a breach of such terms. All terms regarding the DIP Facility were extensively negotiated by the Debtors and their advisors to ensure that the terms were as favorable to the Debtors as possible under the circumstances, and the Debtors believe that such terms represent fair consideration for the critical financing proposed to be provided by the DIP Lenders.

33.     In particular, the Roll-Up is appropriate.  Roll-ups of prepetition debt are a common feature in debtor-in-possession financing where, as here, they are necessary to induce prospective postpetition lenders to advance debtor-in-possession financing.  The importance of roll-up features in DIP facilities has been repeatedly recognized by courts which have granted relief similar to the

27

relief requested herein. *See, e.g.*, *In re Stanford*, 17 Fed.4th 116, 119 (11th Cir. 2021) (discussing bankruptcy court's approval of debtor-in-possession loan of up to $13.2 million that would "roll up" the $12.2 million in debt and provide an additional $1 million of working capital); *In re Mission Coal Co., LLC*, No. 18-04177-TOM11, 2019 WL 1024933, at *6 (Bankr. N.D. Ala. Mar. 1, 2019)(discussing DIP Facility that provided for the roll-up of the prepetition First Lien Loan, and all obligations in the First Lien Credit Agreement); *In re Belle Foods, LLC*, No. 13-81963-11, 2010 WL 11812660, at *5 (Bankr. N.D. Ala. Oct. 5, 2010)(determining that Roll Up is a prudent exercise of the Debtor's business judgment consistent with its fiduciary duties in light of the benefits available under the DIP Facility); *see also In re iM3NY LLC*, No. 25-10131 (Bankr. D. Del. February 28, 2025)(approving $15 million roll-up of prepetition debt and $2.5 in new money loans); *In re Diamond Comic Distributors*, No. 25-10308 (Bankr. D. Maryland February 19, 2025)(approving $36 million roll-up and $6 million of new money loans); *In re Vobev, LLC*, No. 24-26346 D. Utah December 9, 2024 (approving $78.13 million in roll-up with $37.25 million in new money loans); *In re H-Food Holdings, LLC*, No. 24-90586 (S.D. Tex. November 22, 2024)(approving $150 million roll-up with $150 million in new money loans); *In re CareMax, Inc.*, No.24-80093 (N.D. Tex. December 18, 2024 (approving $91.5 million in roll-up with $30.5 million in new money loans); In re Williams Industrial Services Group, Inc., No. 23-10961 (D. Del. August 18, 2023 (approving $10.9 million in roll-up with $20.6 million in new money loans); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. Apr. 23, 2020), ECF No. 49 (authorizing the debtors to incur $90 million of new money loans and $180 roll up prepetition indebtedness); *In re Genesis Care Pty* No. 23-90614 (DRJ) (Bankr. S.D. Tex. June 2, 2023), ECF No. 89 (interim order authorizing the debtors to incur $90 million of new money loans and a roll-up of $270 million of prepetition indebtedness); *In re Venator Materials PLC*, No. 23-90301 (DRJ)

28

(Bankr. S.D. Tex. May 16, 2023), ECF No. 98 (interim order authorizing the roll-up of $190 million of prepetition indebtedness and $100 million of new money loans); *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. May 16, 2023), ECF No. 116 (interim order authorizing an over $220 million refinancing facility and $75 million new money loans); *In re Oasis Petroleum Inc.*, No. 20-34771 (MI) (Bankr. S.D. Tex. Sept. 30, 2023), ECF No. 73 (interim order authorizing the roll-up of $240 million of prepetition indebtedness and $120 million of new money loans); *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019), ECF No. 255 (interim order authorizing the roll-up of $87.5 million of prepetition indebtedness and $35 million of new money loans); *In re Frank Parsons, Inc.*, No. 11-10338, 2011 WL 2750844, at *6 (Bankr. D. Md. Jan. 6, 2011) (where good cause and no more favorable available credit was shown, granting final authorization to the debtors to use DIP loan proceeds "to pay Agent and Lenders in respect of all Pre-Petition Obligations"); *In re Hedwin Corp.*, No. 14-15194, 2009 WL 10805962, at *6 (Bankr. D. Md. Dec. 30, 2009) (authorizing the Debtors to enter into a DIP Facility that included a roll up of the Debtors' prepetition revolving loans); *In re TVI Corp.*, No. 09-15677, 2009 WL 8189167, at *5 (Bankr. D. Md. May 4, 2009) (authorizing DIP lending providing for "the post-petition continuation" and "roll up of the Debtors' pre-petition Revolving Loan").

34.     Furthermore, the amount of the Roll-Up relative to the new money to be provided under the DIP Facility (a ratio of less than 3:1 in this case) is comparable to ratios that have been approved in other bankruptcy cases. *See, e.g., In re Noble House Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Oct. 4, 2023), ECF No. 130 (approving a roll-up with a 5.8:1 ratio); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023), ECF No. 323 (approving a roll-up with a 3:1 ratio); *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. June 13, 2023), ECF No. 434 (approving a roll-up with a 4.3:1 ratio); *In re Mountain*

29

*Express Oil Co.*, No. 23-90147 (DRJ) (Bankr. S.D. Tex. Apr. 25, 2023), ECF No. 332 (approving a roll-up with a 4.5:1 ratio); *In re Amerimark Interactive, LLC*, No. 23-10438 (TMH) (Bankr. D. Del. Apr. 13, 2023), ECF No. 52 (approving a roll-up with a 3:1 ratio); *In re Phoenix Servs. Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022), ECF No. 73 (same).

35.    The repayment of the DIP Loan from the proceeds of sale of the Phase 1 Units as they are sold is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP Facility. Without access to the additional liquidity provided under the DIP Facility, the Debtors will be unable to fund the necessary costs of these chapter 11 cases and the construction and sale process of Phase I of the Project. Accordingly, the Debtors submit that the terms of the DIP Facility, including the Roll-Up, are fair, appropriate, reasonable, and adequate under the circumstances, and in the best interests of the Debtors, their estates and their creditors.

36.    The Roll-up is also well justified and appropriate because both the Pre-petition Collateral and the Post-Petition Collateral consist of substantially the same real and personal property of the Debtors. Therefore, the DIP Lenders would essentially be loaning against the same collateral that secure the loans made by the Prepetition Senior Lenders. The Roll-up also solves the immediate timing and liquidity needs of the Debtors' estates, and enhances (rather than erodes) the possibility of recovery for unsecured creditors.

37.    The Debtors have further satisfied section 364(d) of the Bankruptcy Code. When priming of liens is sought under section 364(d) of the Bankruptcy Code, the courts also examine whether prepetition secured creditors are being provided adequate protection for the value of their liens. *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah, July 3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986). The Bankruptcy Code does not expressly define "adequate protection." Section 361 of the Bankruptcy Code, however,

provides a non-exhaustive list of examples of adequate protection, specifically including replacement liens. *See* 11 U.S.C. § 361. Section 361(3) of the Bankruptcy Code goes on to provide the flexible concept that adequate protection may also take other forms, so long as the relief "will result in the realization by [creditor] of the indubitable equivalent of such [creditor's] interest in [cash collateral]." *See* 11 U.S.C. § 361.

38.    Generally, courts decide what constitutes adequate protection on a case-by-case basis. *See, e.g.*, *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp*, No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding") (internal citation omitted).

39.    As described above, the Prepetition Junior Lender has consented to the DIP Liens priming its respective Prepetition Liens. Nonetheless, the Debtors propose to provide a variety of adequate protection—including, the Adequate Protection Liens and the Adequate Protection Superpriority Claim—to protect the interests of the Prepetition Junior Lender in the Debtors' property from any diminution in value of the Prepetition Collateral resulting from the priming of the Prepetition Junior Liens and the imposition of automatic stay (the "Adequate Protection"). The

31

Debtors submit that the Adequate Protection as described herein is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**II.     The DIP Lenders Should Be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code.**

40.     Section 362(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. 11 U.S.C. § 364(e). Section 364(e) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

*Id.*

41.     As described in detail above, the DIP Financing is the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offers the most favorable terms on which to obtain vital postpetition financing and (b) extensive arm's-length, good faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Facility, as set forth in the DIP Loan Documents and DIP Orders, are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP financing has been extended by the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and, therefore, the DIP Lenders are entitled to the protections afforded thereby.

## III.    The Scope of the Proposed Carve-Out is Reasonable and Appropriate

42.    The DIP Facility DIP Order subject the security interests and administrative expense claims under the DIP Facility to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See, e.g.*, *In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for payment of the Clerk of the Court and the U.S. Trustee fees and Professional Fees.

## V.    The Automatic Stay Should Be Modified on a Limited Basis

43.    The relief requested herein contemplates a modification of the automatic stay to (a) permit the Debtors to grant the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to incur all liabilities and obligations to the DIP Lenders under the DIP Orders; (c) subject to the Carve-Out, authorize the Debtors to pay, and the DIP Lenders to retain and apply, payments made in accordance with the terms of the DIP Orders; and (d) authorize the DIP Lenders, subject to certain limitations in the DIP Order, to exercise remedies upon the occurrence and during the continuation of an event of default under the DIP Order.  Stay modifications of this kind are ordinary and standard features for debtor in possession financing arrangements, and in the Debtors' business judgment, are reasonable and fair under the circumstances.

33

## Bankruptcy Rule 4001(a)(4) Should Be Waived

44.      The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(4).  Bankruptcy Rule 4001(a)(4) provides, "[u]nless the court orders otherwise, an order granting a motion for relief from the automatic stay under [Rule 4001(a)(1)] is stayed for 14 days after it is entered." Fed. R. Bankr. P. 4001(a)(4). As explained above, access to the DIP Facility is essential to prevent irreparable damage to the Debtors' operations. Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

## Waiver of Bankruptcy Rule 6004(h)

45.      The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). As described above, the relief requested in this Motion is necessary for the Debtors to preserve the value of their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

*[Remainder of Page Left Intentionally Blank]*

**Conclusion**

WHEREFORE, the Debtors respectfully request the entry of the proposed Interim and

Final Orders, granting the relief requested herein and such other and further relief as is just and

proper.

Dated: June 12, 2026.                    **ROUNTREE LEITMAN KLEIN & GEER, LLC**

                                         /s/ Ceci Christy
                                         Ceci Christy
                                         Georgia Bar No. 370092
                                         Century Plaza I
                                         2987 Clairmont Road, # 350
                                         Atlanta, Georgia 30329
                                         (404) 584-1238 Telephone
                                         cchristy@rlkglaw.com
                                         Attorneys for Debtors

## <u>Exhibit B</u>

**Proposed Junior Secured Loan Extension Agreement**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| In re:<br><br>Waikoloa Village Lofts West, LLC., *et al.*,<br><br>Debtors.[1] | Case No. 26-20761-JRS<br><br>Chapter 11<br><br>Waipahu Properties, LLC<br>Waipahu, LLC<br>Willow Plaza, LLC<br><br>Jointly Administered |

**ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR
SECURED FINANCING; (II) GRANTING ADEQUATE PROTECTION;
(III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY;
AND (V) GRANTING RELATED RELIEF**

**THIS MATTER** having come before this Court (this "**Court**" or "**Bankruptcy Court**")

upon the Debtors' Motion for Entry of Order (I) Authorizing the Debtors to Obtain Postpetition

Senior Secured Financing; (II) Granting Adequate Protection; (III) Granting Liens and

Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; and

(V) Granting Related Relief (the "***Motion***"), filed by the above-captioned debtors, as debtors-in-

---

[1] The non-operating Debtors are **5425 PAU A LAKA, LLC, FLETCHER K, LLC, GARY L.
PINKSTON, HAWAII REAL ESTATE DEVELOPMENT, LLC, KUKUIULA VISTAS, LLC, MP
ELK GROVE, LLC, MP ELKO II, LLC, MP KAUAI HH DEVELOPMENT FUND, LLC, MP
KAUAI QOZ FUND, LLC, MP MODESTO, LLC, TC CLOVIS, LLC, THE GARY & JANICE
PINKSTON FAMILY TRUST, WAIKOLOA VILLAGE HOTEL CWS, LLC, WAIKOLOA
VILLAGE HOTEL HIE, LLC,** and **WAIKOLOA VILLAGE LOFTS SOUTH, LLC.**

13772650.1

possession (the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), pursuant to

sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things*:*

     i.    authorizing MP Elk Grove, LLC, MP Elko II LLC, and 5425 Pau A Laka LLC (collectively, the "Borrowers") to obtain secured postpetition financing in the form of a superpriority senior secured credit facility (the "DIP Facility"), pursuant to which loans (the "DIP Loans") in a maximum amount not to exceed $45,000,000 (the "Maximum DIP Facility Amount"), subject to the terms and conditions of the Senior Secured Superpriority Debtor-in-Possession Credit Agreement ("DIP Credit Agreement")[2] to be entered into by the Borrower and American Savings Bank, National Association ("ASB"), as Agent (in such capacity, the "Agent") for itself and on behalf of Finance Factors ("FF" and together with ASB in such capacity, the "DIP Lenders") and authorizing Gary L. Pinkston ("Mr. P:inkston") and the Gary L. and Janice C. Pinkston Family Trust (the "Trust") (collectively, the "Guarantors") to guarantee the DIP Loans;

    ii.    authorizing the Debtors thereto to execute, enter into and deliver the DIP Credit Agreement and all other documents relating thereto (collectively, the "DIP Loan Documents"), including without limitation, definitive pledge and security agreements granting priority liens to secure the obligations under the DIP Credit Agreement, and to perform such other acts as may be reasonably necessary, desirable, or appropriate in connection with the DIP Loan Documents;

    iii.    granting the DIP Lenders fully-perfected, priming, first priority security interests in the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, subject to the Carve-Out and Permitted Priority Liens (each as defined below);

    iv.    granting the DIP Lenders (i) superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, (ii) liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on the Prepetition Collateral, subject to the Permitted Priority Liens, and (iii) priming liens pursuant to section 364(d) of the Bankruptcy Code, on the DIP Collateral and all proceeds thereof;

---

[2] The DIP Credit Agreement includes additional non-Debtor borrowers and guarantors.

-2-

**Error! Unknown document property name.**

v.      waiving the Debtors' right to surcharge the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

vi.      finding that neither the DIP Lenders shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, as applicable;

vii.      authorizing and directing the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents, each as applicable, as such become due and payable, all to the extent provided in, and in accordance with, the applicable DIP Loan Documents;

viii.      subject to the restrictions set forth in the DIP Loan Documents and the DIP Orders, authorizing the Debtors to use the proceeds of the DIP Facility in accordance with both the Cost Budget and Cash Flow Forecast and the DIP Loan Documents;

ix.      providing Adequate Protection to the Prepetition Junior Lender for any diminution in the value of the Prepetition Collateral and the granting of priming, first-priority liens to the DIP Lenders;

x.      permitting the Borrowers to enter into that certain Extension Agreement and Payment Forbearance Agreement (the "Junior Loan Extension Agreement") with the Prepetition Junior Lender, pursuant to which the maturity date of the Prepetition Junior Loan will be extended to June 30, 2027 to correspond with the maturity date of the DIP Loans under the DIP Credit Agreement;

xi.      modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the this DIP Order and the DIP Loan Documents;

xii.      providing for the immediate effectiveness of the Court's DIP Order and waiving any applicable stay, including under Bankruptcy Rule 6004, to permit such immediate effectiveness; and

xiii.      granting the Debtors such other and further relief as is just and proper.

The Court having considered the Motion, the exhibits attached thereto, the DIP Credit Agreement attached as **Exhibit "A"**, the Junior Loan Extension Agreement  attached as **Exhibit "B"**, the evidence submitted at the hearing on the Motion (the "*Hearing*") held before this Court on June [   ], 2026; and adequate notice of the Motion and the hearing on the Motion having been

-3-

**Error! Unknown document property name.**

given under the circumstances and in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and no further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is fair and reasonable and in the best interests of the Debtors, their respective estates, and their creditors and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and any objections to the entry of this Order having been withdrawn or overruled on the merits; and upon the record herein and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.      <u>Debtor-in-Possession Operation</u>.  On May 14, 2026 (the "***Petition Date***"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia, Gainesville Division.  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      <u>Jurisdiction</u>.  The Court has jurisdiction over the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and *Standing Order 25-01* from the United States District Court for the Northern District of Georgia.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors have consented to the Court's entry of a final order regarding the Motion, and the Court may enter a final order consistent with Article III of the United States Constitution.

---

[3]      The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable.

**Error! Unknown document property name.**

C.      Committee. As of the date of the Hearing, the United States Trustee for Region 21 (the "**U.S. Trustee**") has not yet appointed an official committee of unsecured creditors (a "**Committee**") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

D.      Notice. Proper, timely, adequate and sufficient notice under the circumstances of the Motion and the Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and no other or further notice of the Motion with respect to the relief requested at the Hearing or the entry of this Order shall be required.

E.      Necessary Approvals. Upon entry of this Order, the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents as provided herein.

F.      Debtors' Stipulations.  Without prejudice to the rights of parties in interest as set forth in paragraph 19 herein, the Debtors, on their behalf and on behalf of their estates, admit, acknowledge, agree and stipulate to the following, which stipulations shall be binding on the Debtors and their estates and all parties in interest (Paragraphs F(i) through F(vii) below are referred to, collectively, as the "**Stipulations**"):

(i)      Prepetition Loan Documents.  On or about December 29, 2023, ASB, as Lender, and MP Elk Grove, LLC, as Borrower, entered into that certain 2023 Loan Agreement (as amended, the "**2023 Loan Agreement**") for an acquisition and development loan to the Borrower in the principal amount of up to $26,000,000.00 (the "**A&D Loan**").  The A&D Loan was made for the purpose of financing a portion of Phase 1 of the "Kauanoe o Koloa" condominium project (the "**Project**") on the Island of Kauai, State of Hawaii, to be developed on

-5-

**Error! Unknown document property name.**

the real property owned by 5425 Pau A Laka LLC and MP Elko II, LLC (the "***Accommodation Mortgagors***").[4]  The A&D Loan is guaranteed by parties including Mr. Pinkston and the Trust.  Phase 1 of the Project consists of (a) the refinancing of that certain acquisition and development loan made by ASB, as Lender to MP Elk Grove LLC, as Borrower, in the principal amount of $14,690,000.00 in 2021 (the "***2021 A&D Loan***"); (b) the refinancing of that certain line of credit made by ASB to MP Elk Grove in the principal amount of $9,000,000.00 in 2021 (the "***2021 Line of Credit***"); (c) certain sitework and development costs to be incurred by the Borrower in connection with the development of the Project; and (d) the construction of 72 condominium units in the Condominium Project (the "***Phase 1 Units***").  On or about December 29, 2023, ASB, as Lender and MP Elk Grove, LLC, as Borrower, entered into that certain 2023 Revolving Construction Line of Credit Agreement (as amended, the "***2023 Line of Credit Agreement***") pursuant to which ASB agreed to available to the Borrower a revolving construction line of credit in the principal amount of up to $7,000,000.00, with an "Aggregate of Advances" of up to $28,100,000.00 (the "***Construction Line of Credit***") for the construction of 72 condominium units in the Project.  The Construction Line of Credit is evidenced by that certain Promissory Note dated December 29, 2023 (the "***Line of Credit Note***"), payable to the order of ASB, in the principal amount of $7,000,000.0.  The Construction Line of Credit is guaranteed by parties including Mr. Pinkston and the Trust.   Both the A&D Loan and Construction Line of Credit were to be repaid from the sales of the Phase 1 Units after construction was completed as units were sold.  The Debtors project that construction and sales could be completed by the end of 2026.  Thus far, 53 sales contracts have been entered to purchase units in the Project.  There are 19 units where sales contracts have not been secured.  Approximately $4.3MM in deposits are being held in escrow at

---

[4] MP Elk Grove, LLC is the sole member of 5425 Pau A Laka LLC and of MP Elko II, LLC.  The "developer" of the Condominium Project is non-debtor Kauai Hale, Inc., which has pledged assets to secure the loans.

-6-

**Error! Unknown document property name.**

ASB and are a part of the Prepetition Collateral of the Prepetition Senior Lenders.  The A&D Loan and the Construction Line of Credit are evidenced by, among other things, (a) 2023 Loan Agreement dated December 29, 2023 relating to the A&D Loan, (b) 2023 Revolving Construction Line of Credit Agreement relating to the Construction Line of Credit; (c) a Promissory Note dated December 29, 2026, payable to the order of ASB, in the principal amount of $26,000,000.00, (d) a Promissory Note dated December 29, 2026, payable to the order of ASB, in the principal amount of $7,000,000.00; (e) a Real Property Mortgage and Financing Statement dated as of May 27, 2021, executed by 5425 Pau A Laka LLC, as mortgagor, in favor of the Mortgagee, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii (the "*Land Court*") as Land Court Document No. T-11474217, and also recorded in the Bureau of Conveyances of the State of Hawaii (the "*Bureau*") as Document No. A-78220763, as modified by that certain Consent; Reaffirmation; Assumption of Mortgage, dated as of August 9, 2023, by and among Pau A Laka LLC, MP Elko II, LLC, and ASB, recorded in the Bureau as Document No. A-86210379 through Document No. A-86210381 (the "*Original Mortgage*"), as amended by that certain 2023 Amendment to Real Property Mortgage and Financing Statement dated December 29, 2023 by and between ASB, as Mortgagee, and 5425 Pau A Laka LLC, MP Elko II, LLC, as Mortgagors, and Kauai Hale, Inc., as Manager, recorded on December 29, 2023 in the Bureau as Document No. A-87630206, relating to the real property described in Tax Map Key No. (4) 2-8-014-032 (the "*Land*")[5]; (f) a 2023 Amendment to and Complete Restatement of Security Agreement dated December 29, 2023, by and between ASB, as Secured Party, and MP Elk Grove LLC, 5425 Pau A Laka LLC, MP Elko II, LLC, MP Financial Group, Ltd. and Kauai

---

[5] The Land consists of approximately 27.886 acres of fee simple land with proposed development of 279-unit for-sale condominium project known as Kauanoe O Koloa consisting of 30 garden-style apartment buildings each containing 9-12 units.

-7-

**Error! Unknown document property name.**

Hale, Inc., as Debtors, and (g) a UCC-1 Financing Statement dated December 29, 2023 recorded in the Bureau on December 29, 2023 under Document No. A-87630208.  All of the foregoing, including all other documents evidencing the A&D Loan and the Construction Line of Credit, shall collectively be referred to as the "***Prepetition Senior Loan Documents***."

(ii)     Prepetition Debt.  As of the Petition Date, the total principal outstanding under the Prepetition Senior Loan Documents is approximately $32,600,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses owing under or in connection therewith (collectively, the "***Prepetition Senior Secured Obligations***") plus all Allowable 506(b) Amounts (defined below), collectively the "***Prepetition Senior Debt***").  As used herein, "***Allowable 506(b) Amounts***" shall mean, to the extent allowable under Bankruptcy Code section 506(b), interest, fees, costs, expenses, and other charges due or coming due under the Prepetition Senior Loan Documents (regardless of whether such fees, costs, interest and other charges are included in the Budget), and all costs and expenses at any time incurred by the Prepetition Senior Lenders in connection with (a) the negotiation, preparation and submission of this Order and any other order or document related hereto, and (b) the representation of Prepetition Senior Lenders in the Chapter 11 Cases, including in defending any Challenge (as defined herein).

(iii)     Prepetition Liens and Prepetition Collateral.  As more fully set forth in the Prepetition Senior Loan Documents, prior to the Petition Date, the Debtors granted to the Prepetition Senior Lenders a first priority security interest in, and continuing lien on, the Land and related personal property relating to acquisition and construction of Phase I of the Project and the sale of  the Phase I Units (subject only to the exceptions set forth in the Prepetition Senior Loan Documents) (the "***Prepetition Senior Liens***") and all proceeds, products, and

-8-

accessions thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "***Prepetition Collateral***") to secure the Prepetition Senior Debt, including the Debtors' respective obligations under the Prepetition Senior Loan Documents.  Upon entry of this Order, for purposes of sections 506(c) and 507(b) of the Bankruptcy Code and Bankruptcy Rule 3012, as of the Petition Date, the Prepetition Senior Debt is fully secured by Prepetition Collateral with a value in excess of the Prepetition Senior Debt.

   (iv) <u>Validity, Perfection and Priority of Prepetition Senior Liens and Prepetition Debt.</u>

   As of the Petition Date, (a) the Prepetition Senior Liens of the Prepetition Senior Lenders on the Prepetition Collateral are valid, binding, enforceable, non-avoidable, and properly perfected; (b) were granted by the Debtors to, or for the benefit of, the Prepetition Senior Lenders for fair consideration and reasonably equivalent value; (c) the Prepetition Senior Liens were senior in priority over any and all other liens on the Prepetition Collateral, except in the case of the Permitted Priority Liens (as defined below); (d) the Prepetition Senior Debt constitutes legal, valid, binding, and non-avoidable obligations of the Debtors who were borrowers and guarantors, enforceable in accordance with the terms of the applicable Prepetition Senior Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Liens or Prepetition Senior Debt of the Prepetition Senior Lenders exist, and no portion of the Prepetition Senior Liens nor the Prepetition Senior Debt of the Prepetition Senior Lenders is subject to any challenge or defense including, without limitation, impairment, set-off, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, subordination (whether equitable or otherwise), counterclaims, or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) each of the Debtors, and their respective estates, do not have

-9-

any claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Senior Lenders (solely in their capacity as such) or any of their affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees (in each case, solely, in such respective capacity) arising out of, based upon, or related to the Prepetition Senior Loan Documents (the "**Estate Claims**"); and (f) the Prepetition Senior Debt constitutes allowed, secured claims of the Prepetition Senior Lenders within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)    Releases. Upon entry of this Order, the Debtors, on behalf of themselves and their respective estates (including any successor, trustee, or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through, or under the Debtors or their estates) hereby forever, unconditionally, and irrevocably release, discharge, and acquit the Prepetition Senior Lenders (solely in their capacity as such) and their successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, agents, and professionals, and its heirs, predecessors, successors, and assigns (in each case, solely in such respective capacity) (collectively, the "**Released Parties**") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the Prepetition Senior Loan Documents, and/or the transactions contemplated hereunder or thereunder including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, and (b) any Estate Claims; *provided* that no party shall be released from any claims found in a final,

-10-

nonappealable judgment of a court of competent jurisdiction to have resulted from such party's

actual fraud.

(vi)     No affiliation.  The Debtors acknowledge and agree that the Prepetition

Senior Lenders are not directly or indirectly, through one or more intermediaries, nor will it be

by operation of this Order, controlling, controlled by or under common control with the Debtors

or any of their affiliates.  As used herein, control shall mean possessing, directly or indirectly, the

power to direct or cause the direction of the management, policies and operations of the Debtors,

whether through ownership of voting securities, by contract, or otherwise.

(vii)    DIP Liens and DIP Debt.  The liens and security interests granted to the

DIP Lenders pursuant to this Order and the DIP Loan Documents shall be valid, binding,

properly perfected, enforceable and non-avoidable liens against the Debtors.  Until such time as

all of the amounts due under the DIP Loan Documents (the "***DIP Debt***") has been indefeasibly

paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause

to be subordinated in any way) the liens and security interests provided to the DIP Lenders by

offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim

pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to (a) prior

payment of the Carve-Out and (b) the Permitted Priority Liens.

Until such time as all DIP Debt has been indefeasibly paid in full in cash, the

Debtors shall not in any way or at any time permit to exist an administrative expense claim

against any Debtor of any kind or nature whatsoever, including, without limitation, claims for

any administrative expenses of the kind specified in, or arising or ordered under sections 105,

326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code,

-11-
**Error! Unknown document property name.**

that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided

herein, subject to the Carve-Out.

      G.      Purpose and Necessity of Financing.  An immediate and ongoing need exists for

the Debtors to obtain the DIP Loans to permit, among other things, the Debtors to fund their sale

process of the Phase I Units in Buildings 5,6,7, and 8 (the "DIP Units") and to meet their

obligations arising during the Chapter 11 Cases.  The Debtors require the DIP Loans (i) for

construction of Phase I of the Project, (ii) to pay fees and expenses incurred by the DIP Lenders

in connection with the DIP Loan Documents as provided therein, (iii) to pay fees and costs

relating to the Project, and (iv) for other purposes as provided in and subject to the terms of the

DIP Loan Documents, and subject to compliance with the Budget and the Permitted Variances, as

provided in the DIP Credit Agreement.  If the Debtors do not obtain authorization to borrow

under the DIP Credit Agreement, they will suffer irreparable harm.  The Debtors are unable to

obtain adequate unsecured credit allowable as an administrative expense under section 503 of the

Bankruptcy Code, or other sufficient financing under sections 364(c) of the Bankruptcy Code, on

more favorable terms than those set forth in the DIP Loan Documents, based on the totality of

the circumstances.  A loan facility in the amount provided by the DIP Loan Documents is not

available to the Debtors without granting the DIP Lenders superpriority claims, liens, and

security interests, pursuant to sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy

Code, as provided in this Order and the DIP Loan Documents.  After considering all alternatives,

the Debtors have concluded, in the exercise of their sound business judgment, that the DIP

Facility represents the best financing available to it at this time.

      H.      Adequate Protection. SWCPT HI KAUANOE LLC (the "***Prepetition Junior***

***Lender***") is entitled to receive adequate protection on account of its prepetition debt for any

Error! Unknown document property name.

Diminution in Value of its interests in the collateral securing its claim (the "***Prepetition Junior Collateral***") from and after the Petition Date resulting from, among other things, the imposition of priming liens on the Prepetition Junior Collateral by the DIP Lenders, the use, sale, lease, consumption, or disposition of Prepetition Junior Collateral, or the imposition of the automatic stay pursuant to sections 361, 362, 363, 364, 503(b), and 507(b) of the Bankruptcy Code. Consequently, as adequate protection, and subject to the DIP Liens and the Carve-Out, the Prepetition Junior Lender shall be granted (i) the Adequate Protection Liens (as defined below) and (ii) the Adequate Protection Superpriority Claim (as defined below). The adequate protection provided herein and other benefits and privileges contained herein are necessary to protect the Prepetition Junior Lender from any Diminution in Value of its interests in the Prepetition Junior Collateral and to obtain the consents and agreements contained herein, including that the adequate protection provided herein is subject and subordinate to the Carve-Out (as defined below). As described in the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements were negotiated in good faith, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

I.      Good Cause Shown. Good cause has been shown for entry of this Order and authorization for: (i) the DIP Lenders to provide the Debtors with the DIP Financing and (ii) the Debtors to accept, incur and undertake the DIP Debt pursuant to the DIP Loan Documents as hereinafter provided. The ability of the Debtors to obtain liquidity under the DIP Loan Documents is vital to the Debtors' estates and their creditors. The liquidity to be provided under the DIP Loan Documents will enable the Debtors to continue to operate their businesses in the ordinary course, to preserve the value of the Debtors' assets, and to proceed with an orderly sale

-13-

Error! Unknown document property name.

process of the Phase I Units.  Among other things, entry of this Order is necessary to maximize the value of the Debtors' assets and to avoid irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of the Debtors, their estates and their stakeholders. Based on the Motion and the record presented to the Court at the Hearing, the terms of the DIP Credit Agreement , this Order, are fair and reasonable, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

J.	No Credit Available on More Favorable Terms.  Despite diligent efforts and a sufficient marketing process, the Debtors have been unable to obtain post-petition financing on terms more favorable than those offered by the DIP Lenders under the DIP Loan Documents.

K.	Sections 506(c), 552(b) and Marshaling. In light of the DIP Lenders' agreement to permit its DIP Liens and DIP Superpriority Claim (as defined below) to be subject to prior payment of the Carve-Out, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in light of the Prepetition Junior Lender's agreement to permit its Prepetition Junior Liens to be subject to prior payment of the Carve-Out and the DIP Liens, subject to entry of this Order, the DIP Lenders and the Prepetition Junior Lender are each entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, and the DIP Lenders are entitled to a waiver of the provision of section 506(c) of the Bankruptcy Code, a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, a waiver of the provisions of section 506(c) of the Bankruptcy Code, and a waiver of the "marshaling" doctrine with respect to the DIP Collateral (as defined below).

-14-

**Error! Unknown document property name.**

L.	Good Faith.

(i)	The DIP Lenders have indicated a willingness to provide financing to the Debtors, but solely on the terms and conditions set forth in the DIP Loan Documents, including, without limitation: (a) entry of this Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents, including, without limitation, the Debtors' ability to enter into such documents and to incur all of the obligations thereunder, and to confer upon the DIP Lenders all rights, powers and remedies thereunder; (c) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (d) findings by this Court that the DIP Facility and the Debtor's use of the DIP Loans are essential to the Debtors' estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Loan Documents and this Order in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.  Accordingly, after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loans to be provided by the DIP Lenders, pursuant to the terms of the DIP Loan Documents, represent the best financing currently available to the Debtors.

(ii)	The terms of the DIP Loan Documents, including, without limitation, the interest rates and fees applicable, are more favorable to the Debtors than any available from alternative sources.  Based upon the record before the Court, the DIP Term Sheet was negotiated in good faith and at arm's-length among the Debtors and the DIP Lenders.  Any DIP Loans and other financial accommodations made to the Debtors by the DIP Lenders pursuant to the DIP Loan Documents and this Order shall be deemed to have been extended by the DIP Lenders in

-15-

Error! Unknown document property name.

good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lenders shall be entitled to all protections afforded thereby.

M.    Fair Consideration and Reasonably Equivalent Value.  The Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Loan Documents and this Order. The terms of the DIP Credit Agreement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

N.    Third Party Consent. To the extent consent is required, the Prepetition Junior Lender consents, or are deemed to have consented, to the Debtors' and DIP Lenders' entry into the DIP Loan Documents in accordance with and subject to the terms and conditions in this Order and the DIP Loan Documents.

O.    Good Cause Shown; Best Interest. The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2).  This Court concludes that good cause has been shown and entry of this Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful chapter 11 process.

Based upon the foregoing findings, acknowledgements and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    Motion Approved.  The Motion is granted as and to the extent set forth herein. The Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Credit Agreement and the DIP Loan Documents, including all instruments, guaranties, security

-16-

**Error! Unknown document property name.**

agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lenders, to give effect to the terms thereof and as will be drafted and executed as contemplated therein, each in final form and substance acceptable to the DIP Lenders.

2.      Objections Overruled. Any objections, reservations of rights or other statements with respect to the Motion and entry of this Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Order shall become effective immediately upon its entry.

## AUTHORIZATION FOR DIP FINANCING

3.      Authorization for DIP Financing Pursuant to Budget.

(a)      The Debtors are hereby authorized to incur DIP Debt, subject to the terms of this Order, the Budget (subject to the Permitted Variances) and the DIP Loan Documents, and also subject to any conditions and limitations on availability in the DIP Credit Agreement, plus all interest, fees and other charges payable in connection with such DIP Loans as provided in the DIP Credit Agreement and other DIP Loan Documents.

(b)      The Debtors have delivered to the DIP Lenders a Cost Budget and Cash Flow Forecast showing a forecast of receipts and disbursements, and sources and uses of the Borrower, broken down by week, including the anticipated uses of the DIP Facility (a "*Budget*"), in each case, in form and substance acceptable to the DIP Lender. The Budget is attached to this Order as **Exhibit "C**." The Debtors shall update the Budget monthly subject to the Borrower's month-end closing process, but no later than ten (10) calendar days after month-end. The Debtors shall update the Budget at the end of each two-week period and provide an updated Budget for the subsequent two-week period (which in each case must be satisfactory to the DIP Lender) extending and supplementing the Budget; *provided, however,* if a line item is not approved by the DIP Lenders it shall be deemed excluded and disregarded.

-17-

**Error! Unknown document property name.**

(c)     The Budget shall at all times be in form and substance acceptable to, and as approved by, the DIP Lenders, in accordance with the DIP Credit Agreement.  The Debtors shall deliver notice copies of each updated Budget to the DIP Lenders.

(d)     Together with the delivery of each updated Budget, the Debtors shall also provide a bi-weekly report/reconciliation to the DIP Lenders setting forth the immediately preceding two weeks, the actual and budgeted results for such week by line item in the Budget (the "**Budget Variance Report**"), as well as additional customary reporting to be agreed among the Debtors and the DIP Lenders.

(e)     Funds borrowed under the DIP Credit Agreement shall be used by the Debtors in accordance with the Budget (subject to the Permitted Variances), the DIP Loan Documents and this Order.  The consent of the DIP Lenders to any Budget shall not be construed as a commitment to provide DIP Loans after the occurrence of the Termination Date (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on the Budget have been expended.  If the DIP Lenders advance monies to the Debtors and the Debtors use such monies other than in accordance with the terms or provisions of this Order, such advances shall be considered DIP Debt for purposes of this Order.

(f)     Any amendments, supplements or modifications to the Budget must be consented to in writing by the DIP Lenders, in accordance with the DIP Credit Agreement, prior to the implementation thereof and shall not require further notice, hearing, or court order.

(g)     The DIP Lenders (i) may assume the Debtors will comply with the Budget (subject to the Permitted Variances), (ii) shall have no duty to monitor such compliance, and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Budget.  The DIP Lenders may rely on the

-18-

Debtors' representations that the amount of the DIP Debt requested at any time, and the use thereof, are in accordance with the requirements of this Order, the Budget, the DIP Loan Documents, the Bankruptcy Code and the Bankruptcy Rules. All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time.

(h)     Notwithstanding anything in this Order to the contrary and upon the Termination Date, the DIP Lenders' obligation to make loans under the DIP Loan Documents shall expire, and the DIP Loans made pursuant to this Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Order by way of acceleration or otherwise).

4.     <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)     The Debtors are authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto. The Debtors are further authorized to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, deposit account control agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and securing all of the Debtors' Obligations under the DIP Loan Documents, each as may be provided for under the DIP Credit Agreement or as otherwise reasonably requested by the DIP Lenders. It is expressly acknowledged that such financing, pledge, security and other statements are authorized but not required for perfection.

-19-

**Error! Unknown document property name.**

(b)      The Debtors are further authorized to (i) perform and incur all of their Obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Order, and (ii) perform all acts required under the DIP Loan Documents and this Order.

(c)      The DIP Loan Documents and any amendments thereto may be executed and delivered on behalf of the Debtors by any officer, director or agent of the Debtors, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute such DIP Loan Documents and amendments for and on behalf of the Debtors and the DIP Lenders shall be authorized to rely upon any such person's execution and delivery of any of the DIP Loan Documents and any amendments thereto as having done so with all requisite power and authority to do so; and the execution and delivery of any of the DIP Loan Documents or any amendments thereto by any such person on behalf of the Debtors shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company or other entity action (as applicable) of the Debtors.

5.      Valid and Binding Obligations.  All DIP Debt under the DIP Loan Documents shall constitute valid, binding, and nonavoidable obligations of the Debtors, enforceable against them and their successors and assigns, in accordance with their terms and the terms of this Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law

-20-

Error! Unknown document property name.

or regulation by any person or entity.  Without limiting the generality of the foregoing, in no event shall the Debtors be authorized to offset or recoup any amounts owed, or allegedly owed, by the DIP Lenders to the Debtors or any of their affiliates against any of the DIP Debt without the prior written consent of the DIP Lenders, and no such consent shall be implied by any action, inaction, or acquiescence by the DIP Lenders.

6. <u>Additional Terms of DIP Debt</u>. The following terms shall apply to the DIP Debt:

(a) <u>Maximum DIP Facility Amount</u>. The sum of (i) the maximum principal amount of the DIP Debt (including Allowable 506(b) Amounts) outstanding at any time shall not exceed $45,000,000 (the "***Maximum DIP Facility Amount***").  All DIP Loans made under the DIP Credit Agreement shall be subject to compliance with the terms, conditions and covenants set forth in the DIP Loan Documents and this Order (including compliance with the Budget).  All DIP Loans made under the DIP Credit Agreement shall be due and payable on the earlier of (a) June 30, 2027 (the "***DIP Maturity Date***"), unless it is extended by the prior written consent of the DIP Lenders, and (b) the occurrence of an Event of Default.  Upon the Bankruptcy Court's entry of this Order (the "***Final Order Entry Date***"), the full Maximum DIP Facility Amount shall be available to the Debtors, subject to (a) Availability, and (b) compliance with the terms, conditions and covenants as set forth in the DIP Loan Documents and this Order (including compliance with the Budget).

(b) <u>Roll-Up</u>.  Upon entry of this Order, the Debtors shall borrow DIP Loans sufficient to pay the full amount of the Prepetition Senior Debt then due and owing under the Prepetition Senior Loan Documents as of the Final Order Entry Date.  The proceeds of the DIP Loan shall be remitted to the Prepetition Senior Lenders to pay down the Prepetition Senior Loan Documents (the "***Roll-Up***").

**Error! Unknown document property name.**

(c)      Interest. The DIP Debt shall bear interest at a floating rate at 1-Month Term SOFR plus an Interest Rate Margin of 4.50%.  For illustrative purposes, 1-Month Term SOFR is currently 3.62%, therefore the all-in interest rate today would be 8.12%.  Upon an Event of Default, the Interest Rate shall be 4.00% higher than the rate in effect under the Note which would be charged in the absence of default.  Default interest shall be payable upon the DIP Lenders' demand.  Any fees or expenses required to be paid or reimbursed, as applicable, pursuant to the DIP Loan Documents shall be payable upon the DIP Lenders' demand.

(d)      Maturity. The DIP Debt shall mature and be due and payable in full by the Debtors on June 30, 2027.

(e)      Guarantors.  Mr. Pinkston and the Trust[6] shall be joint and several guarantors of the DIP Debt.  The Guarantors shall be required to execute the DIP Credit Agreement and all applicable DIP Loan Documents.

(f)      Compliance with Budget. The Debtors shall be required to comply with the Budget (including any Permitted Variances as defined in the DIP Credit Agreement).

(h)      Milestones.  The Debtors shall comply in all respects with the following milestones (the "*Milestones*"), which are also set forth in the DIP Credit Agreement.  These Milestones may be extended in writing by the DIP Lenders in their sole and absolute discretion.  Failure to comply fully and timely with these Milestones will be an Event of Default under the DIP Facility:

(a)      on or before June 12, 2026, the Debtors shall have filed a motion seeking approval of the DIP Facility, including the Order in form and substance reasonably acceptable to the DIP Lenders;

---

[6] Non-debtor parties to the DIP Loan Documents, who are not DIP Lenders, are not made a part of this Order.

-22-

(b)      no later than July 2, 2026, the Debtors shall upload a form of DIP Order to the Bankruptcy Court in a form acceptable to the DIP Lenders and expedite the Court's entry of the Order.

7.      DIP Charges.  All DIP Charges[7] are hereby approved and shall be promptly paid by the Debtors in accordance with this Order and the DIP Loan Documents, without need for filing an application with the Court for approval or payment of the DIP Charges.  Reasonable professional fees and expenses incurred by the DIP Lenders in connection with the Chapter 11 Cases in their respective administration of the DIP Loan Documents shall be paid in each case within five (5) Business Days subsequent to the receipt by the Debtors, any Committee, and the U.S. Trustee of summary form invoices (the "*Invoiced Fees*") which may be redacted for privileged information (the "*Review Period*").  The Debtors, the Committee, and the U.S. Trustee may object to any portion of the Invoiced Fees (the "*Disputed Invoiced Fees*") within the Review Period.  Any disputes regarding the professional fees shall be submitted to the Bankruptcy Court for resolution.  The Debtors shall pay (i) any Invoiced Fees that are not Disputed Invoiced Fees promptly after expiration of the Review Period; and (ii) any Disputed Invoiced Fees that the Court approves in a final order requiring payment thereof within five (5) Business Days after entry of that order.  The submission of such summary invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney-work product doctrine.

8.      Amendments, Consents, Waivers, and Modifications. The Debtors, with the express written consent of the DIP Lenders and in accordance with the DIP Loan Documents,

---

[7]      The term "***DIP Charges***", as used herein and in the DIP Credit Agreement, shall mean interest at the applicable rate of interest under the DIP Credit Agreement and all fees, costs, and expenses provided for in the DIP Credit Agreement, including those incurred by DIP Lenders in connection with the DIP Debt (regardless of whether any such fees, costs, interest and other charges are included in the Budget).

-23-

may enter into any non-material amendments, consents, waivers, or modifications to the DIP

Loan Documents without the need for further notice and hearing or any order of this Court, it

being further understood that further approval of this Court, upon notice and a hearing, shall be

required for any such authorizations, amendments, waivers, consents or other modifications to

and under the DIP Loan Documents (and any fees and other expenses (including attorneys',

accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and

other obligations paid in connection therewith) that are material or that shorten the maturity of

the extensions of credit thereunder or increase the aggregate commitments or the rate of interest

payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the

Budget required to be delivered under the DIP Loan Documents shall not be considered

amendments or modifications to the Budget or the DIP Loan Documents; *provided further* that,

the Debtors and the DIP Lenders shall have the right to seek approval from the Court of material

amendments, waivers, consents or other modifications on an expedited basis.

## **ADEQUATE PROTECTION**

9. <u>Adequate Protection</u>. The Prepetition Junior Lender is entitled, on account of the

Prepetition Junior Debt and the Prepetition Junior Liens, pursuant to sections 361 and 363(e) of

the Bankruptcy Code, to adequate protection of its interests in the Prepetition Junior Collateral

(such adequate protection as set forth in clauses (a)–(e) below, the "***Adequate Protection***

***Obligations***"). Accordingly, the Prepetition Junior Lender is hereby granted, as applicable, the

following liens, claims, rights and protections:

(a) <u>Adequate Protection Liens</u>. As adequate protection of the interests of the

Prepetition Junior Lenders in the Prepetition Junior Collateral against any Diminution in Value of

such interests, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are

authorized to grant, and as of entry of this Order are deemed to have granted to the Prepetition

-24-

Junior Lenders replacement liens, subject only to the DIP Liens, the Carve Out and the Permitted Priority Liens (defined below), additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on (collectively, the "*Adequate Protection Liens*"), the Prepetition Junior Collateral and all post-petition proceeds, products or profits thereof, whether such property and assets were acquired by the Debtors before or after the Petition Date or were subject to a lien that was avoided pursuant to section 549 of the Bankruptcy Code, of any kind or nature, whether real or personal, tangible or intangible, wherever located (collectively, together with the Prepetition Junior Collateral and any Cash Collateral, the "*Junior Collateral*").  The Adequate Protection Liens shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any Trustee or other estate representative appointed in these Chapter 11 Cases, or any Successor Cases.  Except as expressly provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and the Adequate Protection Liens shall be valid and enforceable against any Trustee or other estate representative appointed in any of these Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of these Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens and the Prepetition Collateral shall not be subject to surcharge under section 506(c) of the Bankruptcy Code.  The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment, or avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases.  For the avoidance of doubt, the Adequate Protection Liens shall be deemed to be effective and perfected automatically as of the Petition Date and without the necessity of the execution by the Debtors, or the filing of, as

**Error! Unknown document property name.**

applicable, mortgages, security agreements, pledge agreements, financing statements, state or federal notices, recordings (including, without limitation, any recordings with the United States Patent and Trademark or Copyright Office), or other agreements, and without the necessity of taking possession or control of any of the Junior Collateral.  Except as otherwise expressly provided herein, under no circumstances shall the Adequate Protection Liens be made subordinate to the lien of any other party, no matter when arising.  The Adequate Protection Liens granted to the Prepetition Junior Lender hereunder shall be subject only to (i) the Carve-Out, (ii) the DIP Liens, (iii) the existing liens of the Prepetition Senior Lenders (until such time as the Prepetition Senior Loan Documents are paid in full); (iv) any other existing liens in favor of third parties upon the Prepetition Junior Collateral (including, without limitation, any purchase money security interests), which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Junior Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date, the "***Permitted Priority Liens***"), and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Junior Collateral.  The Adequate Protection Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Order, without the necessity of execution by the Debtors of mortgages, control agreements, security agreements, pledge agreements, financing agreements, financing statements or any other agreements or instruments, such that no additional actions need be taken by the Prepetition Junior Lender to perfect such interests.

(b)      Adequate Protection Superpriority Claims.  As additional adequate protection, the Prepetition Junior Lender shall be granted allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the

-26-

**Error! Unknown document property name.**

"**_Adequate Protection Superpriority Claim_**") to the extent of any Diminution in Value.  The

Adequate Protection Superpriority Claim shall have recourse to and be payable from all

prepetition and postpetition property of the Debtors who are borrowers under the Prepetition

Loan Documents, and the proceeds thereof, but expressly subject to the Carve-Out, and expressly

junior and subordinate to the DIP Superpriority Claim.  Subject only to the Carve-Out and the

DIP Debt, the Adequate Protection Superpriority Claim granted to the Prepetition Junior Lender

hereunder shall not be junior to any administrative expense claims and shall have priority over

all administrative expense claims against each of the Debtors who are borrowers under the

Prepetition Loan Documents, now existing or hereafter arising, of any kind or nature whatsoever,

including, without limitation, administrative expense claims of the kinds specified in or ordered

pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a),

507(b), 546(c), 726, and 1114 of the Bankruptcy Code, whether or not such expenses or claims

may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

(c)     <u>Budget and Variance Reporting</u>.  The Debtors shall provide the Prepetition

Junior Lender and their advisors with (i) monthly financial reports within thirty (30) days after

the end of each calendar month consistent with their respective prepetition loan documents, (ii)

such other information as may from time to time be requested by the DIP Lenders, and (iii) as

well as the Budget and variance reporting described in Paragraph 3 hereof.

(d)     <u>Accrual of Interest</u>.  The interest on the debt owed to the Prepetition Junior

Lender shall continue to accrue at the applicable non-default rate set forth in the Prepetition

Junior Loan Documents.

(e)     <u>Right to Seek Additional Adequate Protection</u>.  This Order is without

prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the

-27-

**Error! Unknown document property name.**

Prepetition Junior Lender to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

(f) Authority to Enter into the Junior Loan Extension Agreement. The Debtor is authorized to enter into the Junior Loan Extension Agreement, pursuant to which the maturity date of the Prepetition Junior Loan will be extended to June 30, 2027 to correspond with the maturity date of the DIP Loans under the DIP Credit Agreement.

10.    Prepayments.  The DIP Facility may be prepaid in whole or in part without premium or penalty at any time.  The Debtors shall make the following mandatory prepayments of the amounts due under the DIP Loan:

(1)    Interest Payments from Reserve.  Monthly interest-only payments on the DIP Loans will be made via an established interest reserve account included as an undisbursed budged amount within the DIP Facility.  The DIP Lenders are hereby irrevocably authorized to disburse monthly from the interest reserve account to pay the interest as due, so long as availability within the interest reserve exists.

(2)    Asset Sales:  Principal shall be paid with the closing of each sale of a condominium unit in Phase I of the Project, subject payment of 100% of "net sales proceeds" for each unit.   The term "net sales proceeds" means gross sales proceeds less customary and reasonable out-of-pocket closing costs (including delinquent real property taxes) and escrow closing costs, which in the aggregate, shall not exceed 8.0% of the contractual sale price.  For the avoidance of doubt, a minimum of 92% of each condominium sale (net of buyer deposits used towards construction) shall be applied to reduce the principal under the DIP Facility.

(3)    Insurance Proceeds:  Prepayments in the amount of all cash proceeds of insurance on account of any loss of any DIP Collateral.

-28-

**Error! Unknown document property name.**

(4)     All such prepayments shall be applied without penalty or premium, to outstanding DIP Debt.

## DIP LIENS AND DIP SUPERPRIORITY CLAIMS

11.     DIP Liens.

(a)     To secure the DIP Debt, the DIP Lenders are hereby granted (i) pursuant to section 364(c)(2), fully-perfected, priming, first priority senior secured liens on the DIP Collateral, subject only to any Permitted Priority Liens and the Carve-Out, and (ii) pursuant to section 364(d)(1), a fully-perfected, priming, first priority senior secured lien on the DIP Collateral (the "*DIP Liens*"), which lien shall have priority over all other liens, including, for the avoidance of doubt, the Prepetition Liens and the Adequate Protection Liens and shall be junior only to any Permitted Priority Liens.

(b)     As detailed in the DIP Loan Documents, the DIP Liens shall attach to all of the DIP Collateral, expressly including, without limitation, all of the Prepetition Senior Collateral, and, to the extent any property, assets or interests of any Debtor is excluded from the DIP Collateral, the proceeds of such property, assets or interests, and all proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale, exchange, collection or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; subject only to (1) the Permitted Priority Liens, and (2) prior payment of the Carve-Out.

(c)     The DIP Liens shall be effective immediately upon the entry of this Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364 of

-29-

the Bankruptcy Code or otherwise, other than (i) the Permitted Priority Liens as provided herein, and (ii) prior payment of the Carve-Out.

(d)      The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Order, without the necessity of execution by any Debtor of mortgages, control agreements, security agreements, pledge agreements, financing agreements, financing statements or any other agreements or instruments, such that no additional actions need be taken by the DIP Lenders to perfect such interests.

12.      DIP Lenders' Superpriority Claim.  The DIP Lenders are hereby granted allowed superpriority administrative expense claims (the "***DIP Superpriority Claims***") pursuant to section 364(c)(1) of the Bankruptcy Code in the Debtors' Chapter 11 Cases and in any successor case under the Bankruptcy Code (including any case under chapter 7 of the Bankruptcy Code, the "***Successor Case***") for all DIP Debt, having priority over any and all other administrative expenses of and unsecured claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors, including all cash and cash equivalents, and all proceeds thereof.  The DIP Superpriority Claims granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out.  Except as referenced in this Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case.  Other than the Adequate

**Error! Unknown document property name.**

Protection Superpriority Claims, the DIP Superpriority Claims shall be senior in all respects to any superpriority claims granted in this Chapter 11 Case.

13.    <u>Survival of DIP Liens and DIP Superpriority Claim</u>. The DIP Liens, DIP Superpriority Claim and other rights and remedies granted under this Order to the DIP Lenders, shall continue in these cases and any Successor Cases and shall be valid and enforceable against any Trustee appointed in any Debtor's Chapter 11 Case and/or upon the dismissal of any Debtor's Chapter 11 Case or any Successor Case and such liens and security interests shall maintain their priority as provided in this Order until all the DIP Debt has been indefeasibly paid in full in cash in accordance with the DIP Loan Documents.

## CARVE-OUT; RESTRICTIONS ON USE OF FUNDS

14.    <u>Carve-Out.</u>

(a)    The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall be subject and subordinate only to prior payment of: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Court as and when they are due without reference to the Budget (the "***Case Administration Fees***"); (ii) unpaid professional fees and expenses payable to attorneys and financial advisory (collectively, the "***Professional Fees***") that are incurred or accrued prior to the date on which the DIP Lenders provide written notice to the Debtors, Debtors' counsel, the U.S. Trustee and counsel to the Committee (if any) of the occurrence of either an Event of Default or the Termination Date (such notice, the "***Carve-Out Notice***", and the date of a delivery of such notice, the "***Carve-Out Effective Date***"), but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Effective Date), are allowed whether by interim order or procedural order, and have been provided for in, and are consistent with, the Budget (subject to the Permitted Variances), in an aggregate amount not to exceed $100,000 to the extent allowed

-31-

Error! Unknown document property name.

at any time, whether by interim order or procedural order (clauses (i)—(ii), collectively, the "*Carve-Out*").  Subject to the immediately preceding sentence, so long as the Carve-Out Effective Date has not occurred, the Debtors shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable under the Bankruptcy Code as provided in the DIP Loan Documents and the Budget (subject to the Permitted Variances).  Any payment of Carve-Out expenses incurred after the occurrence of the Carve-Out Effective Date, including any payment of Professional Fees, shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee or similar payment to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset disposition with respect to the Debtors unless agreed to in writing by the DIP Lenders.

(b)     The Debtors shall maintain a segregated account (the "*Carve-Out Reserve Account*") for the payment of Professional Fees for any counsel and financial advisors for the Debtors and the Committee (the "*Carve-Out Reserve Professionals*"), which account shall be funded by the Debtors in accordance with the Budgets on a weekly basis, until the occurrence of the Carve-Out Effective Date.  No funding shall be provided over and above the amounts set forth in the Budgets proposed by the Debtors and approved by the DIP Lenders.  After the Carve-Out Effective Date, all fees reflected in the Budget but not paid or funded by the Debtors as of that date, will be funded to the Carve-Out Reserve Account, but no further amounts shall be funded to this account.  From funds in the Carve-Out Reserve Account, the Debtors shall pay the Carve-Out Reserve Professionals in compliance with an interim compensation procedures order and in the manner set forth in this Order.

**Error! Unknown document property name.**

(c)    Carveout Usage. No portion of the Carveout and no DIP Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any entity, including the Debtors, any Committee or the Carveout Professionals, in connection with claims or causes of action adverse to the Prepetition Senior Lenders or the DIP Lenders and the Prepetition Senior Liens or DIP Liens, including (i) preventing, hindering or delaying DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; or (ii); or objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the claims and liens of the Prepetition Senior Lenders or the DIP Lenders, or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Code, against the Prepetition Senior Lenders or the DIP Lenders; provided, further, however, that the Carveout may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation and entry of this Order, or any amendment hereto consented to by DIP Lenders.

(d)    Carveout Procedure.  The Debtors shall periodically, upon the request of the DIP Lenders, provide to the DIP Lenders a written report (the "***Carveout Report***"), in which the Debtors disclose their then-current, documented estimate of (i) the aggregate amount of unpaid professional fees, costs and expenses accrued or incurred by the Carveout Professionals, through the date of the Carveout Report and (ii) projected fees, costs and expenses of the Carveout Professionals for the two-week period following the date of such Carveout Report.  Nothing herein shall be construed as consent by the DIP Lenders or the Prepetition Junior Lender to the allowance of any fees or expenses of the Carveout Professionals or shall affect the right of the DIP Lenders or the Prepetition Junior Lender to object to the allowance and payment of such fees, costs or expenses, or the right of the DIP Lenders or the Prepetition Junior Lender to the

-33-

Error! Unknown document property name.

return of any portion of the Carve-Out that is funded with respect to fees and expenses for a Carveout Professional that are approved on an interim basis that are later denied on a final basis. For the avoidance of doubt, no Carveout Professional shall be entitled to any portion of the Carve-Out allocated for any other Carveout Professional in the Budget that are not earned and approved.

(e)     The DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any professionals incurred in connection with the Chapter 11 Case or any Successor Case under any chapter of the Bankruptcy Code.  Nothing in this Order or otherwise shall be construed to obligate the DIP Lenders in any way, to pay compensation to, or to reimburse expenses of, professionals retained by the Debtors or, if applicable, the Committee or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

15.     <u>Restrictions on Use of DIP Funds</u>.

(a)     The Debtors are authorized to use the DIP Debt solely: (i) in accordance with the terms of this Order, and the DIP Loan Documents; (ii) to pay expenses in the amounts set forth in the Budget (including any Permitted Variance therefrom, solely as allowed under the DIP Credit Agreement), including funding of the Carve-Out, as and when such expenses become due and payable in accordance with the Budget; (iii) to pay Allowable 506(b) Amounts and the DIP Charges; and (v) upon entry of the Order, to repay the remaining outstanding amount of the Prepetition Senior Debt.

(b)     Notwithstanding anything in this Order or the DIP Loan Documents to the contrary, no portion of the DIP Facility, DIP Collateral, or any portion of the Carve-Out may be used in any manner to, and it shall constitute an Event of Default under the DIP Loan Documents

-34-

if any DIP Proceeds are used to: (i) request authorization to obtain DIP Loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise that are senior to or *pari passu* with the DIP Debt, the DIP Liens or the DIP Superpriority Claim, other than from the DIP Lenders, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Debt; (ii) pay any amount for any use not provided for in this Order, the DIP Credit Agreement and as set forth in the Budget (subject to the Permitted Variances) or otherwise approved by the DIP Lenders; (iii) without the prior written consent of the DIP Lenders, to make any payment or distribution to or for the benefit of any non-Debtor affiliate or insider of the Debtors (other than ordinary course wages, payments made pursuant to employment agreements, or payments made in accordance with the Budget); (iv) make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with the DIP Credit Agreement and the Budget; (v) to finance in any way: (1) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the interests of any or all of the DIP Lenders or the Prepetition Senior Lenders or their respective rights and remedies under DIP Loan Documents, this Order, or the Prepetition Senior Loan Documents, or (2) any other action which with the giving of notice or passing of time would result in an Event of Default as defined under the DIP Loan Documents or the Prepetition Senior Loan Documents; (vi) to make any distribution under a plan of reorganization in the Chapter 11 Cases without the prior written consent of the DIP Lenders; (vii) pay any prepetition pre-petition Claim of a Creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Lenders; and (viii) for any purpose that is prohibited under the Bankruptcy Code or this Order.

-35-

Error! Unknown document property name.

16.	Prohibition on Granting of Additional Liens and Interests.  No liens, claims, interests or priority status, other than the Carve-Out or Permitted Priority Liens, having a lien or administrative priority superior to, *pari passu* with, or junior to that of the DIP Liens or the DIP Superpriority Claims granted by this Order on the DIP Collateral, shall be granted while any portion of the DIP Debt remains outstanding, or any commitment under the DIP Loan Documents remains in effect, without the prior written consent of the DIP Lenders.

17.	Release.  The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph shall be deemed effective upon entry of this Order.  The Debtors, by their execution of the DIP Credit Agreement, on behalf of themselves and on behalf of their successors and assigns (collectively, "***Releasors***" and, individually, a "***Releasor***"), each hereby (a) releases, acquits, and forever discharges the DIP Lenders, and any of their officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates or shareholders (the "***Releasees***") from any and all liabilities, claims, demands, actions or causes of action of every kind or nature (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, that any Releasor now has, ever had or hereafter may have against the Releasees based on acts, transactions or circumstances that have occurred or been consummated on or before the closing of the DIP Credit Agreement and that arise out of or relate to (i) the DIP Facility or any other extension of credit by the DIP Lenders to any Debtor including any equitable subordination or recharacterization claims or defenses; (ii) any of the DIP Loan Documents or DIP Collateral; (iii) any transaction, act or omission contemplated by or described in or concluded under any of the DIP Loan Documents; or (iv) any aspect of the dealings or relationships between or among the Releasors, on the one hand, and the Releasees on the other hand, under or in connection with any

-36-

**Error! Unknown document property name.**

of the DIP Loan Documents or any transaction, act or omission contemplated by or described in or concluded under any of the DIP Loan Documents (collectively, the "*Claims*"); and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DIP Debt and the DIP Liens.  The provisions of this paragraph shall survive the termination of the DIP Facility and any other DIP Loan Documents and payment in full of any Obligations thereunder.  Each of the Debtors, by their execution of the DIP Loan Documents, on behalf of themselves and on behalf of their successors, assigns and other legal representatives, hereby unconditionally and irrevocably agrees that such Releasor shall not sue any Releasee on the basis of any Claim released, remised and discharged pursuant to the foregoing provisions of this paragraph, and if any Releasor violates the foregoing covenant, such Releasor, for itself and its successors and assigns, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.  For the avoidance of doubt, nothing contained in this Order shall be construed to release, discharge or acquit the DIP Lenders from any of their obligations hereunder or under the DIP Loan Documents.

## REMEDIES; MODIFICATION OF AUTOMATIC STAY

18.      Remedies and Stay Modification.

(a)      The occurrence of any of the following events, unless waived by the DIP Lenders in writing and in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (an "*Event of Default*") of this Order:  (i) the failure of any Debtor to perform, in any respect, any of the material terms, provisions, covenants, or obligations under this Order, or (ii) the occurrence of an "Event of Default" under the DIP Loan Documents.

Error! Unknown document property name.

(b)     The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable), whether or not an Event of Default under the DIP Loan Documents or a default by any Debtor of any of its obligations under this Order has occurred, including without limitation:  (i) to require all cash, checks or other collections or proceeds from DIP Collateral received by the Debtors to be treated in accordance with the requirements of the DIP Loan Documents, and to apply any amounts as required under the DIP Loan Documents in accordance therewith; (ii) the right, but not the necessity, to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral; (iii) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Loan Documents as provided therein; (iv) the right to give the Debtors any notice provided for in any of the DIP Loan Documents or this Order; and (v) the right to declare (1) the termination, reduction or restriction of any further commitment under the DIP Loan Documents to the extent any such commitment remains unfunded; (2) all DIP Debt to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Debtors; and/or (3) the termination of the DIP Loan Documents as to any future liability or obligation of the DIP Lenders, but without affecting any of the DIP Liens on the DIP Collateral or the Obligations of the Debtors; *provided* that with respect to the enforcement of the DIP Liens on the DIP Collateral or the exercise of any other rights or

-38-

remedies with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral, including the Deposits made under the Escrow Agreement), the DIP Lenders shall file a written notice with the Court, which notice can be the same as the Carve-Out Notice (the "***Default Notice***") setting forth the Event of Default(s) and, if a Default Notice is filed, shall serve such Default Notice upon the Debtors, their counsel, counsel to the Creditors' Committee (if any), counsel to the Prepetition Junior Lender, and the U.S. Trustee.  Effective five (5) Business Days after the Default Notice (the "***Enforcement Notice Period***") is filed (and during which time the DIP Lenders shall permit the Debtors to cure such Event of Default), the DIP Lenders shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code and shall be authorized, without further notice to the Debtors or any other interested party, to enforce the DIP Liens on the DIP Collateral or exercise any other rights or remedies with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral, including the Deposits made under the Escrow Agreement).

(c)      During the Enforcement Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility, and (ii) the only basis on which the Debtors shall be entitled to seek an emergency hearing within the Enforcement Notice Period with the Court shall be to contest whether an Event of Default has occurred and/or is continuing.  The Enforcement Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents.

(d)      The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Committee (if any), any other party in interest and/or the U.S.

-39-

Error! Unknown document property name.

Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Enforcement Notice Period.

(e)    If the DIP Lenders are entitled, and have elected in accordance with the provisions hereof, to enforce the DIP Liens or exercise any other default-related remedies following expiration of the Enforcement Notice Period, the Debtors shall cooperate with the DIP Lenders in connection with such enforcement by, among other things, (i) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Lenders (including any collateral liquidator or consultant), (ii) providing the DIP Lenders and their representatives or agents, at all reasonable times, access to the Debtors' non-privileged books and records and any information or documents requested by the DIP Lenders or their representatives, (iii) performing all other obligations set forth in the DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Lenders' enforcement of rights.

(f)    Upon the occurrence of the Termination Date, the DIP Lenders shall have no further obligation to provide financing under the DIP Loan Documents; provided that the DIP Debt shall remain subject to the Carve-Out.

(g)    Unless extended by the Court upon written agreement of the DIP Lenders, upon the Termination Date and without further notice or order of Court:  (i) the Debtors' authorization to use the DIP Loan will automatically terminate and (ii) at DIP Lenders' election: (1) the DIP Debt shall immediately be due and payable and (2) DIP Lenders shall be entitled to setoff any cash in DIP Lenders' possession or control and apply such cash to the amounts due under the DIP Loan.

**Error! Unknown document property name.**

**BAR OF CHALLENGES AND CLAIMS**

19.     Reservation of Certain Committee and Third-Party Rights and Bar of Challenges and Claims. The stipulations, releases, and admissions contained in this Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below). The stipulations, releases, and admissions contained in this Order, including, without limitation, the Debtors' Stipulations, shall be binding upon all other parties-in-interest, including, without limitation, any Trustee appointed or elected for a Debtor or any Committee (if appointed), unless and to the extent that (a) a Committee (if any), a Trustee appointed prior to the Challenge Period Termination Date (as defined below), or any other party in interest (other than any Debtor), after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part any such stipulations, releases and admissions, including the Debtors' Stipulations, or has otherwise asserted an Estate Claim (each, a "*Challenge*") by no later than (i) the earlier of (1) sixty (60) days following the date of entry of this Order, and (ii) any such later date agreed to in writing by the Debtors and the Prepetition Senior Lenders (the time period established by the later of the foregoing clauses, the "*Challenge Period*" and the date of expiration of each Challenge Period being a "*Challenge Period Termination Date*"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly-filed adversary proceeding.

20.     Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges shall be deemed to be forever waived, released, and barred; (b) the Prepetition Senior Debt of the Prepetition Senior Lenders shall constitute allowed claims, not subject to counterclaim, setoff,

-41-

Error! Unknown document property name.

recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Chapter 11 Cases and any Successor Cases; (c) the Prepetition Liens of the Prepetition Senior Lenders shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected first priority liens in the Prepetition Collateral, not subject to recharacterization, subordination, or avoidance; (d) all of the Debtors' stipulations and admissions contained in this Order, including, without limitation, the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Senior Debt and the Prepetition Liens of the Prepetition Senior Lenders shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these Chapter 11 Cases and any Successor Cases; and (e) all Estate Claims shall be waived.  If any such adversary proceeding is timely filed, the stipulations and admissions contained in this Order, including the Stipulations, shall nonetheless remain binding and preclusive on the Debtors' estates, successors, any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding prior to the Challenge Period Termination Date.  Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges, and an order of the Court conferring such standing on a Committee (if appointed) or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee (if appointed) or such other party-in-interest.

21.     The Prepetition Senior Lenders are authorized to apply all payment of the proceeds of the DIP Loan to pay the Prepetition Senior Debt in accordance with the DIP Loan

-42-

Error! Unknown document property name.

Documents.   Such payment shall be final, subject only to the right of the parties in interest to assert a Challenge in accordance with paragraph 19.  Any amounts disgorged in connection with any such objection or determination shall be first applied to reduce the DIP Debt, dollar-for-dollar.

**MISCELLANEOUS**

22.      Limitation on Section 506(c) Claims.  Upon entry of Order, no costs or expenses of administration which have been or may be incurred in this Chapter 11 Case or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Lenders or the Prepetition Senior Lenders, or any of their respective claims, the Carve-Out or the DIP Collateral or the Prepetition Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lenders.  No action, inaction, or acquiescence by the DIP Lenders or the Prepetition Senior Lenders shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Lenders or the Prepetition Senior Lender, any of their respective claims, the Carve-Out, the DIP Collateral or the Prepetition Collateral.

23.      No Marshaling.  Upon entry of this Order, the DIP Lenders and the Prepetition Senior Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.  Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral after an Event of Default under the DIP Loan Documents.

24.      Waiver of Right to Return/Consent to Setoff.  The Debtors shall not, without the prior written consent of the DIP Lenders, exercise their rights: (a) to return any of the DIP

-43-

Error! Unknown document property name.

Collateral pursuant to section 546(h) of the Bankruptcy Code; (b) to consent to any order permitting any claims pursuant to section 503(b)(9) of the Bankruptcy Code; and (c) to consent to setoff pursuant to section 553 of the Bankruptcy Code.

25.     <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Lenders and the Prepetition Senior Lenders in accordance with the DIP Credit Agreement and the Prepetition Senior Loan Documents, as applicable.

26.     <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to Prepetition Senior Lenders or the DIP Lenders, or their counsel, pursuant to the provisions of this Order, the Prepetition Senior Loan Documents or the DIP Loan Documents, or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code whether asserted or assessed by, through, or on behalf of the Debtors.

27.     <u>Additional Perfection Measures</u>.  The DIP Liens shall be perfected by operation of law immediately upon entry of this Order.  None of the Debtors nor the DIP Lenders shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or any other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens.

**Error! Unknown document property name.**

(a)      If the DIP Lenders choose to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments or to otherwise record or perfect such security interests and liens, the DIP Lenders are hereby authorized, but not directed, to take such action or to request that the Debtors take such action on its behalf (and the Debtors are hereby authorized and directed to take such action), and no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)      In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lenders may choose to file a true and complete copy of this Order in any place at which any such instruments would or could be filed, together with a description of the DIP Collateral and such filing by the DIP Lenders shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Order.

28..      _Delivery of Documentation_. The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Lenders, and counsel to the DIP Lenders, all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings and/or filings that are either (a) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Lenders pursuant to the DIP Loan Documents or (b) reasonably requested by the DIP Lenders (or their legal and financial advisors), as the case may be.

29.      _Access to Books and Records and Property_.  The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true, and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with and provide to the DIP Lenders all such

**Error! Unknown document property name.**

information as required or allowed under the DIP Loan Documents or the provisions of this Order, (c) permit, consistent with the DIP Loan Documents, representatives of the DIP Lenders to visit and inspect any of their respective properties (to the extent practicable, during customary business hours), to examine and make abstracts or copies from any of their non-privileged respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties (to the extent practicable, during customary business hours), and to discuss and be informed as to the Debtors' respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit, consistent with the DIP Loan Documents, representatives of the DIP Lenders to consult with and be informed by the Debtors' management on matters concerning the general status of the Debtors' businesses, financial condition, status of construction, and operations.

30.     <u>Lenders Not Responsible Persons; No Control</u>.  In (a) making the decision to make the DIP Loans; (b) administering the DIP Loans; (c) extending other financial accommodations to the Debtors under the DIP Loan Documents; and (d) making the decision to collect the indebtedness and obligations of the Debtors, the DIP Lenders shall not be considered to (i) owe any fiduciary obligation to any Debtor or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Order or (ii) be exercising control over the Debtors or their operations, have authority to determine the manner in which any of the Debtors' operations are conducted, or acting in any way as a responsible person, a control person, insider or as an owner or operator of any Debtor or any of its affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Order, the DIP Facility, and/or the DIP Loan Documents, under any applicable law.

-46-

**Error! Unknown document property name.**

31.     Successors and Assigns.  The DIP Loan Documents and the provisions of this

Order shall be binding upon each Debtor, the DIP Lenders, and each of their respective

successors and assigns, and shall inure to the benefit of each Debtor, the DIP Lenders, and each

of their respective successors and assigns, including, without limitation, any trustee, examiner

with expanded powers, responsible officer, estate administrator or representative or similar

person appointed in a case for any Debtor under any chapter of the Bankruptcy Code.  The terms

and provisions of this Order shall also be binding on all of the Debtors' creditors, equity holders

and all other parties in interest, including, but not limited to any Trustee appointed or elected.

32.     DIP Credit Bid Rights.  The DIP Lenders shall be entitled to credit bid up to the

full amount of the outstanding DIP Debt, including, without limitation, any accrued interest and

expenses, in any sale of any DIP Collateral, whether such sale is effectuated through section 363

of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 in a chapter

11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding or otherwise, and the DIP Lenders

expressly reserve the right to credit bid up to the full amount of their outstanding DIP Debt

including, without limitation, all principal, interest, fees, expenses, call and make-whole

premiums, yield maintenance premiums and other fees and charges.

33.     Prepetition Credit Bid Rights.  Subject to the consent of the DIP Lenders, and

subject to the DIP Liens, the Prepetition Junior Lenders shall be entitled to credit bid up to the

full amount of the outstanding Prepetition Junior Debt, including, without limitation, any accrued

interest and expenses, in any sale of any Prepetition Collateral, whether such sale is effectuated

through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under

section 1129 of the Bankruptcy Code in a chapter 11 proceeding, by a chapter 7 trustee in a

chapter 7 proceeding or otherwise, and the Prepetition Junior Lender expressly reserves the right

-47-

to credit bid up to the full amount of its outstanding Prepetition Debt including, without

limitation, all principal, interest, fees, expenses, call and make-whole premiums, yield

maintenance premiums and other fees and charges.

36. Binding Nature of Agreement. Each of the DIP Loan Documents to which any of

the Debtors are or will become a party shall constitute legal, valid and binding obligations of the

Debtors party thereto, enforceable in accordance with their terms. Unless otherwise consented to

in writing, the rights, remedies, powers, privileges, liens and priorities of the DIP Lenders

provided for in this Order, the DIP Loan Documents or otherwise shall not be modified, altered

or impaired in any manner by any subsequent order (including a confirmation or sale order), by

any plan of reorganization or liquidation in the Chapter 11 Cases, by the dismissal or conversion

of these Chapter 11 Cases or in any subsequent case under the Bankruptcy Code.

35. Subsequent Reversal or Modification. This Order is entered pursuant to section

364 of the Bankruptcy Code, and Bankruptcy Rules 4001(c), and the DIP Lenders are

accordingly entitled to all protections afforded by section 364(e) of the Bankruptcy Code with

respect to all right, claims, liens and interests granted under this Order.

36. Collateral Rights. If any party who holds a lien or security interest in DIP

Collateral that is junior and/or subordinate to the DIP Liens in such DIP Collateral receives or is

paid the proceeds of such DIP Collateral prior to the indefeasible payment in full in cash and the

complete satisfaction of all DIP Debt under the DIP Loan Documents and termination of the

commitment in accordance with the DIP Loan Documents, such junior or subordinate lienholder

shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust

for the benefit of the DIP Lenders and shall immediately turn over such proceeds for application

-48-

by the DIP Lenders, in accordance with the DIP Loan Documents to repay the DIP Debt in accordance with the DIP Loan Documents, and this Order until indefeasibly paid in full in cash.

37.     No Waiver. This Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lenders may have to bring or be heard on any matter brought before this Court.

38.     No Discharge.  None of the DIP Debt (unless paid in full in cash) shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in these Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived such discharge.

39.     Limits on DIP Lenders' Liability.  Nothing in this Order or in any of the DIP Loan Documents or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts, including the negotiation and entry into any agreements, or documents relating to the DIP Loans.  The DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person; and all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

40.     Priority of Terms; Inconsistencies.  To the extent of any conflict or inconsistencies between or among (a) the express terms or provisions of any of the DIP Loan Documents, the relief requested in the Motion, any other order of this Court or any other agreements, on the one

-49-

Error! Unknown document property name.

hand, and (b) the terms and provisions of this Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Loan Documents (or words of similar import), the terms and provisions of this Order shall govern and control.

41.      No Third-Party Beneficiary. Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

42.      Survival.

(a)      Upon the occurrence of any Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement. Notwithstanding any order that may be entered dismissing any of these Chapter 11 Cases under section 1112 of the Bankruptcy Code: (i) the DIP Superpriority Claim, the DIP Liens, the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Debt shall have been paid in full (and that such DIP Superpriority Claim, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Order.

(b)      If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Debt incurred prior to the actual receipt of written notice by the DIP Lenders, as applicable, of the effective date of such reversal, modification, vacatur or

-50-

Error! Unknown document property name.

stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.

Prior to the actual receipt of written notice by the DIP Lenders of the effective date of any such reversal, modification, or vacatur of this Order, the DIP Loans shall be governed in all respects by the original provisions of this Order and the DIP Loan Documents, and the DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in sections 364(e) of the Bankruptcy Code, this Order and the DIP Loan Documents with respect to the DIP Debt, and all DIP Loans under the DIP Loan Documents are deemed to have been made in reliance upon this Order, and, therefore, the indebtedness resulting from such DIP Loans prior to the effective date of any modification or reversal of this Order cannot as a result of any subsequent order the Debtor's Chapter 11 Case, or any Successor Case, (i) be subordinated or (ii) be deprived of the benefit or priority of the DIP Superpriority Claim or DIP Liens granted to the DIP Lenders under this Order or the DIP Loan Documents.

(c)      Except as otherwise provided herein, (i) the protections afforded under this Order, and any actions taken pursuant thereto, shall survive the entry of an order (1) dismissing these Chapter 11 Cases or (2) converting these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code; and (ii) the DIP Liens, the DIP Superpriority Claim, Adequate Protection Liens and Adequate Protection Superpriority Claim continue to be valid and enforceable in these Chapter 11 Cases, in any such successor case or after any such dismissal.  Except as otherwise provided herein, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall maintain their priorities as provided in this Order and the DIP Loan Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any

-51-

Error! Unknown document property name.

additional financing to be provided by the DIP Lenders), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of this Chapter 11 Case or by any other act or omission until all DIP Debt is indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance therewith.

43.     Adequate Notice. The notice given by the Debtors of the Hearing was given in accordance with Bankruptcy Rules, such notice was sufficient under the particular circumstances, and no other or further notice of the request for relief granted at the Hearing is required.

44.     Immediate Binding Effect.  This Order shall constitute findings of fact and conclusions of law.  Notwithstanding Fed. R. Bankr. P. 4001(a)(4) or anything else to the contrary, this Order is enforceable immediately upon entry.  The Clerk of the Court is hereby directed to enter this Order on the Court's docket in this Chapter 11 Case.  There shall be no stay of execution or effectiveness of this Order and any stay of the effectiveness of this Order that might otherwise apply is hereby waived for cause shown.

45.     Headings. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Order.

46.     Proofs of Claim. Notwithstanding any order of this Court to the contrary, each of the DIP Lenders and the Prepetition Secured Lenders are hereby relieved of any obligation or requirement to file proofs of claim or applications for administrative claims in this Chapter 11 Case with respect to any of the DIP Debt or the Prepetition Senior Debt and any other claims or liens granted hereunder or created hereby.

**Error! Unknown document property name.**

47.     <u>Retention of Jurisdiction</u>. This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Order.

48.     <u>Service</u>.  Within three (3) days of the entry of this Order, Counsel for Debtor shall cause a copy of this Order to be served by CM/ECF service or first-class mail, postage prepaid, on all parties and shall file promptly thereafter a certificate of service confirming such service.

**END OF ORDER**

**Prepared and presented by**:

<u>*/s/ Ceci Christy*</u>
Ceci Christy
Rountree Leitman Klein & Geer, LLC
Century Plaza I
2987 Clairmont Rd., Ste. 350
Atlanta, Georgia 30329
Attorneys for Debtors
and Debtors-in-Possession

**Error! Unknown document property name.**

## EXHIBIT A

**DIP Credit Agreement**

13772650.1

## EXHIBIT B

**Junior Loan Extension Agreement**

13772650.1

## EXHIBIT C

## Initial Budget

13772650.1

## Exhibit A

## Proposed DIP Order

13772646.1

**SENIOR SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "DIP Credit Agreement", or the "Agreement") is dated as of _____, 2026 by and among MP ELK GROVE LLC, a California limited liability company, as a debtor-in-possession ("MP Elk Grove"), MP ELKO II, LLC, a Nevada limited liability company, as a debtor-in-possession ("MP Elko"), 5425 PAU A LAKA LLC, a Hawaii limited liability company, as a debtor-in-possession ("5425 PAL", and together with MP Elk Grove and MP Elko, the "Borrowers", each of which a "Borrower"), AMERICAN SAVINGS BANK, National Association, a national banking association ("ASB," and together with any other individual or entity acquiring or succeeding to all or any part of ASB's interest hereunder being individually referred to herein as a "DIP Lender" and collectively called the "DIP Lenders"), and AMERICAN SAVINGS BANK, National Association, a national banking association, as administrative agent to the DIP Lenders (the "Agent").

**RECITALS:**

A.      On May 14, 2026 (the "Petition Date"), the Borrowers and certain affiliated debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (each a "Chapter 11 Case," and collectively, the "Chapter 11 Cases"), jointly administered under Chapter 11 Case No. 26-20761-JRS, by filing voluntary petitions for reorganization under Chapter 11, 11 U.S.C. § 101, *et seq* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Georgia, Gainesville Division (the "Bankruptcy Court").

B.      Since the Petition Date, the Borrowers have continued in possession of their property and have operated and managed their affairs as debtors-in-possession pursuant to the provisions of §§ 1107 and 1108 of the Bankruptcy Code.

C.      Prior to the Petition Date, financing was provided by American Savings Bank, F.S.B., now known as American Savings Bank, National Association ("ASB") to Borrower MP Elk Grove (the "Prepetition Senior Loan") pursuant to (i) that certain 2023 Revolving Construction Line of Credit Agreement dated December 29, 2023 (the "Pre-Petition Construction Line"), and (ii) that certain 2023 Loan Agreement (the "Pre-Petition A&D Loan", and together with the Pre-Petition Construction Loan, the "Prepetition Senior Loan Agreements"), in each case to pay certain costs and expenses in connection with the acquisition and development of Phase 1 of a condominium project situated in the County of Kauai, State of Hawaii, knows as "Kauanoe o Koloa" (the "Condominium Project") to be developed on the "Land" (as defined below), consisting of 72 condominium units in the Condominium Project more particularly described in Exhibit "B" attached hereto and made a part hereof (the "Phase 1 Units").

D.      The notes, documents, instruments and contacts evidencing the Prepetition Senior Loan include, among other things, (i) a Promissory Note dated December 29, 2023, payable to the order of ASB, in the principal amount of $26,000,000.00, (ii) a Promissory Note dated December 29, 2023, payable to the order of ASB, in the principal amount of $7,000,000.00; (iii) a Real Property Mortgage and Financing Statement dated as of May 27, 2021, executed by 5425 Pau A

1

Laka LLC, as mortgagor, in favor of the Mortgagee, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii (the "Land Court") as Land Court Document No. T-11474217, and also recorded in the Bureau of Conveyances of the State of Hawaii (the "Bureau") as Document No. A-78220763, as modified by that certain Consent; Reaffirmation; Assumption of Mortgage, dated as of August 9, 2023, by and among Pau A Laka LLC, MP Elko II, LLC, and ASB, recorded in the Bureau as Document No. A-86210379 through Document No. A-86210381 (the "Original Mortgage"), as amended by that certain 2023 Amendment to Real Property Mortgage and Financing Statement dated December 29, 2023 by and between ASB, as Mortgagee, and 5425 Pau A Laka LLC, MP Elko II, LLC, as Mortgagors, and Kauai Hale, Inc., as Manager, recorded on December 29, 2023 in the Bureau as Document No. A-87630206, relating to the real property described in Tax Map Key No. (4) 2-8-014-032 (the "Land")[1]; (iv) a 2023 Amendment to and Complete Restatement of Security Agreement dated December 29, 2023, by and between ASB, as Secured Party, and MP Elk Grove LLC, 5425 Pau A Laka LLC, MP Elko II, LLC, MP Financial Group, Ltd. and Kauai Hale, Inc., as Debtors (the "Original Security Agreement"), and (v) a UCC-1 Financing Statement dated December 29, 2023 recorded in the Bureau on December 29, 2023 under Document No. A-87630208. All of the foregoing, including all other documents evidencing the Prepetition A&D Loan and the Prepetition Construction Line, shall collectively be referred to as the "Prepetition Senior Loan Documents." The Prepetition Senior Loan Documents grant the Lenders liens and security interests in real and personal property of the Borrowers (the "Prepetition Collateral").

E.     By way of a Loan Participation Agreement dated December 29, 2023, Finance Factors, Limited ("Finance Factors") purchased a Participating Interest (as that term is defined in the Loan Participation Agreement) equal to approximately 24.23% of the Prepetition Senior Loans.

F.     In connection with the Chapter 11 Cases, the Borrowers have requested that the DIP Lenders provide the Borrowers, as debtors-in-possession, a senior secured, super-priority term loan facility in the amount of $45 million composed of (i) Thirty-Three Million Dollars ($33,000,000) to pay (the "Roll-Up") all indebtedness owed to the Prepetition Senior Lenders under the Prepetition Senior Loan Documents (the "Prior Lender Obligations"), and (b) a construction loan facility (the "New Money") in the maximum principal amount of Twelve Million Dollars ($12,000,000) (collectively, the "DIP Loan" or the "DIP Financing").

G.     The obligations arising under the DIP Loan (the "DIP Loan Obligations") will be secured by senior, first priority perfected security interests in and liens upon all of the Prepetition Collateral of the Borrowers, plus all personal and real property of non-debtors Kauai Hale, Inc., a Delaware corporation (the "Developer"), MP Financial Ltd. (the "Manager") and Meridian Pacific Ltd. (together with the Manager, the "Non-Debtor Pledgors"). The DIP Loan Obligations will be guaranteed by Gary L. Pinkston, individually (the "Individual Guarantor"), the Estate of Janice C. Pinkston (the "Estate Guarantor"), and by the Gary L. and Janice C. Pinkston Family Trust (the "Trust Guarantor", and together with the Individual Guarantor and the Estate Guarantor, collectively, the "Guarantor").

---

[1] The Land consists of approximately 27.886 acres of fee simple land with proposed development of 279-unit for-sale condominium project known as Kauanoe O Koloa consisting of 30 garden-style apartment buildings each containing 9-12 units.

E.      The DIP Lenders are willing to make the post-petition DIP Loan to the Borrowers on the terms and subject to the conditions set forth herein.

**ARTICLE I**
**DEFINITIONS**

SECTION 1.01      Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"Act" means the Condominium Property Act, Chapter 514B, Hawaii Revised Statutes.

"Advance" means the disbursement of proceeds of the DIP Loan pursuant to the terms of this Agreement.

"Affiliate" means, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.

"Agent's Engineer" means an engineer or an engineering firm of the Agent's choice, retained by the Agent at the sole cost and expense of the Borrowers, to perform the services specified in Section 7.09 of this Agreement in the discretion of the Lenders.

"Architect" means New Works Architects, Inc., a Hawaii corporation.

"Architect's Contract" means that certain agreement dated December 27, 2021, executed by and between the Mortgagor and the Architect, as the same may be amended from time to time with the consent of the Agent.

"Architect's Letter" means the instrument executed by the Architect in substantially the form of Exhibit "1" attached to this Agreement.

"Assigned Property" means all of the properties covered by the Assignment of Rents and all of the properties covered by the Assignment of Sales Contracts, and described in the Financing Statement.

"Banking Day" means a day on which the Agent is open for business in the State of Hawaii.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals to this Agreement.

"Binding Sales Contract" means a non-contingent, arm's length Sales Contract, together with all amendments thereto, in form, substance and amount approved by the Agent, for one or more of the DIP Loan Units, duly executed by a Pre-Qualified Buyer (i) who has received and receipted for a Developer's Public Report for such Unit(s); (ii) who has waived such buyer's right to rescind such Sales Contract, or whose rescission rights have expired; and (iii) who, having opened escrow, has made a non-refundable deposit to the Escrow Agent or the Agent of at least 10% of the purchase price (with an additional 10% to be deposited into escrow upon roof

installation of the applicable Unit).  Notwithstanding the foregoing, the term "Binding Sales Contract" shall not include a Sales Contract entered into by the Borrowers or any affiliate of the Borrowers, as buyer, without the Agent's consent, nor shall any buyer, together with any Affiliate of such buyer, be under contract to purchase more than two (2) Phase 1 Units. All buyers who have selected options or upgrades shall have paid and deposited 100% of the agreed-upon price for such option or upgrade into escrow, with such deposit to be verified by the Agent.

"Bonds" means the performance bond and the labor and material payment bond, each in an amount equal to one hundred percent (100%) of the amount of the Construction Contract, with such riders and supplements as the Agent may require, in form and substance satisfactory to the Agent, naming the General Contractor as principal, a corporate surety satisfactory to the Agent as surety, and the Agent as an additional or dual obligee.

"Broker's Agreement" means the Project Brokerage Agreement for the Condominium Project dated June 4, 2021, between the Developer, as seller, and MP Financial Group, Ltd., a Nevada corporation, as broker.

"Carve-Out" has the meaning set forth in the DIP Order.

"Change Order" means any change order or change bulletin or other instrument or understanding which may result in any increase or decrease in the contract price contained in, or any other revision of whatever nature or form to, the Construction Contract.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the meaning assigned to such term in the recitals to this Agreement.

"Closing Date" means the date the Agent's counsel has informed the Agent that all of the conditions to closing set forth in Article 4 of this Agreement have been met, or the Agent has, in writing, waived such conditions.

"Code" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

"Commission" means the Real Estate Commission of the State of Hawaii.

"Compliance Certificate" means the certificate in the form attached hereto as Exhibit "2" and made a part hereof.

"Condominium Project" means the "Kauanoe o Koloa" condominium project.

"Construction Contract" means one or more construction contracts ay and among the Mortgagor and the General Contractor for the construction of the DIP Loan Units and other improvements to be developed on the Land, in form and substance acceptable to the Agent, as the same may be amended from time to time with the consent of the Agent.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Cost Budget and Cash Flow Forecast" means the detailed budget and schedule attached to this Agreement as Exhibit "3" and made a part hereof, showing, among other things, the costs and expenses to be incurred by the Borrowers in connection with the design, construction, development, equipping, furnishing, administering, marketing and sale of the DIP Loan Units, including contingencies therefor, and an Interest Reserve, and the anticipated dates for the disbursements of proceeds of the DIP Financing to be used for the costs of designing, constructing, developing, equipping, furnishing, marketing and sale of the DIP Loan Units, together with a schedule of sources and uses of funds.

"Cost Overrun" means the amount by which the projected total Project Costs, as redetermined from time to time by the Agent, shall exceed the amounts set forth in the Cost Budget and Cash Flow Forecast.

"DCCA" means the Department of Commerce and Consumer Affairs of the State of Hawaii.

"Declaration" means the Declaration of Condominium Property Regime for the Kauanoe o Koloa condominium project, filed or recorded in accordance with the Act.

"Default Rate" means a rate of interest that is four (4) percentage points higher than the rate in effect under the DIP Loan which would be charged in the absence of default.

"Developer" means Kauai Hale, Inc., a Delaware corporation.

"Developer's Public Report" means the Public Report for the Condominium Project for which the Commission has issued an "effective date", as provided in Section 514B-82 of the Act, together with any amendments thereto.

"DIP Assignment of Rents" means an absolute assignment of rents and lessor's interest in leases entered into in connection with the DIP Loan, in a form and substance acceptable to Agent, on substantially the same terms as that certain Absolute Assignment of Rentals and Lessor's Interest in Leases dated as of May 27, 2021, executed by 5425 Pau A Laka LLC, as Assignor, as amended by that certain 2023 Amendment to Assignment of Rentals and Lessor's Interest in Leases entered into by 5425 Pau A Laka LLC and MP Elko II, LLC, as assignor and Kauai Hale, Inc., as developer.

"DIP Assignment of Sales Contracts" means an assignment of sales contract and proceeds entered into in connection with the DIP Loan, in a form and substance acceptable to Agent, on substantially the same terms as that certain Assignment of Sales Contracts and Proceeds dated as of May 27, 2021, executed by 5425 Pau A Laka and MP Elko II, LLC, as assignor, and Kauai Hale, Inc., as developer, as amended by that certain 2023 Amendment to and Complete Restatement of Assignment of Sales Contracts and Proceeds dated as of December 29, 2023.

"DIP Collateral" means all real and personal property and assets of the Borrowers and the Non-Debtor Pledgors that were a part of the Prepetition Collateral, plus all post-petition proceeds and profits thereof, now owned or hereafter acquired, upon which a Lien is created by any of the Prepetition Senior Loan Documents or by any of the DIP Loan Documents.

"<u>DIP Environmental Certificate and Indemnity</u>" means a certificate and indemnity in favor of the Agent and the DIP Lenders regarding environmental matters, in form and substance acceptable to the Agent, and on substantially similar terms to that certain Certificate and Indemnity Regarding Hazardous Substances (Hawaii), dated as of December 29, 2023, executed by MP Elk Grove LLC, and 5425 Pau A Laka LLC, MP Elko II, LLC, and Gary L. Pinkston and Janice C. Pinkston, individually and as trustees under the Declaration of Trust for the Gary and Janie Pinkston Family Trust dated January 1, 2008, as amended.

"<u>DIP Financing Statement</u>" means one or more UCC-1 Financing Statements naming the Borrowers and the Non-Debtor Pledgors as debtors, and the Agent as secured party, perfecting a first-priority senior security interest in and to that part of the DIP Collateral in which a security interest may be perfected by filing.

"<u>DIP Guaranty</u>" means an agreement in form and substance satisfactory to the Agent, duly executed by the Guarantor, guaranteeing the due and punctual payment of the DIP Loans, and the observance and performance of the Borrowers' obligations under the DIP Loan Documents.

"<u>DIP Liens</u>" means (i) the fully-perfected, priming, first priority senior secured liens on the DIP Collateral, subject only to any Permitted Priority Liens and the Carve-Out, granted to the DIP Lenders pursuant to section 364(c)(2) of the Code; and (ii) a fully-perfected, priming, first priority senior secured lien on the DIP Collateral pursuant to section 364(d)(1) of the Code.

"<u>DIP Loan Documents</u>" means this Agreement, the DIP Security Documents, the DIP Note, and all other agreements, documents, contracts or instruments executed in connection with this Agreement to evidence and secure the DIP Loan Obligations.

"<u>DIP Loan Obligations</u>" means all debts, liabilities, obligations, covenants and duties of the Borrowers under the DIP Loan Documents, including, without limitation, (x) the repayment of the principal amount of the DIP Loans and all interest, fees, reimbursement obligations and indemnification obligations under the DIP Loan Documents, in each case, whether absolute or contingent, and without regard to whether such obligations are yet due and payable, and (y) the timely performance of all covenants and duties of the Borrowers under the DIP Loan Documents.

"<u>DIP Loan</u>" means the $45 million facility made by the Lenders to the Borrowers pursuant to the terms and conditions of the DIP Loan Documents.

"<u>DIP Loan Units</u>" means those condominium units among the Phase 1 Units located in Buildings 5, 6, 7, and 8 at the Condominium Project, plus the common interest in the Condominium Project appurtenant thereto.

"<u>DIP Mortgages</u>" means one or more mortgages entered into in connection with the DIP Loan, in form and substance acceptable to the Agent, of the interests of the Borrowers and the Non-Debtor Pledgors in the portion of the DIP Collateral comprising real property.

"<u>DIP Mortgagors</u>" means, individually and collectively, the mortgagors under the DIP Mortgages.

"DIP Note" means the promissory note evidencing the DIP Loan in the maximum principal amount of $45,000,000.

"DIP Order" means a final, non-appealable order of the Bankruptcy Court approving the DIP Loan in a form acceptable to Agent, it its sole discretion, which among other things, but not by way of limitation, authorizes the Borrowers to obtain credit, incur (or guaranty) indebtedness, and grant first priority priming liens under this Agreement and the other DIP Loan Documents, as the case may be, provides for the super priority of the DIP Lender' claims hereunder and provides for the Roll-Up of the Prior Lender Obligations as contemplated herein.

"DIP Pledge and Security Agreement" means a Pledge and Security Agreement or Agreements, in form and substance satisfactory to the Agent, to be executed on or before the Closing Date by and among between the Borrowers, the Non-Debtor Pledgors, and the Agent, pursuant to which the Borrowers and the Non-Debtor Pledgors pledge and grant security interests in favor of the Agent in and to (i) the Interest Reserve Account, and (ii) the depository account to be established pursuant to Section 8.16 of this Agreement.

"DIP Security Agreement" means a security agreement in form and substance acceptable to the Agent, made by MP Elk Grove LLC, 5425 Pau A Laka LLC, MP Elko II, LLC, MP Financial Group, Ltd. and Kauai Hale, Inc., as debtors, in favor of the Agent, as agent to the DIP Lenders, in which the DIP Lenders are granted security interests in substantially the same collateral described in the Original Security Agreement.

"DIP Security Documents" means all documents, agreements, contracts, and instruments that secure the obligations of the Borrowers under the DIP Loan Documents, including the DIP Mortgages, the DIP Assignment of Rents, the DIP Assignment of Sales Contracts, the DIP Security Agreement, the DIP Pledge and Security Agreement, the DIP Financing Statements, the General Contractor's Letter, and the Architect's Letter.

"DIP Superpriority Claim" means any superpriority administrative expense claims allowed to the DIP Lenders under the DIP Order pursuant to section 364(c)(1) of the Code.

"Eligible Assignee" means (a) a DIP Lender; (b) an Affiliate of a DIP Lender; and (c) any other person (other than a natural person) approved by the Agent; provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrowers or any of the Borrowers' Affiliates, Subsidiaries or members.

"Escrow Agent" means Title Guaranty Escrow Services, Inc., a Hawaii corporation, or such other escrow company in Hawaii as the Agent may reasonably approve.

"Escrow Agreement" means the condominium Escrow Agreement for the Condominium Project, dated January 21, 2022, executed by and between the Developer and the Escrow Agent, as the same may be amended from time to time with the consent of the Agent.

"Escrow Letter" means the letter dated January 8, 2024, executed by the Developer and the Borrower, and acknowledged by the Escrow Agent, for the Condominium Project, consenting to the assignment of sales proceeds to the DIP Lenders, and making other customary agreements in favor of the DIP Lenders.

"Escrowed Proceeds" means the funds held by the Escrow Agent pursuant to the Escrow Agreement in a deposit account opened with the Agent.

"Event of Default" means any event described in Section 9.1 of this Agreement.

"Expenses" means the fees, costs and expenses described in Section 8.13 of this Agreement.

"Financial Officer" of any entity means the chief financial officer, principal accounting officer, treasurer or controller of such entity.

"General Contractor" means MP Financial Group, Ltd., a Nevada corporation.

"General Contractor's Letter" means the instrument executed by the General Contractor substantially in the form of Exhibit "4" attached to this Agreement.

"Governmental Authority" means the government of the United States of America or any other nation, any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantor" has the meaning set forth in the Recitals.

"Interest Reserve" means a portion of the DIP Loan, in an initial amount of $1,800,000.00, which shall be allocated for the payment of interest under the DIP Loan Documents from and after the Closing Date until the Maturity Date. The amount of the Interest Reserve shall be subject to adjustment, from time to time, as provided in Section 6.06 of this Agreement.

"Interest Reserve Account" means the pledged deposit account with the Agent, owned by the Borrowers, into which the Borrowers shall deposit funds, as required by the Agent from time to time, in amounts sufficient to cover any anticipated shortfall in the Interest Reserve, as provided in Section 6.6 of this Agreement.

"Land" means that certain real property located at Koloa, Kona, Island and County of Kauai, State of Hawaii, more particularly described in Exhibit "A" attached hereto and made a part hereof.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Materials" means hardware, machinery, apparatus, appliances, equipment or other materials stored on or off the Land, for subsequent incorporation into the DIP Loan Units.

"<u>Maturity Date</u>" means June 30, 2027.

"<u>Minimum Sales Price</u>" for a DIP Loan Unit means the sales price shown on Exhibit "5" attached hereto and made a part hereof.

"<u>Mortgaged Property</u>" means (i) the real property and related personal property subject to the Liens granted in this Agreement and the other DIP Loan Documents.

"<u>Net Sales Proceeds</u>" means gross sales proceeds less customary and reasonable out-of-pocket closing costs (including delinquent real property taxes) and escrow closing costs, which in the aggregate, shall not exceed 8.0% of the contractual sale price.  For the avoidance of doubt, a minimum of 92% of each condominium sale (net of buyer deposits used towards construction) shall be applied to reduce the principal under this DIP Facility.

"<u>New York City Banking Day</u>" means a day on which commercial banks and foreign exchange markets settle payments and are open for general business in New York City.

"<u>Non-Debtor Pledgors</u>" means Kauai Hale, Inc., a Delaware corporation, MP Financial Group Ltd., and Meridian Pacific Ltd.

"<u>Original Mortgage</u>" has the meaning set forth in the Recitals.

"<u>Original Security Agreement</u>" has the meaning set forth in the Recitals.

"<u>Participant</u>" means another lender or lenders that has or have agreed to purchase a participating interest in the DIP Loans and the DIP Loan Documents from a DIP Lender.

"<u>Permitted Priority Liens</u>" has the meaning set forth in the DIP Order.

"<u>Permits</u>" means all foundation, grading and building permits which are a prerequisite to construction and use of the DIP Loan Units and the other improvements in accordance with the Plans and Specifications, except for certificates of occupancy for the DIP Loan Units.

"<u>Phase 1 Units</u>" has the meaning set forth in the Recitals.

"<u>Plans and Specifications</u>" means the plans and specifications for the Phase 1 Units prepared by the Architect and incorporated into the Construction Contract, as the same may be amended from time to time with the consent of the Agent.

"<u>Prepetition Junior Lender</u>" means SWCPT HI KAUANOE LLC, in its capacity as lender in connection with its prepetition loan to 5425 Pau A Laka LLC and MP Elko II, LLC in the amount of $12,000,000, which loan is expressly subordinate and junior to the loans made by the Prepetition Senior Lenders.

"<u>Prepetition Junior Loan Documents</u>" means all notes, mortgages, documents and instruments evidencing the Prepetition Junior Loan.

"Prepetition Senior Loan Documents", "Prepetition Construction Line", "Prepetition A&D Loan", and "Prepetition Senior Loan Agreements" shall have the respective meanings assigned to such terms in the recitals to this Agreement.

"Prepetition Senior Lenders" means ASB and Finance Factors, Limited, in their capacities as lender under (in the case of ASB) or participants in (in the case of Finance Factors, Limited) the Prepetition Senior Loan Documents.

"Pre-Qualification Agent" means the Agent, or any other financial institution reasonably acceptable to the DIP Lenders and the Borrowers.

"Pre-Qualification Letter" means a letter, in form and substance reasonably acceptable to the Agent, from the Pre-Qualification Agent, stating that the subject buyer is qualified to obtain financing to purchase such buyer's DIP Loan Unit, pursuant to such buyer's Sales Contract, based on receipt of: (i) a loan application/qualification form; (ii) a credit report; (iii) income qualification; (iv) deposit/down payment verification; and (v) any other documentation necessary to analyze such buyer's ability to qualify for such financing, and containing no contingencies (other than lien free completion of construction of the DIP Loan Units, issuance of the appropriate certificates of occupancy for the DIP Loan Unit, reconfirmation of such buyer's pertinent financial information within 120 days of the scheduled closing date for such DIP Loan Unit, and such other contingencies as may be approved by the Agent in its sole discretion).

"Pre-Qualified Buyer" means a buyer who has obtained a Pre-Qualification Letter, or who has submitted documentary evidence, satisfactory to the Agent, demonstrating that such buyer has the financial ability to perform such buyer's obligations under such buyer's sales contract, including the ability to pay the balance of the purchase price in cash as and when scheduled.

"Prior Lender Obligations" shall have the meaning assigned to such term in the recitals to this Agreement.

"Project Costs" means the aggregate of (a) the amounts required to repay the DIP Loan, (b) the cost of designing, constructing, developing, equipping, furnishing, marketing and selling the DIP Loan Units in accordance with all contracts or agreements relating thereto, including, without limitation, the Construction Contract, and the Plans and Specifications, including contingencies therefor, (c) interest due under the DIP Note, (d) the Loan Fee, (e) the Expenses, (f) the fees, costs and expenses of the Agent's and its professionals, including the Engineer, and (g) such other reasonable costs and expenses as the Agent may approve which have been incurred or will be incurred in connection with the design, construction, development, equipping, furnishing, marketing and sale of the DIP Loan Units.

"Release Price" means the applicable amount payable by the Borrowers to the Agent as a condition for the release by the Agent of its mortgage lien and of its security interest over and in each DIP Loan Unit subject to the DIP Mortgages. The Release Price for a particular DIP Loan Unit shall be the applicable amount for such DIP Loan Unit described in Exhibit "5" attached hereto and made a part hereof.

"Retention" means an amount equal to ten percent (10%) of the amount of each application for a disbursement of DIP Loan proceeds made pursuant to this Agreement for payment to the

General Contractor, until the work described in the Construction Contract is completed, as evidenced by approved billings (exclusive of any deductions for prior Retentions), or where the context so requires, the aggregate of all prior Retentions.

"Roll-Up" means the Borrowers' use of the proceeds of the DIP Loan to pay off all existing indebtedness owed to the Prepetition Senior Lenders under the Prepetition Senior Loan Documents.

"Sales Contract" means a sales contract for the purchase of a DIP Loan Unit, duly executed by an acceptable Pre-Qualified Buyer. No contingencies (other than the lien-free completion of the buyer's DIP Loan Unit) will be allowed, unless otherwise permitted by the Agent in writing.

"Subsidiary" means any subsidiary of any Borrower.

"Term SOFR Rate" means, for any calendar month, an interest rate per annum equal to the Term SOFR for such calendar month.

"Term SOFR" means, for any calendar month, the published rate referred to as the Term SOFR Reference Rate for a tenor of one month, on the day and time (such day, the "Periodic Term SOFR Determination Day") that is two (2) New York City Banking Days prior to the first day of such calendar month, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (Hawaii standard time) on any Periodic Term SOFR Determination Day, the Term SOFR Reference Rate for such Interest Period has not been published by the Term SOFR Administrator, then "Term SOFR" will be the Term SOFR Reference Rate for such period as published by the Term SOFR Administrator on the immediately preceding New York City Banking Day on which such rate is published; and provided, further, that Term SOFR shall not be less than one percent (1.00%) per annum, and if the above described published rate of interest is less than one percent per annum, Term SOFR will be one percent (1.00%) per annum.

"Title Insurer" means a title insurance company, authorized to do business in the State of Hawaii, which shall issue the Title Policy.

"Title Policy" means a policy of title insurance issued by the Title Insurer, in the form and with the indorsements described in Section 4.5 of this Agreement.

"Title Searcher" means a corporate searcher of titles, authorized to do business in the State of Hawaii, which shall issue the Financing Statement and Personal Property Lien Report and the Court Report.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent in its reasonable discretion).

"Term SOFR Margin" means a rate of interest per annum equal to four and one-half percent (4.5%).

## ARTICLE II
## THE DIP LOAN FACILITY

SECTION 2.01        Commitments.   Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein:

(a)        DIP Financing.   Immediately following entry of the DIP Order, the Borrowers shall use the proceeds of the DIP Loan to pay, in full, all of the Prior Lender Obligations of the Prepetition Senior Lenders arising under the Prepetition Senior Loan Documents (the "Roll-Up") which total approximately $33,000,000.

(b)        The DIP Loan shall bear interest at a floating rate equal to the Term SOFR Rate plus the Term SOFR Margin and shall be due and payable to the Agent, as agent for the Lenders, in accordance with the terms of this Agreement.

(c)        New Money Construction Loan.   The $12 million in New Money shall be solely be used to finance the remaining site work and vertical construction of the DIP Loan Units.

SECTION 2.02        Repayment of Loans; Evidence of Debt.

(a)        The Borrowers and the Guarantor hereby unconditionally promise to pay to the Agent on the Maturity Date the then unpaid principal amount of the DIP Loan, and all accrued and unpaid interest thereon, together with all other amounts payable under the DIP Loan Documents.

(b)        The obligation of the Borrowers to repay the DIP Loan together with accrued interest thereon, shall be evidenced by the DIP Note, in form and substance satisfactory to the Agent, duly executed and delivered by the Borrowers to the Agent on the Closing Date.

(c)        The Agent shall maintain accounts in which it will record (i) the amount of each Advance made hereunder, (ii) with respect to such Advance, the amount of any principal or interest due and payable or to become due and payable from the Borrowers to the DIP Lenders hereunder and (iii) with respect to each such Advance, the amount of the sum received by the Agent hereunder from the Borrowers or any Guarantor and each DIP Lender's share thereof. The Agent shall maintain accounts in which it will record (i) the amount of the DIP Loan outstanding hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each DIP Lender hereunder and (iii) the amount of the sums received by the Agent hereunder from the Borrowers or any Guarantor and each DIP Lender's share thereof.  The entries made in the accounts maintained pursuant to this paragraph shall be prima facie evidence of the existence and amounts of the obligations therein recorded; provided, however, that the failure of the Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers to repay the DIP Loan and other advances of credit to the Borrowers in accordance with the terms of this Agreement.

SECTION 2.03        Fees.  The Borrowers agree to pay to the Agent, as agent for the DIP Lenders, on or before the Closing Date, a loan fee in the amount of $450,000 (the "Loan Fee").

The Loan Fee is fully earned as of the Closing and is not refundable in whole or in part under any circumstances.

SECTION 2.04      Interest.  Subject to Section 2.05, the DIP Loan shall bear interest at a floating rate per annum equal to the Term SOFR Rate plus the Term SOFR Margin.  The interest rate shall be adjusted monthly on the first day of each calendar month while any portion of the DIP Loan remains outstanding.  Interest shall be computed on the basis of a year of 360 days, and the actual number of days elapsed.

SECTION 2.05      Default Interest.  Upon the occurrence and during the continuation of an Event of Default, at the election of the Agent, the Borrowers shall on demand from time to time pay interest, to the extent permitted by law, on the DIP Loan at the Default Rate.

SECTION 2.06      Application of Proceeds.  The proceeds of the DIP Loan will be applied as follows: (a) to pay all obligations owed to the Prepetition Senior Lenders under the Prepetition Senior Loan Documents; (b) to pay the General Contractor, in accordance with the provisions of Section 6 of this Agreement, for the costs of constructing, developing, equipping and furnishing the DIP Loan Units, in accordance with (i) the Construction Contract, and (ii) the Plans and Specifications; (b) to pay the fees of the Architect, under the Architect's Contract; (c) to pay interest on the DIP Note from the Interest Reserve; (d) to pay the Loan Fee; (e) to pay the Expenses; and (f) to pay such other costs and expenses as the Agent may approve which have been incurred and will be incurred in connection with the design, construction, development, equipping, furnishing, administering, marketing and sale of the DIP Loan Units.  Notwithstanding anything contained in the Cost Budget and Cash Flow Forecast, disbursements for such costs and expenses shall be made in accordance with this Agreement and at such times, in such amounts and to such parties as the Agent shall deem advisable.  None of the proceeds of the DIP Loan shall be used to pay for any improvements to the Land or the Condominium Project other than to the DIP Loan Units, or to improvements necessary to the completion and sale of the DIP Loan Units.

SECTION 2.07      Termination of DIP Loan Commitments.  Unless previously terminated in accordance with the terms hereof, the all obligations of the DIP Lenders to make Advances under the DIP Loan shall automatically terminate on the Maturity Date.

SECTION 2.08      Repayment.  Monthly interest only payments will be made in accordance with the procedures set forth in Section 6.06 of this Agreement.  All DIP Loans shall be due and payable on the Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

SECTION 2.09      Voluntary Prepayment.

(a)      The Borrowers shall have the right at any time and from time to time to prepay the DIP Loan, in whole or in part, upon at least three Business Days' prior written or fax notice (or telephone notice promptly confirmed by written or fax notice) to the Agent before 12:00 p.m. (noon), Hawaii Standard Time; provided, however, that each partial prepayment shall be in an amount that is an integral multiple of $100,000 and not less than $100,000.

(b)      Each notice of prepayment shall specify the prepayment date and the amount to be prepaid, shall be irrevocable and shall commit the Borrowers to prepay the DIP Loan

by the amount stated therein on the date stated therein. All prepayments under this Section 2.09 shall be without premium or penalty. All prepayments under this Section 2.09 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.10       Mandatory Prepayments.

(a)       In the event of any termination of the DIP Loan, the Borrowers shall, on the date of such termination, repay or prepay the outstanding balance of the DIP Loan, together with all accrued but unpaid interest and all other amounts payable to the DIP Lenders hereunder.

(b)       Whenever the Borrowers close the sale of a DIP Loan Unit in the Condominium Project, the Borrowers shall pay the applicable Release Price therefor to the Agent, to be applied as set forth in Exhibit "5" attached hereto and made a part hereof.

SECTION 2.11       Security; Guaranty. To secure and guarantee the due and punctual payment of the DIP Note and the performance of any and all obligations of the Borrowers under the DIP Loan Documents, the Borrowers, the Guarantor, and the Non-Debtor Pledgors will deliver, or cause to be delivered, to the Agent on or before the Closing Date, among other items which may be required by the Agent:

(a)       The DIP Mortgages;

(b)       The DIP Security Agreement;

(c)       The DIP Pledge and Security Agreement;

(d)       The DIP Assignment of Rents;

(e)       The DIP Assignment of Sales Contracts;

(f)       The DIP Financing Statement;

(g)       The DIP Environmental Certificate and Indemnity; and

(h)       The DIP Guaranties.

SECTION 2.12       Partial Releases.   The Agent shall, upon the request of the Borrowers, release individual DIP Loan Units and their appurtenant undivided percentage interests in the common elements of the Condominium Project from the liens and security interests of the DIP Mortgage, the DIP Security Agreement, the DIP Assignment of Rents, the DIP Assignment of Sales Proceeds and the DIP Financing Statement, upon the following conditions:

(a)       no Event of Default shall have occurred and be continuing;

(b)       the Borrowers shall pay to the Agent, at the time of each partial release, the applicable Release Price, if any, therefor; and

(c)     the Borrowers shall pay to the Agent, at the time of each partial release, all fees, costs and Expenses (including all reasonable attorneys' fees, if any) and recording costs, which are payable to or which have been or will be incurred by the Agent in connection with such partial release.

SECTION 2.13      Payments.  The Borrowers shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder and under any other DIP Loan Document not later than 12:00 (noon), Hawaii Standard Time, on the date when due in immediately available dollars, without setoff, defense or counterclaim.  Each such payment shall be made to the Agent at its offices designated by such Agent to the Borrowers.  All payments hereunder and under each other DIP Loan Document shall be made in dollars. The Agent shall distribute such payments to the DIP Lenders promptly upon receipt in like funds as received. Except as otherwise expressly provided herein, whenever any payment (including principal, interest, any Fees, or other amounts) hereunder or under any other DIP Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding business day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.

SECTION 2.14      Application of Payments and Proceeds. All payments, distributions or proceeds of DIP Collateral received at any time by, or payable or distributable at any time to, the Agent or any DIP Lender on account of any DIP Loan Obligations shall be applied as follows:

first, to the payment of fees and expenses of the Agent payable or reimbursable by the Borrowers under this Agreement;

second, to the payment of all accrued unpaid interest on the DIP Loan;

third, to the payment of principal of the DIP Loan;

fourth, to the payment of all other Obligations then outstanding;

fifth, to the payment of all other obligations and liabilities required by the terms of the DIP Order, as then in effect; and

sixth, any remainder shall be for the account of and paid to whomever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided above until exhausted prior to the application to the next succeeding category and (ii) each of the Agent, the DIP Lenders or other Persons entitled to payment under any of the clauses above shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to such clauses above. Any payments on the DIP Loan Obligations received by any DIP Lender in contravention of this Section 2.14 shall be segregated and held in trust and forthwith paid over to the Agent for application to the DIP Loan Obligations in accordance with this Section 2.14.

SECTION 2.15      Super Priority Nature of Obligations and Agents' Liens.  The DIP Lenders shall be granted (i) super priority liens on the DIP Collateral pursuant to Bankruptcy Rule

4001(c), including, but not limited to, ~27.886 acres of fee simple real property and all existing and future improvements of the real property located at 5425 Pau A Laka Street, Koloa, HI 96756 and is further identified by TMK (4) 2-8-014-032 & 041, plus an assignment of any and all escrow agreements, purchasers' deposits, sales contracts, leases, rents, other contracts etc. related to the Project, assignment of all construction and architectural contracts, reciprocal easement agreements, consultant and professional agreements, bonds, permits and governmental approvals, and other material licenses and agreements relating thereto, as customary, and as otherwise required by the DIP Lenders, as set forth in the DIP Loan Documents.  The DIP Liens in favor of the DIP Lenders will be duly perfected, first priority liens and security interests and will be subject to no other liens, security interests, or claims, except the fees of the Office of the United States Trustee pursuant to 28 U.S.C. §1930 ("US Trustee Fees"), but subject to a carve-out (the "Carve-Out") for fees and expenses incurred prior to the Maturity Date by professional persons retained by the Debtor or any Committee and approved by the Bankruptcy Court in the maximum aggregate amount of $100,000.00, which shall not be used for litigation against DIP Lenders; (ii) an allowed superpriority administrative priority under Sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the US Trustee Fees and the Carve-Out.

SECTION 2.16    Stipulations and Waivers of Borrowers.  The DIP Order shall (a) contain provisions and findings of fact that bind the Borrowers' Estates with respect to the validity, perfection and amount of the Prepetition Senior Lender's claims and liens and include a waiver of claims against the Prepetition Senior Lenders; (b) modify the automatic stay imposed by section 362 of the Bankruptcy Code as necessary to permit the Borrowers to perform their obligations under the DIP Order and the DIP Loan Documents, and to permit the DIP Lenders to enforce their rights, in connection with the DIP Facility; (c) permit the Borrowers and their respective Estates, upon entry of the DIP Order, to waive, discharge, and release any right to challenge any of the DIP Loan Obligations, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Senior Loan Documents, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lenders and the Prepetition Senior Lenders; and (d) provide that all costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Cases shall not be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lenders.

SECTION 2.17    Payment of Obligations. Upon the maturity (whether by acceleration or otherwise) of any of the DIP Loan Obligations under this Agreement or any of the other DIP Loan Documents, the Agent and the DIP Lenders shall be entitled to immediate payment of such DIP Loan Obligations without further application to or order of the Bankruptcy Court. The DIP Order shall provide that the automatic stay imposed by section 362 of the Bankruptcy Code shall be modified as necessary to permit the Borrowers to perform their obligations, and to permit the DIP Lenders to enforce their rights, in connection with the DIP Facility

SECTION 2.18    No Discharge; Survival of Claims. Each Borrower agrees that (a) the DIP Loan Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and each Borrower, on behalf of itself and its

Subsidiaries, pursuant to Section 1141 (d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superpriority administrative claim granted to the Agent and the DIP Lenders pursuant to the DIP Order and described therein and the Liens granted to the Agent pursuant to the DIP Order and described therein shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

SECTION 2.19        Release.  Each Borrower hereby acknowledges effective upon entry of the DIP Order, that no such Borrower has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of such Borrower's liability to repay the DIP Lenders as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Agent or any DIP Lender.  Each Borrower, in its own right and with respect to its respective bankruptcy estate, and on behalf of all its respective successors, assigns, subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge the Agent and each DIP Lender and all of the Agent's and each DIP Lender's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the DIP Loan Documents, the DIP Order, and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

SECTION 2.20        Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral. Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any DIP Loan Obligations shall be outstanding, each Borrower hereby irrevocably waives (i) any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the DIP Loan Obligations, or to approve a claim of equal or greater priority than the DIP Loan Obligations, except as permitted under the DIP Order, and (ii) any right, pursuant to Section 363 of the Bankruptcy Code or otherwise, to use DIP Collateral proceeds or any other cash collateral (as defined in the Bankruptcy Code) in any

manner not permitted by the DIP Loan Documents or otherwise without the consent of the Agent and the DIP Lenders.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES BY THE BORROWERS

Each Borrower hereby represents and warrants to the Agent and the DIP Lenders that:

SECTION 3.01        Organization, Standing and Authority of the Borrowers. Borrower MP Elk Grove is a California limited liability company, duly organized, validly existing and in good standing under the laws of the State of California, and is authorized to do business in the State of Hawaii, and has all requisite power and authority to carry the business and to own the property that it now carries on and owns. Borrower MP Elko is a Nevada limited liability company, duly organized, validly existing and in good standing under the laws of the State of Nevada, and is authorized to do business in the State of Hawaii, and has all requisite power and authority to carry the business and to own the property that it now carries on and owns.  Borrower 5425 is a Hawaii limited liability company, duly organized, validly existing and in good standing under the laws of the State of Hawaii, and is authorized to do business in the State of Hawaii, and has all requisite power and authority to carry the business and to own the property that it now carries on and owns. The Developer is a Delaware corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware, and is authorized to do business in the State of Hawaii, and has all requisite power and authority to carry the business and to own the property that it now carries on and owns.  The execution and delivery of the DIP Loan Documents, and the observance and performance of all of the provisions and conditions thereof, have been duly authorized in accordance with the organizational documents of each Borrower, each of the Guarantor, each Non-Debtor Pledgor, and the Developer, as applicable, and no other limited liability company or corporate action of any Borrower, Non-Debtor Pledgor or the Developer is required therefor.

SECTION 3.02        Title to the Mortgaged Property. The DIP Mortgagor now has good, marketable title to the DIP Mortgaged Property, free and clear of all defects, liens and encumbrances, excepting only liens for taxes, assessments or governmental charges or levies not yet delinquent or payable without penalty or interest, those listed on the Title Policy, and those approved by the Agent in writing.

SECTION 3.03        Title to Collateral; Title to Assigned Property. The Borrowers, the Mortgagor, the Developer, MP Financial Group, Ltd., and Meridian Pacific, Ltd., now have (except for properties which may hereafter be acquired or moneys which may hereafter be received by the Borrowers, the Mortgagor, the Developer, MP Financial Group, Ltd., or Meridian Pacific, Ltd.) absolute title to the DIP Collateral, free and clear of all security interests, liens and encumbrances. The DIP Mortgagor and the Developer now have, except for properties which may hereafter be acquired or moneys which may hereafter be received by the DIP Mortgagor or the Developer, absolute title to the DIP Assigned Property, free and clear of all security interests, liens and encumbrances.

SECTION 3.04        Tax Returns and Payments. All tax returns and reports of the Borrowers, Guarantor, and Non-Debtor Pledgors required by law to be filed have been duly filed,

and all taxes, assessments, contributions, fees and other governmental charges (other than those presently payable without penalty or interest and those which have been disclosed to the Agent but which are currently being contested in good faith) upon the Borrowers, Guarantor, and Non-Debtor Pledgors, or upon their properties or assets or income which are due and payable, have been paid.

SECTION 3.05        Litigation.  Except as disclosed in Schedule 3.05 attached hereto, there is no action, suit, proceeding or investigation at law or in equity or before any federal, state, territorial, municipal or other governmental department, commission, board, bureau, agency or instrumentality pending or, to the knowledge of the Borrowers, threatened against or which might adversely affect the Borrowers, the DIP Mortgagor, the Developer, the Land (including, without limitation, the land use classification or zoning of the Land), the DIP Mortgaged Property, the DIP Collateral, the DIP Assigned Property, the Borrowers' ability to construct the DIP Loan Units, the Developer's ability to develop the Condominium Project and to market and sell the condominium units in the Condominium Project, the ability of the Borrowers, the DIP Mortgagor or the Developer otherwise to perform its or their obligations under the DIP Loan Documents, or the ability of the Guarantor to perform their obligations under the DIP Guaranty, or the ability of the Non-Debtor Pledgors to pledge the DIP Collateral under their ownership to the DIP Lenders.

SECTION 3.06        Compliance with Other Instruments; None Burdensome. The Borrowers are not in violation of or in default with respect to any term or provision of the Borrowers' organizational documents or any mortgage, indenture, agreement or instrument applicable to the Borrowers or by which they may be bound; and the execution, delivery, performance of and compliance with each and all of the DIP Loan Documents will not result in any such violation or be in conflict with or constitute a default under any such term or provision or result in the creation of any mortgage, lien or charge on any of the properties or assets of the Borrowers not contemplated by this Agreement; and there is no term or provision of the Borrowers' organizational documents or of any mortgage, indenture, contract, agreement or instrument applicable to the Borrowers or by which it may be bound which adversely affects or in the future (so far as the Borrowers can now foresee) would adversely affect the business or prospects or condition (financial or other) of the Borrowers or of any of its properties or assets or the DIP Collateral.

SECTION 3.07        Compliance with Law. The consummation of the transactions contemplated by the DIP Loan Documents will not conflict with or result in a breach of any law, statute, ordinance, regulation, order, writ, injunction, decree or judgment of any court or governmental instrumentality, domestic or foreign.

SECTION 3.08        Governmental Authorization. No consent, approval or authorization of or registration, declaration or filing with any governmental or public body or authority is required or, if required, such consent, approval, order or authorization shall have been obtained prior to the first Advance, in connection with (a) the valid execution and delivery of each of the DIP Loan Documents, (b) any compliance with subdivision, building, setback, building moratorium, special design district, historic preservation, or other ecological or environmental requirements, or land use classification or zoning of the Land, or any other federal, state or county laws, regulations, codes or rules prerequisite to the commencement of the construction of the DIP Loan Units, or (c) the observance or performance of any of the transactions required or contemplated hereby or thereby. Without limiting the generality of the foregoing, the Commission

has issued an "effective date" for the Developer's Public Report under the Act, which is in full force and effect.

SECTION 3.09        Financial Statements. All financial statements heretofore delivered to the Agent by the Borrowers (including financial statements pertaining to the Guarantor) have been prepared in accordance with generally accepted accounting principles consistently applied, and fairly represent the financial condition of the Borrowers (or the Guarantor, as applicable) as of the dates thereof; no material, adverse changes have occurred in the financial condition reflected therein since the respective dates thereof; and no additional borrowings have been made by the Borrowers other than borrowings approved by the Agent.

SECTION 3.10        Utility Services. All utility services necessary for the construction of the DIP Loan Units, and the operation and use thereof for their intended purposes (including, without limitation, water supply, storm and sanitary sewer facilities, cable television and electric and telephone facilities) are available at the boundary of the Land. The Borrowers have no knowledge of any current or potential moratorium or other governmental action which might prevent the Borrowers from making direct connection from the completed DIP Loan Units to all such facilities.

SECTION 3.11        Zoning. The Land is classified under the state land use law and zoned under the applicable county ordinances for the use of the improvements to be constructed thereon as a resort residential condominium project.

SECTION 3.12        Access. The Land is contiguous to publicly dedicated streets, roads or highways, or to roadway lots which provide access to publicly dedicated streets, roads or highways; and vehicular access from the Land is permitted to all such publicly dedicated streets, roads or highways, or such roadway lots.

SECTION 3.13        No Default Under the Escrow Agreement, the Architect's Contract, the Construction Contract or the Broker's Agreement. The Escrow Agreement, the Architect's Contract, the Construction Contract, and the Broker's Agreement are each in full force and effect and have not been amended, modified or supplemented in any material respect except as approved in writing by the Agent. There are no defaults under any material provision of such instruments, and all conditions to the continuing effectiveness of such instruments required to be satisfied as of the date hereof have been satisfied. The Borrowers have not received any advice or information, written or verbal, from any of the parties to any of such instruments which, if true, could have a materially adverse effect upon the Borrowers' ability to effect the timely completion of the DIP Loan Units, (ii) the Developer's ability to market and sell the DIP Loan Units, (iii) the ability of the Borrowers to make direct connection from the completed DIP Loan Units to all necessary water, sewer, and other utility facilities, (iv) the ability of the Borrowers, the DIP Mortgagor or the Developer otherwise to perform its or their obligations under the DIP Loan Documents, or (v) the ability of the Guarantor to perform their obligations under the DIP Guaranty.  To the extent necessary, the Borrowers shall assume the Escrow Agreement, the Architect's Contract, the

Construction Contract, and/or the Broker's Agreement under Section 365 of the Bankruptcy Code, in order to complete construction and sale of the DIP Loan Units.

SECTION 3.14 <u>Accuracy of Cost Budget and Cash Flow Forecast</u>. The Cost Budget and Cash Flow Forecast provided to the Agent sets forth to the best of the Borrowers' knowledge, accurately and fully, all Project Costs, and the date or dates for disbursements to pay for all or portions of each category of Project Costs.

SECTION 3.15 <u>Brokers, Finders and Agents</u>. Neither the Borrowers nor the DIP Mortgagor or the Developer has employed or engaged any broker, finder or agent who may claim a commission or fee or other compensation with respect to the DIP Loan, the acquisition of the Land, the sale of the DIP Loan Units, or any of the transactions described herein, except pursuant to the Broker's Agreement. Without limiting the generality of Section 8.6 hereof, the Borrowers will indemnify and hold the Agent and the DIP Lenders harmless from any and all such claims of brokers or other claims for commissions or fees, as described above, and will further hold the Agent and the DIP Lenders harmless and indemnify the Agent and the DIP Lenders against all losses, damages, reasonable out-of-pocket costs and charges (including reasonable attorneys' fees) which the Agent or the DIP Lenders may sustain because of such claims or in consequence of defending against such claims.

SECTION 3.16 <u>Character of Representations and Warranties</u>. None of the financial statements or any certificate or statement furnished to the Agent or any DIP Lender by or on behalf of the Borrowers in connection with the DIP Loan, and none of the representations and warranties in this Agreement, or in any of the other DIP Loan Documents, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading. To the best knowledge of the Borrowers, there is no fact which materially adversely affects or in the future (so far as the Borrowers can now foresee) may materially adversely affect the ability of the Borrowers to observe or perform their obligations under the DIP Loan Documents which has not been set forth herein or in a certificate or opinion of counsel or other written statement furnished to the Agent or any DIP Lender by or on behalf of the Borrowers.

**ARTICLE IV**
**<u>CONDITIONS TO CLOSING</u>**

The DIP Lenders' obligation to make the DIP Loan available to the Borrowers hereunder is subject to the fulfillment, to the sole, personal and subjective satisfaction of the Agent and the DIP Lenders, prior to or on the Closing Date, of the following conditions:

SECTION 4.01        Representations and Warranties True at Closing. The representations and warranties contained in Article 3 of this Agreement and otherwise made by or on behalf of the Borrowers in connection with the DIP Loan shall be true and correct as of the Closing Date.

SECTION 4.02        No Event of Default. There shall exist at the Closing Date no condition or event which would constitute an Event of Default or which, after notice or lapse of time, or both, would constitute an Event of Default.

SECTION 4.03        Performance. The Borrowers shall have performed and complied with all agreements and conditions contained herein and required to be performed and complied with prior to or at the Closing Date.

SECTION 4.04        Compliance Certificate. Each of the Borrowers shall have delivered to the Agent the Compliance Certificate, dated concurrently with the DIP Note and signed by an authorized representative of the Borrowers.

SECTION 4.05        Title Insurance. The Borrowers shall have delivered to the Agent the Title Policy including such endorsements as the Agent may require, issued by the Title Insurer and reinsured by such number of additional title insurance companies as the Agent may require, in form, substance and amount (which shall not be less than the maximum principal amount of the DIP Loan) satisfactory to the Agent, insuring (or agreeing to insure) that the DIP Mortgage constitutes a valid first lien on Land (including the Phase 1 Units), free and clear of all defects, liens, encumbrances and exceptions to title whatsoever, except such as are shown on the Title Policy. The Title Policy shall effect full coverage against losses arising out of encroachments against boundary or setback lines, against losses from existing mechanics' or materialmen's liens and subsequent mechanics' and materialmen's liens which may gain priority over the DIP Mortgage, losses arising out of the violation of zoning ordinances and regulations and such other losses with respect to which the Agent may require coverage. The Title Policy shall contain no exclusions, stipulations or exceptions not theretofore approved by the Agent. THE DIP LENDERS HEREBY NOTIFY THE BORROWERS THAT THE DIP LENDERS MAY NOT MAKE THE GRANTING OF THE DIP LOAN CONTINGENT UPON THE BORROWERS PROCURING ANY SUCH POLICY OR POLICIES WITH A TITLE INSURER DESIGNATED BY THE DIP LENDERS.

SECTION 4.06        Financing Statement and Personal Property Lien Report: Court Report. The Borrowers shall have delivered to the Agent the Financing Statement and Personal Property Lien Report and the Court Report issued by the Title Searcher.

SECTION 4.07        Zoning. The Borrowers shall have furnished to the Agent evidence satisfactory to the Agent that the Land is duly and validly classified under the state land use law and zoned under the applicable county ordinances for the construction of condominium units for resort residential purposes.

SECTION 4.08        Plans and Specifications. The Borrowers shall have furnished to the Agent, and the Agent shall have approved:

(a)        a complete set of the Plans and Specifications, together with a certificate of the Architect to the effect that (i) the Plans and Specifications conform to the plans and

specifications approved by officers of the County of Kauai charged with the responsibility of issuing the Permits, and (ii) that such officers have issued all of the Permits required for the DIP Loan Units;

(b) copies of all of the Permits required for the DIP Loan Units, and the applications therefor; and

(c) as required by the Agent, copies of all other permits or approvals of any governmental or regulatory authority or agency having jurisdiction requisite for the construction and use of any of the improvements described in the Construction Contract, and all agreements from utility companies furnishing utility services necessary for the construction and use of such improvements for their intended purposes.

SECTION 4.09    Survey. The Borrowers shall have furnished to the Agent a survey of recent date prepared and certified as correct by a registered surveyor satisfactory to the Agent, disclosing the boundaries and area of the Land. Such survey shall comply with the Minimum Standard Detail Requirements for Land Court Title Surveys as adopted by the American Congress on Surveying and Mapping, and shall disclose:

(a) The location of the perimeter of the Land by courses and distances;

(b) All easements and rights-of-way, whether above ground or underground;

(c) Existing improvements and utilities;

(d) The lines of any streets abutting the Land and the width thereof; and

(e) Encroachments, if any, and the extent and the width thereof.

The Borrowers shall also furnish to the Agent a certificate from the surveyor, in form and substance satisfactory to the Agent, certifying that the Land consists wholly of parcels which have been legally subdivided in accordance with applicable state law and county ordinances.

SECTION 4.10    Soils Test Report. The Borrowers shall have delivered to the Agent a soils test report prepared by a soils engineer acceptable to the Agent, certifying that the Land is satisfactory for the improvements described in the Construction Contract.

SECTION 4.11    Construction Schedule: Schedule of Sources and Application of Funds. The Borrowers shall have furnished to the Agent, and the Agent shall have approved, a schedule of sources and applications of funds for the DIP Loan Units, a construction schedule with anticipated dates of finish for the DIP Loan Units, and a schedule of anticipated closings and DIP Loan repayment, in form and substance satisfactory to the Agent.

SECTION 4.12    Lists and Approval of Contractors, Subcontractors and Materialmen. The Borrowers shall have furnished or caused to be furnished, to the Agent, and the Agent shall have approved, correct lists of all contractors and subcontractors employed as of the Closing Date in connection with the construction of the DIP Loan Units, whose contracts are for $250,000.00 or more. Such list shall show the name, address and telephone number of each such contractor or

subcontractor, a general statement of the nature of the work to be done, the labor and materials to be supplied, the names of materialmen, if known, and the approximate dollar value of such labor, work or materials with respect to each. The Agent has the right to disapprove any contractor who, in the Agent's good faith determination, is deemed to be financially, or otherwise, unqualified. Failure by the Agent to disapprove a contractor shall not constitute a warranty or representation by the Agent that any contractor or subcontractor not so disapproved is in fact qualified. The Agent shall have the right to telephone or otherwise communicate with the General Contractor, or any other contractor or materialman, to verify the facts disclosed by such list or any application for any Advance, or for any other purpose.

SECTION 4.13      Insurance; Insurance Certificate. The Borrowers shall have delivered to the Agent: (a) the policies of insurance required by Section 7.03 of this Agreement and the other DIP Loan Documents and (b) if required by the Agent, a certification in form and substance satisfactory to the Agent by a financially responsible licensed insurance broker or agent that such policies of insurance comply with and satisfy all of the requirements for insurance (including but not limited to policy limits, risk coverage and endorsements) under Section 7.03 of this Agreement and under certain designated provisions in the other DIP Loan Documents.

SECTION 4.14      Approval of Condominium Documents. The Borrowers shall have furnished to the Agent and the Agent shall have approved, the Declaration, the Bylaws, the Developer's Public Report for the Condominium Project (for which the Borrowers shall have received an "effective date" from the Commission), the Condominium Map, the House Rules, the form of Unit Deeds, the specimen deposit receipt and sales contract for the DIP Loan Units, a list of all sales prices for such Units, as well as all literature, brochures and materials of any kind used in connection with the sales of such Units (collectively, the "Condominium Documents"). Any material modifications or changes to any of the Condominium Documents after the Closing Date shall require the Agent's written approval, which approval shall not be unreasonably withheld.

SECTION 4.15      [Reserved]

SECTION 4.16      Current Financial Statements. The Borrowers shall have delivered current financial statements satisfactory to the Agent, showing that no adverse changes have occurred in their financial condition, or the financial condition of the Guarantor, since the date of the financial statements previously delivered to the Agent.

SECTION 4.17      Evidence of Tax Payments; Tax Clearance Certificate. The Agent shall have received a Tax Clearance Certificate issued by the Department of Taxation of the State of Hawaii certifying that all taxes due to the State of Hawaii by the Borrowers, up to and including a date within thirty (30) days of the Closing Date have been paid.

SECTION 4.18      Compliance with Law; Governmental Authorization. All restrictive covenants, land use laws and regulations, zoning ordinances and regulations, building codes and regulations, environmental and ecological laws and regulations, and any other applicable laws, statutes, ordinances or regulations, shall have been fully complied with, and all licenses, permits

and all certificates required by governmental authorities with respect to the erection, completion, and use of the DIP Loan Units shall have been obtained.

SECTION 4.19         [Reserved]

SECTION 4.20         Borrowers' Ownership Structure and Organizational Documents and Proceedings.  All limited liability company proceedings taken by the Borrowers in connection with the DIP Facility hall be satisfactory in form and substance to the Agent and its counsel, and the Agent shall have received: (i) properly certified resolutions of the governing body of each of the Borrowers duly authorizing the execution and delivery of the DIP Loan Documents and the consummation of the transactions contemplated hereby, (ii) a certificate of good standing of each of the Borrowers issued by appropriate office of the jurisdiction of each Borrower's organization, (iii) certified copies of the organizational documents of each Borrower, (iv) a copy of the Operating Agreement of each Borrower, certified as true, collect and complete by the manager of such Borrower, (v) a Certificate of Authority for a foreign limited liability company to transact business in the State of Hawaii, pursuant to HRS Section 428-1002, issued by the Director of the DCCA; (vi) a completed Business Certification of Beneficial Owners, in form and substance satisfactory to the Agent, together with an ownership chart of each Borrower, describing the Borrower's ownership structure and identifying all members of and investors in the Borrower, in such detail as the Agent may reasonably require; and (vii) such authenticated copies of such other limited liability company documents as the Agent may reasonably request.

SECTION 4.21         Hazardous Waste Assurance. The Borrowers shall have delivered to the Agent a hazardous waste inspection report, and the Environmental Certificate and Indemnity, in form and substance satisfactory to the Agent relating to the Land.

SECTION 4.22         Approval of Cost Budget and Cash Flow Forecast. The Agent shall have received and approved the Cost Budget and Cash Flow Forecast.

SECTION 4.23         Post-Closing Items. To the extent the Agent has agreed that certain specified conditions set forth in this Article 4 may be deferred to a date after the Closing Date, the Borrowers and the Agent shall have entered into a "post-closing agreement", in form and substance satisfactory to the Agent, listing the items to be deferred, and the date by which such items shall be completed

**ARTICLE V**
**[RESERVED]**

**ARTICLE VI**
**DISBURSEMENT OF DIP LOAN FUNDS AND OTHER FUNDS**

The disbursement of the DIP Loan funds and other proceeds shall be made upon and subject to the following terms and conditions:

SECTION 6.01          [Reserved]

SECTION 6.02          Applications for Advances.

(a)      Applications for each Advance under this Agreement for payments to the General Contractor shall be made by the Borrowers no more frequently than once per month, on or about the fifteenth day of each month and at least fifteen (15) days before the date upon which the Advance is desired. Each such application shall be set forth on the standard AIA Application and Certification for Payment form or other form approved by the Agent, executed by the Borrowers and the General Contractor, and shall bear the written certification of the Architect and, if required by the Agent, be accompanied by a written certification of the Agent's Engineer. The application shall be for work actually done by the General Contractor under the Construction Contract, and for Materials actually incorporated into the DIP Loan Units, or delivered to, inventoried and stored on (or, with the approval of the Agent, off) the construction site, for incorporation into the DIP Loan Units, during the preceding month, or, in the case of the first such application, prior to the date of such application (provided that an Advance for such stored Materials shall not exceed $1,000,000.00). Such application shall not exceed the value of all suitably stored Materials and the value of the work, as certified by the Architect and the Agent Engineer, acceptably completed by the General Contractor, to the date thereof, less the Retention and less the aggregate of all prior payments made to the General Contractor pursuant to the Construction Contract. Such certification by the Architect, and the Agent's Engineer (if required), and shall state, among other things, that the aggregate of all payments made to the General Contractor under the Construction Contract, plus the Advance applied for, does not exceed one hundred percent (100%) of the value less the Retention -- such value being calculated as if the work and materials were part of a completed structure, as determined by the Agent -- of all work acceptably done, all Materials actually incorporated into the DIP Loan Units by the General Contractor, to the date thereof, and all Materials delivered to and stored on the construction site (or off-site if approved in writing by the Agent) for incorporation into the DIP Loan Units. The Agent shall disburse the Advance no later than fifteen (15) days after receipt of the AIA Application and Certification for Payment, and all other information and documentation required for such Advance, pursuant to this Agreement.

(b)      If any application for an Advance is to cover, in whole or in part, a payment to the Borrowers, the General Contractor or others, for the cost of any Materials, such application shall be accompanied by (i) evidence satisfactory to the Agent that the Materials are stored at a suitable location agreed to by the Borrowers and the Agent, are fully insured against damage or destruction for their full insurable value pursuant to a policy or policies under which the Agent and the Borrowers are additional loss payees, and are properly identified and segregated from materials and equipment not intended to be incorporated into the DIP Loan Units, (ii) unless the Materials shall, in the Agent's opinion, be satisfactorily covered by the Security Agreement, a security agreement, in form and substance satisfactory to the Agent, duly executed by the Borrowers, the General Contractor or a subcontractor (whichever shall have title to the Materials), granting to the Agent (if a Borrower shall have title) or granting to the Borrowers (if the General Contractor shall have title) or granting to the Borrowers and the General Contractor (if a subcontractor shall have title), a security interest in the Materials, (iii) a UCC-1 Financing Statement appropriately completed, and naming the necessary parties, (iv) unless the Agent shall be named as the secured party under such security agreement, an assignment to the Agent from the Borrowers or from the

Borrowers and the General Contractor (in case the General Contractor is a secured party) of the secured party's or parties' interest under such security agreement, (v) unless the Agent shall be named as a secured party in such UCC-1 Financing Statement, a UCC-3 Financing Statement, appropriately completed and duly executed by the necessary parties, perfecting the assignment of such security interest to the Agent, and (vi) documentary evidence satisfactory to the Agent that the Borrowers have, at their own expense, duly recorded such UCC-1 Financing Statement and UCC-3 Financing Statement (if required).

(c)     Applications on behalf of the Borrowers for payment of any other Project Costs shall be supported by vouchers verified and approved in writing by the Borrowers and such other evidence as shall be required by the Agent. Notwithstanding anything contained in the Cost Budget and Cash Flow Forecast, disbursements for such costs shall be made at such times, in such amounts and to such parties as the Agent shall deem advisable.

(d)     Each application for an Advance shall be deemed a certification by the Borrowers that, as of the date of such application, all representations and warranties contained in Article 3 are true and correct, and that the Borrowers are in compliance with all of the provisions of Articles 4, 5 and 6 of this Agreement.

(e)     The Borrowers hereby constitute and appoint the Agent its true and lawful attorney-in-fact to pay all such Advances directly (i) to the General Contractor and any subcontractors or other parties in payment of the sums due under the Construction Contract, (ii) to any other creditor furnishing labor or materials in connection with the construction or equipping of the DIP Loan Units and (iii) to any other person or entity having a claim upon, or who shall be a creditor of, the DIP Mortgaged Property, the DIP Collateral or the DIP Assigned Property. This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable. No further direction or authorization from the Borrowers shall be necessary to warrant such direct Advances, and all such Advances shall, to the extent of such Advances, directly satisfy the obligations of the Agent hereunder, and shall be secured by the DIP Mortgage, the DIP Security Agreement, the DIP Assignment of Rents and the DIP Assignment of Sales Contracts, as fully as if made to the Borrowers, regardless of the disposition thereof by the General Contractor, any subcontractor, materialman or other party. Nothing in this Section 6.02(e) shall be deemed to constitute the General Contractor, or any subcontractor, materialman or any other party, a third-party beneficiary of this Agreement.

SECTION 6.03      Conditions Precedent to Advances. The DIP Lenders' obligation to make each Advance hereunder shall be subject to the fulfillment, to the Agent's reasonable satisfaction, as of the time of application and as of the time of the Advance, of all of the conditions precedent set forth in Articles 4 and 5 as well as the conditions precedent set forth in this Section 6.03. The final Advance to the General Contractor shall also be subject to the provisions of Section 6.04 of this Agreement.

(a)     Representations and Warranties. The representations and warranties contained in Section 3 of this Agreement), and otherwise made by or on behalf of the Borrowers in connection with the DIP Loan shall be true and correct as of the time of each disbursement by the Agent under this Agreement, with the same effect as if made at such time.

(b)    <u>No Event of Default</u>. There shall exist at the time of each Advance no condition which would constitute an Event of Default or which, after notice or lapse of time, or both, would constitute an Event of Default

(c)    <u>Performance</u>. The Borrowers shall have performed and complied with all agreements and conditions contained in this Agreement which the Borrowers are required to perform and comply with prior to each Advance.

(d)    <u>Approval of Bonds</u>. The Agent shall have received and approved the Bonds. The DIP Lenders agree that contracts with subcontractors and material suppliers for less than $250,000.00 shall not require a bond.

(e)    <u>Governmental Authorization</u>. All licenses, permits and all certificates required by governmental authorities with respect to the erection, completion, and use of the DIP Loan Units shall have been obtained.

(f)    <u>Cost Overruns</u>. The Borrowers shall have fully complied with Sections 6.6 and 7.2 of this Agreement.

(g)    <u>Satisfactory Construction</u>. The Borrowers shall have furnished to the Agent a certification by (i) the Borrowers, the Architect and the General Contractor, and a certification by the Agent's Engineer (if requested) that the construction of the DIP Loan Units is proceeding satisfactorily in accordance with the Plans and Specification and the Construction Contract. Such certification by the Agent's Engineer, as well as any other certification required under this Agreement to be furnished by the Agent's Engineer, shall be separate from the General Contractor's, Architect's and Borrowers' certification, and may state that it is being furnished for the sole benefit of the Agent, as agent to the DIP Lenders. Each certification by the General Contractor, the Architect, and the Borrowers shall include the written representation that they have no cause or reason to believe that the remaining work under the Construction Contract cannot be completed on or before the completion date thereunder for an amount not greater than the aggregate amount of undisbursed sums (excluding Retentions pertaining to prior disbursements) shown on the Cost Budget and Cash Flow Forecast for payments under the Construction Contract. Any such certification may contain such exceptions or qualifications as may be deemed necessary by the Architect, the General Contractor or the Borrowers, in order to disclose fully and accurately the facts upon which such certification is based; provided, however, if the Agent shall not be satisfied with any such exception or with respect to the facts disclosed in such certification, the Agent may withhold further Advances until arrangements satisfactory to the Agent have been made.

(h)    <u>Indorsement to Title Policy</u>. The Agent shall be furnished with an indorsement to the Title Policy which by its terms shall be made a part of the Title Policy, in substantially the form of Exhibit "6" attached hereto and made a part hereof, extending the coverage of the Title Policy to such Advance, as well as any other sums disbursed or credited as provided for in Section 2.06 since the date of the last previous indorsement.

(i)    <u>Payment of Expenses of the Agent and the DIP Lenders</u>. The Borrowers shall have paid to the Agent the Loan Fee and all fees and Expenses provided for in Section 8.13

which the Agent shall determine to be due and payable as of the date of the application for such Advance.

(j)      Insolvency, Bankruptcy, etc. Except for the pending Chapter 11 Cases, the Borrowers, the Guarantor, and the Non-Debtor Pledgors shall not have become insolvent; or become voluntarily or involuntarily dissolved; or made an assignment for the benefit of creditors; or failed generally to pay its debts as they become due; or become the subject of an order for relief in an involuntary case under the bankruptcy laws as now or hereafter constituted, with such order remaining in effect and unstayed for a period of sixty (60) consecutive days; or commenced a voluntary case under the bankruptcy laws as now or hereafter constituted; or filed any petition or answer seeking for itself any arrangement, composition, adjustment, liquidation, dissolution or similar relief to which it may be entitled under any present or future statute, law or regulation; or filed any answer admitting the material allegations of any petition filed against it in any such proceedings, or sought or consented to or acquiesced in the appointment of, or taking possession by, any custodian, trustee, receiver or liquidator of it or of all or a substantial part of its properties or assets; or taken any action looking to its dissolution or liquidation; or failed to have dismissed any proceedings against it seeking any arrangement, composition, adjustment, liquidation, dissolution or similar relief to which it may be entitled under any present or future statute, law or regulation, within sixty (60) days after commencement thereof; or failed to have vacated or terminated the appointment of or taking possession by, any custodian, any trustee, receiver or liquidator of any or of all or a substantial part of its properties or assets, without its consent or acquiescence, within sixty (60) days after such appointment or taking of possession.]]

SECTION 6.04      Final Payment to the General Contractor. After both the completion of the construction specified by the Construction Contract and the expiration, without the filing of any applications for liens, of the statutory period for filing applications for and notices of mechanics' and materialmen's liens pursuant to Section 507-43, HRS, as the same may be amended, and upon the satisfaction of all the conditions precedent set forth in Section 6.3, the DIP Lenders shall make an Advance to cover the final payment due to the General Contractor under the Construction Contract; PROVIDED HOWEVER, that the construction shall not be considered complete for purposes of final payment UNLESS AND UNTIL THE AGENT SHALL HAVE RECEIVED:

(a)      Certification by the Architect, reasonably satisfactory to the Agent, that construction was substantially complete at the time of the first publication of the notice of completion for the DIP Loan Units covered by the Construction Contract and a certified copy of the affidavit of publication of notice of completion filed in the Fifth Circuit Court of the State of Hawaii;

(b)      Evidence satisfactory to the Agent that all work under the Construction Contract requiring inspection by county and other governmental authorities having jurisdiction has been duly inspected and approved by such authorities, and that all parties performing such work have been paid for such work, or will be paid for such work (if payment has not been made because the Agent has held or not applied any such payment);

(c)      A certification by the Architect and the Agent's Engineer (if required) that the DIP Loan Units have been completed substantially in accordance with the Plans and

Specifications and the Construction Contract, that all "punch-list" work under the Construction Contract has been completed to the satisfaction of the Architect, that the DIP Loan Units, as built, conform with all applicable zoning, environmental, building and land use ordinances and regulations and that no municipal authority has issued any notice of violation or nonconformity in connection with the DIP Loan Units, and, if applicable, that direct connection has been made to abutting roadways and water and sewer facilities;

(d)     A final perimeter survey, satisfactory to the Agent and the Title Insurer, showing the completed DIP Loan Units covered by the Construction Contract and all easements on the DIP Mortgaged Property, together with a certification, addressed to the Agent, as agent to the DIP Lenders, and the Title Insurer, by a registered surveyor satisfactory to the Agent, that the DIP Loan Units lie wholly within the boundaries of the Land without encroachment or violation of any zoning ordinances, building regulations or setback requirements; and

(e)     An indorsement to the Title Policy, which by its terms shall be made a part of the Title Policy, in substantially the form of Exhibit "6", extending the coverage of the Title Policy to the final Advance.

SECTION 6.05     Optional Conditions to Advance. The Agent may, as a condition precedent to the making of any Advance, require the Borrowers (a) to obtain and attach to each application for an Advance executed acknowledgments of payment of all sums due and releases of mechanics' and materialmen' s liens and lien rights for the sums covered by the immediately preceding Advance; and (b) to deliver to the Agent, concurrently with the making of the Advance to cover the final payment to the General Contractor under the Construction Contract, duly executed acknowledgments of payment and releases of mechanics' and materialmen' s liens and lien rights, in form satisfactory to the Agent, from the General Contractor, and all subcontractors and materialmen dealing directly with the General Contractor, which acknowledgments of payment and releases of liens shall cover all work, labor and materials, including equipment and fixtures of all kinds, done, performed or furnished for the construction and equipping of the DIP Loan Units.

SECTION 6.06     Interest Reserve. A portion of the proceeds of the DIP Loan (in the amount of $1,800,000) shall be reserved for the payment of interest on the DIP Loan, as an Interest Reserve. Notwithstanding the above, the Borrowers shall be permitted, subject to the provisions of this paragraph, to use their own funds to pay interest on the DIP Note. Unless the Borrowers advise the Agent in writing of its intent to use their own funds to pay interest on the DIP Note within five (5) Banking Days prior to the date such interest shall become due and payable, the Agent shall disburse funds from the Interest Reserve to pay interest on the DIP Note, subject to the provisions of this paragraph. If the Agent disburses funds from the Interest Reserve to pay interest on the DIP Note, such disbursement and payment shall be made on or before the date such interest becomes due and payable, or on such other date as the Agent may choose, provided that such disbursement and payment shall be made prior to the date on which the Borrowers would incur any late charge under the DIP Loan Documents. The Agent shall not be required to obtain any further application or authorization from the Borrowers in order to disburse funds from the Interest Reserve to pay such interest. The disbursement of funds from the Interest Reserve to pay interest

is not intended by the Agent, and shall not be construed, as a waiver of any term or condition of the DIP Loan Documents or as a waiver of any Event of Default.

Without limiting the generality of the foregoing, if at any time the Agent reasonably believes that the amount remaining in the Interest Reserve is or will be insufficient to pay interest under the DIP Note when due, the Agent shall have the right to require the Borrowers to deposit additional funds into the Interest Reserve Account, in an amount sufficient to cover the anticipated deficiency in the Interest Reserve. As additional security for the Borrowers' performance under the DIP Loan Documents, the Borrowers hereby irrevocably pledge and assign to the Agent, all monies at any time deposited in the Interest Reserve Account.

Notwithstanding the foregoing, or any projections in the Cost Budget and Cash Flow Forecast indicating an application of a portion of the DIP Loan proceeds to the payment of interest on the DIP Note, neither the Agent nor the DIP Lenders shall be under any contractual obligation to make any disbursement of DIP Loan proceeds for such purpose (including any amount from the Interest Reserve or any amount from the Interest Reserve Account) if an Event of Default has occurred hereunder, or if the projected total Project Costs, as redetermined by the Agent at any time pursuant to Section 7.02, shall exceed the New Money portion of the DIP Loan.

SECTION 6.07        Monthly Disbursements Restricted to Amount Shown in Each Category of Costs for that Month. Notwithstanding any contrary provision in this Agreement, the DIP Lenders will not be obligated to disburse DIP Loan proceeds for payment of costs or expenses included in any category shown in the Cost Budget and Cash Flow Forecast (and as the same may be redetermined by the Agent pursuant to Section 7.2) in an amount which exceeds the amount set forth therein for such category, nor will the DIP Lenders be obligated to disburse in any month for payment of any category of costs an amount which either exceeds the amount shown on the Cost Budget and Cash Flow Forecast (and as the same maybe redetermined by the Agent pursuant to Section 7.02) for disbursement that month, or if added to the amounts disbursed in prior months for that category would exceed the cumulative total for such month, unless (a) the Borrowers furnish to the Agent documentary evidence, satisfactory to the Agent, that any such excess is offset by an existing reduction in an equal or greater amount in another cost category, or (b) the Borrowers comply with the provisions of Section 7.02 of this Agreement to assure the payment or subordination of such excess. If the amount of the Borrowers' monthly application submitted in conformity with the provisions of Article 6 exceeds the amount set forth in the Cost Budget and Cash Flow Forecast for the month, it is the DIP Lenders' intention to waive the requirements set forth in clauses (a) and (b) of the preceding sentence if the excess results solely from the orderly and satisfactory completion of the DIP Loan Units earlier than contemplated.

SECTION 6.08        Amounts and Order of Disbursement of Funds. The DIP Loan proceeds shall be disbursed by the Agent pursuant and subject to the provisions of Article 6 of this Agreement in such amounts and in such order of priority as the Agent shall determine in its sole judgment; provided, however, that disbursements are made timely after all conditions thereto have been satisfied, in order to avoid suspension of work or application of mechanics' liens.

SECTION 6.09        Conditions are Solely for Benefit of the DIP Lenders. All conditions of the obligations of the DIP Lenders to make Advances hereunder are imposed solely and exclusively for the benefit of the DIP Lenders and their successors and assigns, and no other person

shall have standing to require satisfaction of such conditions in accordance with their terms, and no other person (including, without limitation, any surety, contractor, subcontractor, materialman, or junior lienholder) shall, under any circumstances, be deemed to be the beneficiary of such conditions, any or all of which may be freely waived, in whole or in part, by the Agent at any time if, in its sole discretion, it deems it advisable to do so.

SECTION 6.10      Advances Made to the Borrowers; Trust Fund. All Advances made to the Borrowers under the DIP Loan to pay Project Costs shall be held by the Borrowers as a trust fund for the purpose of paying the Project Costs, and the Borrowers shall apply the same solely for such purpose.

SECTION 6.11      Limitation of Responsibility. The making of any Advance or part of any such Advance shall not be deemed to constitute an approval or acceptance by the Agent or the DIP Lenders of the work theretofore done. Inspections and approvals of the Plans and Specifications, the DIP Loan Units and the workmanship and materials used therein, and the exercise of any other right of inspection or inquiry granted to the Agent or the DIP Lenders in this Agreement, shall impose no responsibility or liability of any nature whatsoever on the Agent or the DIP Lender, the DIP Lenders' sole obligation hereunder being to make the Advances if and to the extent required by this Agreement.

SECTION 6.12      [Reserved]

## ARTICLE VII
## COVENANTS OF THE BORROWERS CONCERNING CONSTRUCTION

Each Borrower hereby covenants with the Agent and the DIP Lenders that:

SECTION 7.01      Compliance with Plans and Specifications, Construction Contract, and Applicable Laws and Ordinances. The Borrowers shall cause the DIP Loan Units (a) to be constructed and equipped in a diligent and orderly manner and substantially in accordance with the Plans and Specifications approved by the Agent, the Construction Contract and all applicable ordinances, building, (b) to be constructed entirely on the Land, and not to encroach upon or overhang any easement or right-of-way or the land of others, (c) to be constructed wholly within any building restriction lines, however established, and (d) not to violate any applicable use or other restrictions contained in prior conveyances, zoning ordinances or regulations.

The Borrowers shall ensure that the consummation of the transactions contemplated by the DIP Loan Documents, including, but not limited to, the work required under the Construction Contract, does not and will not conflict with or result in a breach of any declaration pertaining to the Land, or any community association instruments pertaining to the Land, or any law, statute, ordinance, regulation, order, writ, injunction, decree or judgment of any court or governmental instrumentality, domestic or foreign. The Borrowers shall obtain all required consents, approvals and authorizations and shall make all necessary registrations, declarations and filings in order to comply with such declarations and community association instruments, and with applicable subdivision, building, setback, building moratorium, special design district, historic preservation, and other ecological and environmental requirements, state land use classification and county zoning, and all other federal, state and municipal laws, regulations, codes and rules.

The Borrowers shall, within fifteen (15) business days after the foundation lines for each building or structure comprising a part of the DIP Loan Units are physically established, provide the Agent with an endorsement to the Title Policy, and a verified statement by a licensed surveyor satisfactory to the Agent, that such foundations are located wholly within the perimeter boundary of the Land, and that the foundation lines will comply with all applicable setback and similar regulations. The Borrowers shall strictly enforce the Construction Contract to assure that the General Contractor promptly and diligently performs the obligations on its part to be performed thereunder in a manner preserving to the DIP Lenders their security in the Land, the DIP Mortgaged Property, the DIP Collateral and the DIP Assigned Property. Promptly after the Borrowers discover that any estimate or allowance in the Construction Contract will be insufficient, the Borrowers shall give the Agent notice of such insufficiency. The Borrowers will cause the DIP Loan Units to be completed and certificates of occupancy to be issued for all DIP Loan Units, and all requirements of Section 6.04 with respect thereto to be fulfilled, on or before December 31, 2026.

SECTION 7.02      Estimated Cost Overruns. The Agent may from time to time redetermine the projected total Project Costs from current cost data and other information obtained by or otherwise made available to the Agent, including, but not limited to, applications for Advances made by the Borrowers. If, in the reasonable judgment of the Agent, the projected total Project Costs, as so redetermined, shall at any time exceed the total Project Costs specified in the Cost Budget and Cash Flow Forecast, or if such projected total Project Costs, as so redetermined, shall exceed the amount of the New Money portion of the DIP Loan, then and in any such case, within thirty (30) days after receipt of a written request from the Agent, the Borrowers shall:

(a)      deposit with the Agent for disbursement pursuant to Section 6 of this Agreement additional funds equal to the Cost Overrun, or

(b)      furnish to the Agent a letter of credit or other documentary evidence, in form and substance satisfactory to the Agent, confirming that sufficient additional funds are unconditionally and irrevocably committed by a financially responsible and substantial investor or lender to the payment of the Cost Overrun.

SECTION 7.03      Insurance. The Borrowers shall provide, or cause to be provided, (i) hazard insurance by blanket coverage against causes of loss in builder's risk completed value form, with such additional coverages as the Agent may require, (ii) commercial general liability insurance (covering liability with respect to the DIP Mortgaged Property), (iii) workers' compensation insurance and (iv) such other insurance as the Agent may require, all in form and amount satisfactory to the Agent and bearing such endorsements as shall be deemed necessary by the Agent. The Borrowers hereby acknowledges the DIP Lenders' execution of this Agreement as written notice to the Borrowers that the DIP LENDERS MAY NOT MAKE THE GRANTING OF THE DIP LOAN CONTINGENT UPON THE BORROWERS PROCURING ANY REQUIRED INSURANCE FROM AN INSURANCE COMPANY DESIGNATED BY THE DIP LENDERS. All losses payable under such hazard insurance shall be payable to the Agent, as agent for the DIP Lenders, as mortgagee, pursuant to a standard mortgagee clause. The originals or certified copies of all policies or certificates of insurance in respect thereof, stamped "paid" in each case, shall be deposited with the Agent. Each insurer shall agree by endorsement upon the policy or policies issued by it, or by independent instruments furnished to the Agent, that it will give the Agent at least thirty (30) days' prior written notice before any such policy or policies shall be altered or

canceled, and that no act or default of the Borrowers or any other person shall affect the right of the Agent, as agent for the DIP Lenders, to recover under such policy or policies in case of loss or damage.

SECTION 7.04      Damage or Destruction. In case of loss or damage to any of the DIP Loan Units by any insured casualty, the Borrowers shall promptly pay to the Agent the applicable "Release Price" for such damaged or destroyed Unit (either from the proceeds of insurance or otherwise), or, if the Agent shall consent in writing, proceed with the resumption of construction of such Unit, including the repair of all damage resulting from such cause and the restoration of such Unit to its former condition. If the Agent has consented to the Borrowers resuming construction after such loss or damage, the Agent shall make the insurance proceeds available to the Borrowers on terms consistent with the construction disbursement provisions of this Agreement.

SECTION 7.05      Change Orders. All requests for changes in the Plans and Specifications for the DIP Loan Units which alter the original Plans and Specifications for DIP Loan Units, other than minor changes involving no extra cost, must be in writing, signed by the Borrowers and the Architect, and shall be delivered to the Agent promptly after execution and before performance of the work. The Borrowers shall not permit the performance of any work pursuant to any Change Order materially affecting the value or use of the DIP Loan Units, or which will result in an increase or decrease in the aggregate of the contract prices for the construction of the DIP Loan Units in excess of $50,000.00, nor pursuant to any Change Order which, together with the aggregate of change orders theretofore executed by the Borrowers, will result in total increases or total decreases in such prices in excess of $250,000.00, unless, in either case, it shall have received the written approval of the Agent to such Change Order. Each such computation will be made prior to giving effect to any cost savings in such Change Order. Without limiting the generality of the foregoing, the Borrowers will not direct or permit the performance of any work pursuant to any Change Order which would result in a material change in the structural composition or the quality of the DIP Loan Units, or a change in the number of the DIP Loan Units, the number of parking stalls, or the common elements of the Condominium Project, as described in the Declaration, without in each case the prior written approval of the Agent. The Borrowers will obtain all required permits or authorizations from governmental authorities having jurisdiction thereover before approving or requesting any Change Order, regardless of the price thereof. The Borrowers will submit copies of all Change Orders to the Agent's Engineer regardless of the nature or size of such change or whether the Agent's prior approval is required under this Section 7.05.

SECTION 7.06      Modifications of Construction Contract, Architect's Contract, etc. The Borrowers shall not make, or permit to be made, any modification in the Construction Contract, the Architect's Contract, or any contract between the Borrowers (or any of them) and any other person or entity supplying labor, equipment or materials to the DIP Loan Units, unless the Borrowers shall have received the prior written approval of the Agent.

SECTION 7.07      Defects. The Borrowers shall, upon demand of the Agent, promptly correct any defect in the DIP Loan Units, or any departure from the Plans and Specifications, not approved by the Agent, including without limitation, any encroachment by the DIP Loan Units over any boundary line, any established building setback lines or any street lines. After any such request by the Agent, no further work shall be done upon that portion of the DIP Loan Units so

affected without the prior written consent of the Agent unless and until such defective condition has been corrected.

SECTION 7.08      Liens. The Borrowers shall not, without the prior written consent of the Agent, create, or suffer to be created, any mechanics', materialmen' s, laborers, tax, statutory or other lien or charge upon the DIP Loan Units, the Land, the DIP Mortgaged Property, the DIP Collateral, or the DIP Assigned Property, or any part thereof, except liens, security interests or charges approved in writing by the Agent and liens for taxes or assessments not yet payable or payable without penalty so long as payable.

SECTION 7.09      Appointment of Inspecting Engineer. The Agent may retain, at the sole cost and expense of the Borrowers, the Agent's Engineer, to review and inspect the Plans and Specifications, to inspect the construction of the DIP Loan Units, to report to the Agent on the conformity of such construction with the Plans and Specifications, to certify requests for Change Orders and Advances and to perform such other services as may be requested by the Agent. No consent, approval or other action by the Agent's Engineer shall be deemed to be a release or waiver of any of the terms and conditions of this Agreement or the other DIP Loan Documents.

SECTION 7.10      Status Reports. At least monthly, or more frequently if requested by the Agent, the Borrowers shall cause their management personnel to meet with representatives of the Agent at the project site or at such other locations as may be designated by the Agent to discuss the progress of construction, to report on the progress of sales of the DIP Loan Units, to furnish pertinent information relating to the DIP Loan or the DIP Loan Units, and to discuss and provide such other information as the Agent may request.

SECTION 7.11      The DIP Lender's Right of Entry and Inspection. The Agent, the Agent's Engineer and the agents of either shall at all reasonable times during normal business hours, and with at least 24 hours' notice, during the construction of the DIP Loan Units, have the right of entry upon and free and unfettered access to the construction site and the right to inspect all work done, labor performed, materials and equipment furnished with respect to such construction, provided that there is no material interference with the construction work, and to inspect, and to make extracts from or copies of, the Plans and Specifications, as amended from time to time, and all books, contracts, subcontracts, records and papers, wherever located, of the Borrowers. All such books, contracts, subcontracts, records and papers will be made available to the Agent, the Agent's Engineer or the agents of either promptly upon demand by the Agent. The Agent shall be under no duty to supervise or to inspect the work or construction or any books and records, it being understood that any such inspection by the Agent's Engineer or the agents of the Agent is for the sole purpose of preserving the Agent's and the DIP Lenders' rights hereunder. Any such inspection not followed by notice of default shall not constitute a representation by the Agent that there has been or will be compliance with the Plans and Specifications, or that the work is free from defective materials and workmanship or that the Borrowers is not otherwise in default hereunder.

SECTION 7.12      Waste Materials. The Borrowers shall keep the Land and the DIP Loan Units free from unreasonable accumulations of waste materials and refuse at all times, and prior to completion of the DIP Loan Units will remove, or cause to be removed, all waste materials and refuse from and about the Land, and all tools, surplus materials and any and all structures and

equipment utilized in connection with the prefabrication, erection and construction of the DIP Loan Units.

SECTION 7.13     Default in Construction; Other Defaults. If at any time prior to the completion of the construction and equipping of the DIP Loan Units the same shall be abandoned or work thereon shall cease for any cause or causes other than those permitted by the Construction Contract, or if the DIP Loan Units shall not be constructed and equipped substantially in accordance with the Plans and Specifications (except as to changes therein approved by the Agent or permitted by Section 7.05), or if changes shall be made in the Plans and Specifications without the Agent's prior written approval (except as to changes permitted by Section 7.05), or if the Borrowers shall fail in any material respect to comply with the provisions of this Agreement, then, and in any such event, the Agent, at its option, may refuse to make further Advances, may accelerate the indebtedness under the DIP Note and the other DIP Loan Documents, and, in addition, without thereby impairing any of the rights, powers or privileges of the Agent or the DIP Lenders under any of the DIP Loan Documents, may enter into possession of the construction site and perform any and all work and labor necessary to complete the DIP Loan Units substantially according to the Plans and Specifications, and all sums expended by the Agent or the Lenders in so doing, including, but not limited to, a construction supervision fee, payable to the Agent, equal to ten percent ( 10%) of all such sums, shall be deemed to be paid for the account of the Borrowers and secured by the DIP Mortgage, the DIP Security Agreement, the DIP Assignment of Rents and the DIP Assignment of Sales Contracts, notwithstanding that such expenditures (including such fee) may exceed the amount of the DIP Loan, or the cost of the Construction Contract or any other contracts. For this purpose, the Borrowers hereby constitute and appoint the Agent its true and lawful attorney-in-fact, with full power of substitution, to complete such construction and equipping in the name of the Borrowers, and hereby empowers such attorney or attorneys:

(a)     To use any of the DIP Loan proceeds, funds deposited with the Agent pursuant to Section 7.02(a), or Escrowed Proceeds which may remain unadvanced for the purpose of completing the construction and equipping of the DIP Loan Units in the manner called for by the Plans and Specifications;

(b)     To make such changes and corrections in the Plans and Specifications as shall be necessary or desirable to complete the construction of the DIP Loan Units in substantially the manner contemplated by the Plans and Specifications;

(c)     To employ such contractors, subcontractors, agents, engineers, architects and inspectors as shall be required for such purposes;

(d)     To pay, settle or compromise all bills and claims which may be or become liens or security interests against the Land, the Mortgaged Property, the DIP Collateral or the Assigned Property, or any part thereof;

(e)     To execute applications and certificates in the name of the Borrowers which may be required by the Construction Contract, the Architect's Contract, the Loan Documents or any other agreement or instrument executed by the Borrowers in connection with the DIP Loan Units;

(f)     To prosecute and defend all actions or proceedings in connection with the construction of the DIP Loan Units, or the Land, the DIP Mortgaged Property, the DIP Collateral, or the DIP Assigned Property, and to take such action and require such performance as such attorney deems necessary under the Construction Contract, and the DIP Loan Documents;

(g)     To enter into possession of and to sell, convey, rent or lease the DIP Loan Units, or any portion or portions thereof; and

(h)     To do any and every other act which the Borrowers might do in their own behalf.  This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable. The Borrowers hereby assign and quitclaim to the Agent all sums to be advanced under the DIP Loan as well as all Escrowed Proceeds, conditioned upon the use of such sums in trust for the completion and equipping of the DIP Loan Units, and for payment of all sums due the DIP Lenders pursuant to the terms of the DIP Loan Documents.

SECTION 7.14     Signs; Other Publicity. The Borrowers will at the request of the Agent prominently display on the construction site a sign satisfactory in design to the Agent informing the public that the DIP Lenders are the construction lenders for the DIP Loan Units. The Borrowers shall return to the Agent upon the completion of construction all signs furnished or posted on the Land by the Agent to identify the DIP Lenders as the construction lenders. The DIP Lenders will have the right to obtain other publicity in connection therewith through press releases and participation in ground breaking and opening ceremonies and similar events.

### ARTICLE VIII
### OTHER COVENANTS OF THE BORROWERS

Each Borrower covenants and agrees with the Agent and the DIP Lenders as follows:

SECTION 8.01     Information. The Borrowers shall (a) furnish to the Agent with reasonable promptness such data and information, financial or otherwise, concerning the Borrowers, the DIP Mortgagor, the Developer, the Guarantor or the Condominium Project, as from time to time may reasonably be requested by the Agent; (b) promptly notify the Agent of any condition or event which constitutes a breach or event of default of any covenant, condition, warranty, representation or provision of any of the DIP Loan Documents, the Construction Contract, the Architect's Contract, or any contract between any of the Borrowers and any other person or entity supplying labor, equipment or materials to the DIP Loan Units, and of any materially adverse change in the financial condition of the Borrowers or the Guarantor; and (c) permit any authorized representative of the Agent to inspect the Borrowers' books of account (and to make extracts or copies therefrom) and to discuss the Borrowers' affairs, finances and accounts with its officers, all at such reasonable times and as often as the Agent may reasonably request.

SECTION 8.02     Payment of Taxes. The Borrowers shall pay or cause to be paid all taxes, assessments, or other governmental charges levied upon any of their properties or assets, or in respect of its income before the same become delinquent, except that the Borrowers will have the right to contest assessments and other charges in the manner provided in Section 9.02.

SECTION 8.03     Litigation. The Borrowers will give the Agent prompt notice of: (a) any litigation or claims of any kind which might subject the Borrowers or the Guarantor to any

liability, whether covered by insurance or not, and (b) all complaints and charges filed by any governmental agency or any other party affecting the construction of the DIP Loan Units or development of the Condominium Project, the Land, the DIP Mortgaged Property, the DIP Collateral or the DIP Assigned Property, or exercising supervision or control of the Borrowers, the DIP Mortgagor, the Developer or the Guarantor, or their respective businesses or assets which may delay or require changes in construction of the DIP Loan Units or development of the Condominium Project, or impair the security of the DIP Lenders or adversely affect any of their rights under any of the DIP Loan Documents.

SECTION 8.04     Compliance with DIP Loan Documents and Other Documents. The Borrowers shall duly perform and observe all covenants, conditions, undertakings and obligations to be performed by the Borrowers under the DIP Loan Documents. The Borrowers shall comply with and perform all conditions, covenants, undertakings and obligations on their part to be complied with or performed pursuant to the Construction Contract, the Architect's Contract, or any contract between the Borrowers and any other person or entity supplying labor, equipment or materials to the DIP Loan Units or the development of the Condominium Project, and will not amend or modify any of such instruments without the prior written consent of the Agent.

SECTION 8.05     Preservation of Juristic Existence. The Borrowers shall maintain their juristic existence in good standing under the laws of the jurisdiction of its formation and any other jurisdiction in which it conducts business, and shall not, without the prior written consent of the Agent, amend, modify, or terminate its constituent documents, true and correct copies of which the Borrowers represent have been provided to the Agent. The Borrowers shall cause the DIP Mortgagor and the Developer to maintain their respective juristic existences in good standing in the State of Hawaii and in all other all jurisdictions in which they conduct business.

SECTION 8.06     Indemnification of the Agent and the DIP Lenders. The Borrowers shall indemnify and hold the Agent and the DIP Lenders harmless from any and all claims asserted against the Agent or any DIP Lender by any person, entity or governmental authority arising out of or in connection with the construction of the DIP Loan Units, except for claims arising out of or in connection with the Agent's or the DIP Lenders' gross negligence or willful misconduct. The Agent and each DIP Lender shall be entitled to appear in any action or proceeding to defend itself against such claims, and all costs incurred by the Agent or any DIP Lender in connection therewith, including reasonable attorneys' fees, shall be reimbursed by the Borrowers within ten (10) days after presentment, as provided in Section 8.13. Any failure to so reimburse the Agent or a DIP Lender within the specified time period shall constitute an Event of Default under this Agreement, and the unreimbursed amount shall thereupon be added to the principal balance of the DIP Note and shall bear interest at the Default Rate until paid.

The Agent shall, at its sole option, be entitled to settle or compromise any asserted claim against it, and such settlement shall be binding upon the Borrowers for purposes of this indemnification. Payment thereof by the Agent or the payment by the Agent or any DIP Lender of any judgment or claim successfully perfected against the Agent or such DIP Lender (except for judgments or claims based in whole or part upon the Agent's or such DIP Lender's gross negligence or willful misconduct) shall be added to the balance of the DIP Loan and shall bear interest at the Default Rate until paid. The agreements contained in this section shall survive repayment of the DIP Loan and shall survive the termination of any other portions of this Agreement.

SECTION 8.07      Other Projects. The Borrowers shall not enter into any agreements, arrangements, or ventures which shall impair its ability to perform its obligations under the DIP Loan Documents.

SECTION 8.08      Indebtedness. The Borrowers shall not create, assume or guarantee or become or remain liable for, or committed to incur directly or indirectly, any indebtedness except:

(a)      Indebtedness in respect of the DIP Loan Documents;

(b)      Indebtedness in respect of the Prepetition Senior Loan Documents;

(c)      Indebtedness in respect of the Prepetition Junior Loan Documents;

(d)      Indebtedness for taxes, assessments, governmental charges or levies to the extent that payment thereof shall not at the time be required to be made in accordance with the provisions of Section 9 .2;

(e)      Indebtedness incurred in the ordinary course of business which will not materially impair the ability of the Borrowers to repay the DIP Loan; and

(f)      Indebtedness approved by the Agent in writing.

SECTION 8.09      Mortgages, Liens and Encumbrances. The Borrowers shall not incur or suffer to be created or incurred or to exist any encumbrance, mortgage, security interest, pledge, lien or charge of any kind upon any of its property or assets of any character, whether now owned or hereafter acquired, or transfer any of such property or assets for the purpose of subjecting the same to the payment of any indebtedness or performance of any other obligation, or acquire or have an option to acquire any property or assets upon conditional sale or other title retention agreement, device or arrangement; PROVIDED, HOWEVER, that the Borrowers may create or incur or suffer to be created or incurred or to exist:

(a)      Liens for taxes or assessments for governmental charges or levies if payment thereof shall not at the time be required to be made in accordance with the provisions of Section 9 .2;

(b)      Liens in respect of pledges and deposits under workers' compensation laws or similar legislation, and in respect of pledges or deposits in connection with appeal or similar bonds incidental to the conduct of litigation, and liens incidental to the conduct of the business of the Borrowers not incurred in connection with the borrowing of money or the obtaining of advances or credit and which do not in the aggregate materially detract from the value of its assets or property;

(c)      The lien of the DIP Mortgage;

(d)      The security interests and charges of the DIP Security Agreement, the DIP Assignment of Rents and the DIP Assignment of Sales Contracts; and

(e)      Any other liens with the prior written approval of the Agent.

SECTION 8.10      Investments, Loans and Advances. The Borrowers shall not directly or indirectly purchase or acquire any stock or other securities of or make or permit to remain outstanding any loan or advance to or investment in any corporation, association, partnership, organization or individual except such as may be approved in writing by the Agent.

SECTION 8.11      Anticipation of Payment. The Borrowers shall not pay or discharge any of its obligations (other than the DIP Note or the DIP Loan) prior to the maturity thereof.

SECTION 8.12      Loan Fee. On or before the Closing Date, the Borrowers shall pay to the DIP Lender the sum of $450,000 representing the Loan Fee.

SECTION 8.13      Expenses. Whether or not the transactions hereby contemplated shall be consummated, the Borrowers shall assume and pay upon demand of the Agent:

(a)      All out-of-pocket expenses incurred by the Agent in connection with the making and continued administration of the DIP Loan, including, but not limited to, the fees and disbursements and expenses of legal counsel for the Agent and the construction inspection expenses of the Agent's Engineer;

(b)      All premiums for the Title Policy, Financing Statement and Personal Property Lien Report and Court Report, filing and recording fees, appraisal fees, surveyor's fees, escrow fees, conveyance taxes, any and all advances or payments made by the Agent or any DIP Lender pursuant to this Agreement or any of the other DIP Loan Documents, and other similar or dissimilar expenses and charges in connection with the administration, servicing or collection of the DIP Loan, including restructuring of the DIP Loan, all of which shall constitute an additional liability owing by the Borrowers to the Agent; and

(c)      All costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred by the Agent or the DIP Lenders as a result of an Event of Default or for the purpose of negotiating a resolution of any default (whether by means of refinancing or otherwise and whether or not successful) or for the purpose of effecting collection of the DIP Loan or any portion thereof, principal and interest, or any other sums required to be paid by the Borrowers or the Guarantor pursuant to any of the DIP Loan Documents, when the same shall become due and payable (whether at the stated maturity thereof or upon any acceleration of the maturity thereof).

SECTION 8.14      [Reserved]

SECTION 8.15      Reporting Requirements. For as long as the DIP Loan is outstanding, Borrowers will, unless otherwise permitted by Agent in writing, provide the following to the Agent:

(a)      no later than ninety (90) days after the end of each of the Borrowers' calendar years, company-prepared financial statements of the Borrowers, in form and substance satisfactory to the Agent;

(b)      no later than thirty (30) days after filing a true and correct copy of the Borrowers' and Guarantor's federal and State of Hawaii income tax returns, in form and substance satisfactory to the Agent;

(c)      no later than one hundred twenty (120) days after the end of each calendar year, the Guarantor's personally-prepared financial statements, in form and substance satisfactory to the Agent;

(d)      the monthly sales activity, escrow and status report for the DIP Loan Units, as required by Section 8.22; and

(e)      promptly from time to time on request, any other financial or other information concerning the Borrowers' business, conditions and affairs as the Agent may reasonably request.

SECTION 8.16      Depository Account. The Borrowers shall, at all times while any portion of the DIP Loan is outstanding, maintain all of its project-related depository accounts with the Agent, as additional security for the DIP Loan, unless the same is contrary to state or federal law.

SECTION 8.17      Agreements Under Borrowers' Operating Agreement. The Borrowers shall not, without the prior written consent of the Agent, make any distributions to its members under such Borrowers' Operating Agreements, until all amounts under the DIP Loan and the DIP Loan Documents have been paid in full.

SECTION 8.18      Covenants of the Borrowers Concerning Development of the Improvements as a Condominium Property Regime. The Borrowers covenant and agree with the Agent as follows:

(a)      Development as Condominium Property Regime. The Borrowers shall take all appropriate steps necessary, in their reasonable discretion and in accordance with their development plans, to develop or cause the Developer to develop, the Land and improvements to be constructed thereon (including the DIP Loan Units) as a Condominium Property Regime in compliance with the Act, the rules and regulations issued by the Commission and any other applicable ordinances, statutes, regulations or requirements of regulatory authorities having jurisdiction over such development.

(b)      Approval by Agent. The Borrowers shall obtain the Agent's prior written approval of all documents to be filed or recorded by the Borrowers, the DIP Mortgagor or the Developer in the Office of the Assistant Registrar of the Land Court of the State of Hawaii, or the Bureau of Conveyances of the State of Hawaii, or to be filed with the Commission, for any purpose with respect to the DIP Mortgaged Property, or the Condominium Project. For so long as the Borrowers, the DIP Mortgagor or the Developer has the power and the right, without the consent of condominium unit purchasers, to do so, the Borrowers will make, will cause the DIP Mortgagor or the Developer to make or propose to the applicable approving governmental authority or counter party, all changes to any of such documents which may from time to time be reasonably requested by the Agent or its counsel in order that, in the reasonable opinion of the Agent and its counsel, such documents will comply with the Act, the rules and regulations issued by the Commission,

and other applicable ordinances, statutes, regulations or regulatory requirements; provided that the Agent shall not require the Borrowers, the DIP Mortgagor or the Developer to make any changes that may be considered "material changes" that would require the Borrowers, the DIP Mortgagor or the Developer to offer rights of rescission to buyers. The Agent shall not be required to execute the Declaration or any amendment thereto. So long as the DIP Loan is outstanding the Agent shall have the right:

(i)     To exercise, as a member of the Association of Unit Owners of the Condominium Project (the "Association") all voting rights appurtenant to the Phase 1 Units subject to the Mortgage;

(ii)     To approve material changes to the initial operating budget and vote, as a member of the Association, on all subsequent operating budgets (unless prohibited by the Act, the Declaration or the Bylaws of the Association);

(iii)     As a member of the Association, with respect to the Phase 1 Units then subject to the Mortgage, to vote for the election of directors of the Association, to receive notices of and to attend meetings of the directors; and

(iv)     To approve any change to the initial managing agent, if made prior to the date that the Borrowers turn over control of the Association and, thereafter, as a member of the Association, to vote for any succeeding managing agent (unless prohibited under the Bylaws).

(c)     Condominium Sales Program. In compliance with the provisions of the Act, the rules and regulations issued by the Commission, and all other applicable ordinances, statutes, regulations or requirements of regulatory authorities having jurisdiction, the Borrowers shall take, or cause the Mortgagor or the Developer to take, all appropriate steps necessary, in the Borrowers' reasonable discretion and in accordance with its development plans, to undertake and diligently pursue a program for the sale of the DIP Loan Units in the Condominium Project. Each such sale of a DIP Loan Unit shall be pursuant to a Sales Contract and the Borrowers shall diligently proceed, or cause the Mortgagor or the Developer to diligently proceed, to close the sale comprehended thereby and to repay the Line and the 2023A&D Loan from the proceeds of such sale; provided, however, that the Borrowers (or the Mortgagor or the Developer) shall have the right, from time to time, without the consent of the Agent, to negotiate a mutual cancellation of a Sales Contract for a DIP Loan Unit with a prospective buyer as long as (i) there is no existing Event of Default; and (ii) such cancellation is subject to the Borrowers, the Mortgagor or the Developer having first entered into a Binding Sales Contract with a Pre-Qualified Buyer for such DIP Loan Unit within thirty (30) days after such cancellation. The purchase price payable for a DIP Loan Unit under each such Sales Contract shall be equal to or greater than the Minimum Sales Price for such DIP Loan Unit. The Borrowers will institute or cause the Mortgagor or the Developer to institute such sales procedures as will ensure that the advertising of DIP Loan Units for sale and the sales activities of it or its agents do not constitute the offering of a "security" as that term is used in the Securities Act of 1933 or the Securities Exchange Act of 1934 and similar applicable laws. The Borrowers covenant that if the Condominium Project has been advertised for sale outside of the State of Hawaii by the Borrowers or their agents, or if purchasers have been solicited outside of the State of Hawaii by the Borrowers or their agents, and if such advertisement or solicitation

allows such purchasers to cancel their Sales Contracts, the Borrowers shall take such reasonable actions as the Agent may require in order to mitigate such result.

(d)      [Reserved]

(e)      No Material Change. The Borrowers will not direct or permit to be made any material change in the structural composition or the quality of any portion of the Condominium Project (including a DIP Loan Unit, the limited common elements appurtenant to such DIP Loan Unit, the parking stalls in the Condominium Project, or the amenities of the Condominium Project), which would give a buyer a right to rescind the sale of such buyer's DIP Loan Unit, either pursuant to Section 514B-87 of the Act, or otherwise.

(f)      Use of Escrowed Proceeds. The Borrowers represent and warrant to the Agent and the DIP Lenders that the Escrow Agreement permits the Escrow Agent to disburse, and that the Escrow Agent will disburse to the Agent upon the request of the Agent pursuant to the Escrow Letter, all sums held by the Escrow Agent pursuant to the Escrow Agreement, for payment of Project Costs, as permitted by the Act. Notwithstanding the foregoing, the Borrowers shall not be permitted to use Escrowed Proceeds for payment of Project Costs.

SECTION 8.19      Compliance with Law and Escrow Agreement. The Borrowers shall not do, permit or suffer any act or omission which would constitute a violation of, or give any person any right to maintain any action for rescission of any sale of, or agreement to sell, any DIP Loan Unit. The Borrowers shall comply with and fulfill, or cause the Mortgagor or the Developer to comply with and fulfill, all provisions of the Escrow Agreement, the Sales Contracts and any other documents in connection with the DIP Loan Units on the part of such party to be complied with or fulfilled.

SECTION 8.20      Buyers' Subordination Agreements. Unless a subordination provision, acceptable to the Agent, is contained in the buyers' Sales Contracts, the Borrowers shall deliver, or cause to be delivered, to the Agent, upon its request and from time to time, valid and subsisting subordination agreements, in form and content satisfactory to the Agent, duly executed and acknowledged by all buyers under Sales Contracts for the DIP Loan Units, effecting the subordination to the Mortgage and the other DIP Loan Documents of all of their respective right, title and interest in and to the DIP Loan Units covered by such Sales Contracts.

SECTION 8.21      [Reserved]

SECTION 8.22      Monthly Sales Reports. The Borrowers shall submit to the Agent on or about the tenth day of each month, a report disclosing the following information with respect to sales and closings of DIP Loan Units, during the preceding month, and cumulative to date: (i) the number of Sales Contracts executed, together with the DIP Loan Unit numbers, and the buyers' names and addresses applicable to such Sales Contracts; (ii) the amount of monies deposited with the Escrow Agent pursuant to such Sales Contracts; (iii) the amount of monies released by the Escrow Agent to the Agent as refunds to buyers pursuant to the Escrow Agreement and the Escrow Letter; (iv) the number of DIP Loan Units closed and the allocation and disposition of the sales proceeds therefrom; (v) the number of Sales Contracts cancelled, together with the DIP Loan Unit numbers and the buyers' names and addresses applicable to such cancelled Sales Contracts; and

(vi) such other information with respect to the sales program and other financial matters as the Agent may reasonably request.  The obligations of the Borrowers under this Section 8.22 shall continue as long as the DIP Loan is outstanding.

## ARTICLE IX
## DEFAULT; REMEDIES ON DEFAULT

SECTION 9.01        Events of Default. If any of the following events shall occur:

(a)    The Borrowers shall default in the payment of principal or interest when due on the DIP Note; or

(b)    There shall be a default under any other term, covenant, condition or provision contained in any of the DIP Loan Documents, and such default shall not have been remedied within twenty (20) days after the Agent notifies the Borrowers of such default but if such default cannot reasonably be remedied within such twenty (20) day period, then the Borrowers shall be required to commence such remedy within such twenty (20) day period, diligently pursue such remedy, and complete such remedy within ninety (90) days after such notification; or

(c)    Other than in connection with the pending Chapter 11 Cases, if any of the Borrowers, the Guarantor, or the Non-Debtor Pledgors shall become insolvent, or shall be voluntarily or involuntarily dissolved, or shall make an assignment for the benefit of creditors or shall fail generally to pay its debts as they become due; or shall become the subject of an order for relief in an involuntary case under the bankruptcy laws as now or hereafter constituted, and such order shall remain in effect and unstayed for a period of thirty (30) consecutive days, or shall commence a voluntary case under the bankruptcy laws as now or hereafter constituted, or shall file any petition or answer seeking for itself any arrangement, composition, adjustment, liquidation, dissolution or similar relief to which it may be entitled under any present or future statute, law or regulation, or shall file any answer admitting the material allegations of any petition filed against it in any such proceedings; or shall seek or consent to or acquiesce in the appointment of or taking possession by, any custodian, trustee, receiver or liquidator of it or of all or a substantial part of its properties or assets; or shall take action looking to its dissolution or liquidation; or within thirty (30) days after commencement of any proceedings against the Borrowers, the Guarantor, or the Non-Debtor Pledgors seeking any arrangement, composition, adjustment, liquidation, dissolution or similar relief to which it may be entitled under any present or future statute, law or regulation, such proceedings shall not have been dismissed; or within thirty (30) days after the appointment of or taking possession by, any custodian, trustee, receiver or liquidator of any or of all or a substantial part of its properties or assets, without the consent or acquiescence of the Borrowers, Guarantor, or Non-Debtor Pledgors, as applicable, any such appointment or possession shall not have been vacated or terminated; or

(d)    Sales of more than one-half of the DIP Units situated in Building 8 have not closed and the Release Prices associated therewith been paid to the Agent pursuant to Section 2.10(b) within forty-five (45) days after the entry of the DIP Order (disregarding any appeal period); or

(e)     Any action is taken, or fails to be taken, by the Borrowers or Guarantor that allows any of the presale contracts of any DIP Loan Unit to be canceled or to lapse, without the DIP Lenders' prior written consent; or

(f)     There shall be any attachment, execution or other judicial seizure of or affecting any of the DIP Collateral or the DIP Assigned Property, or any part thereof unless the Borrowers set aside, dissolve, bond off or otherwise eliminate such attachment, execution or seizure within thirty (30) days of its occurrence; or

(g)     Any third person shall obtain an order or decree in any court of competent jurisdiction enjoining or prohibiting the Borrowers, the Agent, or the DIP Lenders from performing the terms of this Agreement or any DIP Loan Document, and such proceedings shall not be discontinued and such decree shall not be vacated within thirty (30) days after the granting thereof; or

(h)     The DIP Guaranty shall be repudiated or breached or become ineffective or worthless in the judgment of the Agent, or any of the events set forth in (c) or (d) above shall occur in respect of the Guarantor (unless a substitute guarantor, acceptable to the Agent in its sole discretion, has been provided to the Agent within thirty (30) days after the effective date of any such event); or

(i)     There shall be a sale, transfer, hypothecation, assignment or conveyance of the Mortgaged Property, the DIP Collateral or the Assigned Property, or any portion thereof or interest therein, by the Mortgagor, without the prior written consent of the Agent, unless the Borrowers pays to the Agent the applicable Release Price therefor pursuant to the terms of Section 2.11(b); or

(j)     There shall be a sale, transfer, hypothecation, assignment or conveyance of any membership or stock ownership interest in the Borrowers, the Mortgagor or the Developer without the prior written consent of the Agent (which consent may be withheld by the Agent in its sole discretion); or

(k)     Any representation made by or on behalf of the Borrowers herein, or by the Borrowers, the Mortgagor or the Developer in any of the other DIP Loan Documents, or by the Guarantor in the DIP Guaranty, or by any of such entities otherwise in writing in connection with the DIP Loan, shall prove to have been false or incorrect in any material respect on the date as of which such representation was made; or

(l)     The Agent shall reasonably determine that there has been a material adverse change in the financial condition of the Borrowers or the Guarantor, which change significantly impairs (i) the likelihood of payment or performance by the Borrowers of their obligations under the DIP Loan Documents, and such change has not been remedied to the satisfaction of the Agent within thirty (30) days after the Agent notifies the Borrowers in writing of such determination, or (ii) the likelihood of performance by the Mortgagor or the Developer of its or their obligations under the DIP Loan Documents, and such change has not been remedied to the satisfaction of the Agent within thirty (30) days after the Agent notifies the Mortgagor or the Developer, as applicable, in writing of such determination, or (iii) the likelihood of performance by the Guarantor

of the Guarantor's obligations under the DIP Guaranty, and such change has not been remedied to the satisfaction of the Agent within thirty (30) days after the Agent notifies the Guarantor in writing of such determination or a substitute guarantor, acceptable to the Agent in its sole discretion, has not been provided to the Agent; or

(m)    A final judgment which alone or with other outstanding final judgments exceeds in the aggregate $100,000 in amount shall be rendered against the Borrowers, or any of them, or the Guarantor and shall not be discharged or have execution thereof stayed pending appeal within thirty (30) days after entry of such judgment or shall not be discharged within thirty (30) days after the expiration of any such stay; or

(n)    The Borrowers shall default in the repayment of any other indebtedness and such default shall not be waived or remedied within thirty (30) days after the occurrence thereof or such further time as may be permitted for the remedying of such default under the applicable document; or

(o)    The Borrowers shall fail to deposit with the Agent additional funds pursuant to Section 7.2 of this Agreement within thirty (30) days after receipt of written request for such funds from the Agent; or

(p)    Any governmental authority shall take any action or enact any rules which, in the Agent's judgment, may adversely affect (i) the completion of the DIP Loan Units, (ii) the ability of the Borrowers, the Mortgagor or the Developer to sell the DIP Loan Units, or (iii) the ability of the Borrowers to repay the DIP Loan; PROVIDED, HOWEVER the occurrence of the foregoing shall not constitute an Event of Default so long as the Borrowers either (i) promptly undertake to reverse, stay or rescind such action or ruling and effects such result within thirty (30) days from the date of such action, or (ii) promptly take all steps necessary to comply with such action or ruling, and thereby substantially mitigate, in the Agent's judgment, the adverse effect of such governmental action or rule within thirty (30) days of its occurrence; or

(q)    The Borrowers shall be unable to satisfy any condition of its right to the receipt of any Advance hereunder for a period in excess of thirty (30) days; or

(r)    There shall be a change in the identity of the individuals or entities in Control of any of the Borrowers from those individuals or entities in Control of such Borrowers on December 29, 2023 (the date of the Prepetition Senior Loan Agreement); or

(s)    All or any material portion of the Land, the Mortgaged Property, the DIP Collateral or the Assigned Property shall be condemned, seized or appropriated without compensation and the Borrowers shall not, within thirty (30) days after such condemnation, seizure or appropriation, initiate and thereafter diligently prosecute appropriate action to contest in good faith the validity of such condemnation, seizure or appropriation; or

(t)    Borrowers request authorization to obtain DIP Loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise that are senior to or pari passu with the DIP Loan, the DIP Liens or the DIP Superpriority Claim, other than from the DIP Lenders, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash the DIP Loan; or

(u)     Borrowers shall pay any amount for any use not provided for in the DIP Order; or

(v)     Borrowers, without the prior written consent of the DIP Lenders, make any payment or distribution to or for the benefit of any non-Debtor affiliate or insider of the Debtors (other than ordinary course wages, payments made pursuant to employment agreements, or payments made in accordance with the Budget); or

(w)     Borrowers make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with this Agreement and the Cost Budget and Cash Flow Forecast; or

(x)     Borrowers, Guarantor or Non Debtor Pledgors finance in any way: (1) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the interests of any or all of the DIP Lenders or the Prepetition Senior Lenders or their respective rights and remedies under DIP Loan Documents, the DIP Order, or the Prepetition Senior Loan Documents, or (2) any other action which with the giving of notice or passing of time would result in an Event of Default as defined under the DIP Loan Documents or the Prepetition Senior Loan Documents; or

(y)     Borrowers make any distribution under a plan of reorganization in the Chapter 11 Cases without the prior written consent of the DIP Lenders; (vii) pay any prepetition Claim of a Creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Lenders; or

(z)     Borrowers take any action that is prohibited under the Bankruptcy Code;

THEN, AND IN ANY SUCH EVENT, in addition to all remedies available to the DIP Lenders pursuant to this Agreement, or conferred upon the DIP Lenders by law, including the right of setoff, the DIP Lenders shall have no further obligation to make Advances hereunder and the Agent shall have the option to declare the DIP Note to be due and payable, whereupon the entire aggregate unpaid principal balance of the DIP Note, all accrued but unpaid interest thereon, and all fees, charges, Expenses and other sums under this Agreement and the other DIP Loan Documents shall forthwith mature and become due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived and upon such maturity by acceleration or otherwise, the principal balance of the DIP Note, all accrued but unpaid interest thereon, and all fees, charges, Expenses and other sums under this Agreement and the other DIP Loan Documents shall bear interest at the Default Rate, and the obligations of the DIP Lenders to make Advances under this Agreement shall terminate. The rights and remedies available to the Agent and the DIP Lenders hereunder are cumulative and may be exercised together, separately, and in any order.

SECTION 9.02     <u>Right of Contest</u>. The Borrowers shall have the right to contest in good faith any claim, demand, levy or assessment by a third party the assertion of which would constitute an Event of Default hereunder; PROVIDED, HOWEVER, any such contest shall be prosecuted diligently and in a manner not prejudicial to the Agent or the DIP Lenders hereunder; and, upon demand by the Agent, the contesting party shall make suitable provision by payment to the Agent or by bond satisfactory to the Agent for the possibility that the contest will be

unsuccessful. Such provision shall be made. within ten (10) days after demand therefor and, if made by payment of funds to the Agent, the amount so deposited shall be disbursed in accordance with the resolution of the contest either to the Borrowers or the adverse claimant.

SECTION 9.03      Marshalling. The Borrowers hereby waive any and all rights to require any security given hereunder to be marshalled and agree and acknowledge that after the occurrence of any Event of Default, the DIP Lenders may, in their sole and absolute discretion, proceed to enforce their rights under the DIP Loan Documents and to realize on any or all of the security for the DIP Loan or any portion or portions thereof, irrespective of the differing nature of such security and whether or not the same constitutes real or personal property.

## ARTICLE X
## MISCELLANEOUS PROVISIONS.

SECTION 10.01      Time of Payment. All payments shall be credited against the DIP Loan on the date of receipt by the Agent so long as (a) the payment is received by the Agent prior to 10:00 a.m., Hawaii Standard Time; and (b) the form of payment is either in federal funds or other immediately available funds. If condition (a) is not satisfied and condition (b) is satisfied, the payment will be credited on the first business day following the date of receipt by the Agent of the instrument of payment. If condition (b) is unsatisfied, credit will be made on the first business day which the Agent actually receives the funds represented by the instrument of payment, subject still, however, to the conditions of subparagraph (a) above.

SECTION 10.02      Authority to File Notices. The Borrowers irrevocably appoint, constitute and designate the Agent its attorney-in-fact to file for record any notice of completion or cessation of labor or any other notice that the Agent deems necessary or desirable to protect its interest hereunder or under any other DIP Loan Document. Such power shall be deemed coupled with an interest and shall be irrevocable while any sum remains due and owing under any of the DIP Loan Documents or any obligation of the Borrowers thereunder remains unperformed.

SECTION 10.03      [Reserved]

SECTION 10.04      [Reserved]

SECTION 10.05      Proceedings, Surveys and Documents Must Be Satisfactory to the Agent. All proceedings taken in connection with the transactions provided for herein, all surveys, appraisals, and any other documents, papers, drawings and other things required or contemplated by this Agreement and the person or persons responsible for the execution and preparation thereof shall be satisfactory to the Agent, and the Agent's counsel shall have received true and correct copies (or certified copies where appropriate in such counsel's judgment) of all documents which it may request in connection therewith.

SECTION 10.06      Actions. The Agent shall have the right to commence, appear in or defend any action or proceeding purporting to affect the rights, duties or liabilities of the parties hereunder, or the disbursement of any DIP Loan funds. In connection therewith, the Agent may incur and pay reasonable costs and expenses, including, but not limited to, reasonable attorneys'

fees. The Borrowers shall pay to the Agent on demand all such expenses, and the Agent is authorized to disburse funds from the DIP Loan for such purposes.

SECTION 10.07    Timeliness: Term of Agreement: Survival of Representations and Warranties. Time is of the essence of this Agreement. This Agreement shall continue in full force and effect until all indebtedness of the Borrowers to the DIP Lenders under the DIP Loan Documents shall have been paid in full, principal and interest, and all obligations of the Borrowers under the DIP Loan Documents shall have been fully observed and performed, and all obligations of the Agent and the DIP Lenders have terminated. All representations and warranties contained herein or made in writing by or on behalf of the Borrowers, the Mortgagor or the Developer, or the Guarantor, in connection with the DIP Loan or the Condominium Project shall survive the execution and delivery of the DIP Loan Documents and any investigation at any time made by, through or on behalf of the Agent or the DIP Lenders. All statements contained in any certificate or other instrument delivered to the Agent or the DIP Lenders on behalf of the Borrowers, the Mortgagor or the Developer, or the Guarantor, pursuant hereto or otherwise in connection with the Line, shall constitute representations and warranties hereunder.

SECTION 10.08    Amendments and Waivers. Neither this Agreement nor any provision hereof may be amended, waived, discharged or terminated orally, but only by an instrument in writing, signed by the party against whom enforcement of the amendment, waiver, discharge or termination is sought.

SECTION 10.09    Remedies Are Cumulative. All rights, powers and remedies herein given to the Agent or the DIP Lenders are cumulative and not alternative, are in addition to all rights, powers and remedies afforded by statutes or rules of law and may be exercised concurrently, independently, or successively in any order whatsoever. Without limiting the generality of the foregoing, the Agent and the DIP Lenders may enforce any one or more of the DIP Loan Documents without enforcing all of them concurrently or in any particular order.

SECTION 10.10    No Waiver. No failure, forbearance or delay on the part of the Agent or the DIP Lenders in exercising any power or right under any of the DIP Loan Documents shall operate as a waiver of the same or any other power or right, and no single or partial exercise of any such power or right shall preclude any other or further exercise thereof or the exercise of any other such power or right. No Advance by the DIP Lenders hereunder shall constitute a waiver of any of the conditions precedent to the DIP Lenders' obligations to make further Advances, nor, in the event the Borrowers are unable to satisfy any such condition, shall the DIP Lenders' decision to make such Advance have the effect of precluding the DIP Lenders from thereafter declaring such inability to be an Event of Default as provided in Section 9 of this Agreement.

SECTION 10.11    No Joint Venture. The execution of this Agreement, the making of the DIP Loan or any Advances, and the exercise of any rights hereunder are not intended, and shall

not be construed, to create a partnership or joint venture among the Agent, the DIP Lenders and the Borrowers, or any of them.

SECTION 10.12    <u>Notices</u>. All notices, requests, demands or documents which are required or permitted to be given or served hereunder shall be in writing and personally delivered, or sent by registered or certified mail addressed as follows:

| | |
|---|---|
| TO BORROWERS at: | 1801 Tiburon Blvd., Suite 800<br>Tiburon, CA 94920<br>Attn: Mr. Gary L. Pinkston |
| with a copy to: | Rountree Leitman Klein & Geer, LLC<br>Attn: Ceci Christy, Esq.<br>Century Plaza I<br>2987 Clairmont Rd., Ste. 350<br>Atlanta, Georgia 30329 |
| TO AGENT at: | P.O. Box 2300<br>Honolulu, Hawaii 96804-2300<br>Attn: Commercial Real Estate Loans |
| with a copy to: | Goodsill Anderson Quinn & Stifel<br>Attn: Johnathan C. Bolton, Esq.<br>999 Bishop Street, Suite 1600<br>Honolulu, Hawaii 96813 |

The addresses may be changed from time to time by the addressee by serving notice as heretofore provided. Service of such notice or demand shall be deemed complete on the date of actual delivery as shown by the addressee's registry or certification receipt or at the expiration of the second day after the date of mailing, whichever is earlier in time.

The Borrowers hereby irrevocably authorize the Agent to accept facsimile ("FAX") or electronic mail transmissions of such notices, requests, demands and documents, provided such transmission is signed by Gary L. Pinkston. The Borrowers shall and do hereby hold the Agent and the DIP Lenders harmless from, and indemnify the Agent and the DIP Lenders against, any loss, cost, expense, claim or demand which may be incurred by or asserted against the Agent or a DIP Lender by virtue of the Agent or DIP Lender acting upon any such notices, requests, demands or documents transmitted in accordance with the above provisions. Any such FAX or electronic mail transmission shall, at the Agent's request, be separately confirmed by telephone conference between the Agent and the person described above, and shall be followed by transmission of the actual "hard copy" of the notice, request, demand or document in question.

SECTION 10.13      Entire Agreement. The DIP Loan Documents constitute all of the agreements between the parties relating to the DIP Loan and supersede all other prior or concurrent oral or written letters, agreements or understandings.

SECTION 10.14      Assignment; Parties in Interest.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrowers may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agent and each DIP Lender and (ii) no DIP Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this section (and any attempted assignment or transfer by any party hereto without such consent shall be null and void).  Nothing in this Agreement expressed or implied shall be construed to confer upon any person (other than the parties hereto and their respective successors and assigns permitted hereby), any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      Any DIP Lender may assign to one or more Eligible Assignees all or any portion of its rights and obligations under this Agreement with the prior written consent (such consent not to be unreasonably withheld or delayed), of the Agent, provided that no consent of the Agent shall be required for an assignment to a DIP Lender.

(c)      Assignments shall be subject to the following additional conditions:

(i)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning DIP Lender's rights and obligations under this Agreement; and

(ii)      the parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee payable to the Agent for its own account.

From and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a DIP Lender under this Agreement, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning DIP Lender's rights and obligations under this Agreement, such DIP Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of this Agreement with respect to the Borrowers' obligations surviving termination of this Agreement).

(d)      Any DIP Lender may, without the consent of the Borrowers or the Agent, but with prior notice to the Agent, sell participations to one or more Participants in all or a portion of such DIP Lender's rights and obligations under this Agreement; provided, that (i) such DIP Lender's obligations under this Agreement shall remain unchanged; (ii) such DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrowers, the Agent and the other DIP Lenders shall continue to deal solely and directly with such DIP Lender in connection with such DIP Lender's rights and obligations under this

Agreement. Any agreement or instrument pursuant to which a DIP Lender sells such a participation shall provide that, with respect to such interest, such DIP Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other DIP Loan Document; provided, however, that such DIP Lender may agree with the Participant that it will not, without the consent of the Participant, agree to (i) increase such DIP Lender's Commitment; (ii) extend the date fixed for repayment of principal on the Loan or a portion thereof owing to the DIP Lender; or (iii) reduce the rate at which interest is payable thereon.

SECTION 10.15     Headings of Paragraphs. The headings of paragraphs and subparagraphs herein are inserted only for convenience and reference and shall in no way define, limit or describe the scope or intent of any provision of this Agreement.

SECTION 10.16     Applicable Law. This Agreement is executed and delivered in and shall be construed and enforced in accordance with the laws of the State of Hawaii.

SECTION 10.17     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument, and in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

SECTION 10.18     Severability. If any provision of this Agreement or the other DIP Loan Documents is held to be invalid or unenforceable, the validity and enforceability of the other provisions of this Agreement and the other DIP Loan Documents will remain unaffected.

SECTION 10.19     Terms and Conditions of this Agreement Supplement Other Loan Documents. The terms and conditions of this Agreement and the covenants, representations and warranties of the Borrowers under this Agreement shall not be deemed to supersede, amend or modify the obligations and duties of the Borrowers, the Mortgagor, or the Developer under the other DIP Loan Documents, or of the Guarantor under the DIP Guaranty. The terms and conditions of this Agreement and the covenants, representations and warranties of the Borrowers hereunder merely supplement, and do not supplant or supersede provisions of similar effect or subject matter in the other DIP Loan Documents. The DIP Loan Documents shall, however, constitute and be deemed amendments to any inconsistent provisions of any commitment letter issued by the Agent or any DIP Lender to the Borrowers in connection with the DIP Loan, and, upon the execution of this Agreement, any such commitment letter shall be deemed superseded by the DIP Loan Documents and cancelled.

SECTION 10.20     Waiver of Jury Trial. The Borrowers hereby knowingly, voluntarily and intentionally waive any right they may have to a jury trial in any legal proceeding which may be hereinafter instituted by the Agent, any DIP Lender, or the Borrowers to assert any of their respective claims arising out of or relating to any of the DIP Loan Documents or any other agreement, instrument or document contemplated thereby. In such event, the Borrowers, at the

request of the Agent, shall cause their attorney of record to effectuate such waiver in compliance with the Hawaii Rules of Civil Procedure, as the same may be amended from time to time.

SECTION 10.21    Compliance with OFAC Restrictions. The Agent, the DIP Lenders and the Borrowers are obligated to comply with the laws and regulations administered by the United States Office of Foreign Asset Control ("OFAC Restrictions"). In order to comply with OFAC Restrictions, the Agent and the DIP Lenders may be required to temporarily suspend processing or funding of the DIP Loan, which may result in delayed availability of funds, or may be prohibited from closing the DIP Loan altogether. The Borrowers agree to the foregoing, and further agree that if the Agent or any DIP Lender is required by applicable OFAC Restrictions to suspend processing or funding of the DIP Loan, or is prohibited by applicable OFAC Restrictions from closing the DIP Loan, neither the Agent nor any DIP Lender will be liable for any damages of any kind or nature (including, without limitation, actual, consequential, special, incidental, punitive, or indirect damages, whether arising out of claims for "lender liability" or any other cause), which the Borrowers may suffer or incur in connection with any such suspension of, or failure to close, the DIP Loan.

SECTION 10.22    Agents. In exercising any rights under this Agreement or the other DIP Loan Documents, the Agent and the DIP Lenders may act through its employees, agents or independent contractors.

IN WITNESS WHEREOF, the Borrowers, the Agent, and the DIP Lenders have executed this Agreement on the day and year first above stated.

MP ELK GROVE LLC,
a California limited liability company

By: _____
     Name:
     Title:

MP ELKO II, LLC,
a Nevada limited liability company

By: _____
     Name:
     Title:

5425 PAU A LAKA LLC,
a Hawaii limited liability company

By: _____
     Name:
     Title:

           The "Borrowers"

AMERICAN    SAVINGS    BANK,    National
Association,
a national banking association

By:  _____
     Name:
     Title:

                              The "DIP Lenders"


AMERICAN    SAVINGS    BANK,    National
Association,
a national banking association

By:  _____
     Name:
     Title:

                              The "Agent"

Exhibit "A"

(Legal Description)

Exhibit "B"

(DIP Loan Units)

Exhibit "1"
(Architect's Letter)

Case 26-20761-jrs   Doc 62   Filed 06/12/26   Entered 06/12/26 23:38:30   Desc Main
Document     Page 151 of 159

Exhibit "2"
(Compliance Certificate)

Exhibit "3"
(Cost Budget and Cash Flow Forecast)

Exhibit "4"
(General Contractor's Letter)

Exhibit "5"
(Minimum Sales Price List and Release Prices)

Exhibit "6"
(Title Policy Endorsement)

Schedule 3.05
(Litigation)

| Court, Case No. | Parties | Filing Date | Issues |
|---|---|---|---|

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing on the following parties through the Court's ECF system:

- **Meredith Laughlin Allen**   mlallen@mcguirewoods.com, trhymes@mcguirewoods.com;sburdette@mcguirewoods.com;mkrizan@mcguirewoods.com;usdocket@mcguirewoods.com;jbroadway@mcguirewoods.com

- **Johnathan Bolton**   jbolton@goodsill.com

- **Christian James Bromley**   christian.bromley@bclplaw.com, christian-bromley-7106@ecf.pacerpro.com

- **Enrique Jose Chaljub Garcia**   enrique.chaljub@alston.com

- **Ashley Champion**   achampion@polsinelli.com, vpreciado@polsinelli.com

- **Ceci Christy**   cchristy@rlkglaw.com, wgeer@rlkglaw.com;willgeer@ecf.courtdrive.com;2836@notices.nextchapterbk.com;6717577420@filings.docketbird.com;dsideris@rlkglaw.com;lmassey@rlkglaw.com

- **William A. DuPre**   Bill.DuPre@millermartin.com, lisa.brown@millermartin.com

- **William B. Freeman**   bill.freeman@katten.com

- **Will B. Geer**   wgeer@rlkglaw.com, dsideris@rlkglaw.com;willgeer@ecf.courtdrive.com;2836@notices.nextchapterbk.com;6717577420@filings.docketbird.com;lmassey@rlkglaw.com;cwilliams@rlkglaw.com;ecf_emails@rlkglaw.com

- **James Taylor Heidelbach**   jheid@gebsmith.com

- **J. Hayden Kepner**   hkepner@swlawfirm.com, rwilliamson@swlawfirm.com;centralstation@swlawfirm.com;fharris@swlawfirm.com;aray@swlawfirm.com;mlevin@swlawfirm.com

- **Keith M. Lusby**   klusby@gebsmith.com

- **Leah Fiorenza McNeill**   leah.mcneill@alston.com

- **Arlen P. Moradi**   arlen.moradi@katten.com

- **Renee Morgan**   rmorgan@wnpllp.com, brobinson@wnpllp.com;bdavis@wnpllp.com;dphillips@wnpllp.com;cwright@wnpllp.com;nathan@wnpllp.com

- **G. Frank Nason**   fnason@lcenlaw.com, emiller@lcenlaw.com;emiller_169@ecf.courtdrive.com;fnason@ecf.courtdrive.com

- **Paul M. Rosenblatt**  prosenblatt@kilpatricktownsend.com, ecfnotices@ktslaw.com;moroberts@ktslaw.com

- **William A. Rountree**  wrountree@rlkglaw.com, 6717577420@filings.docketbird.com;wgeer@rlkglaw.com;2836@notices.nextchapterbk.com;willgeer@ecf.courtdrive.com;emillerrlkg@ecf.courtdrive.com;dsideris@rlkglaw.com;cwilliams@rlkglaw.com

- **Cuyler Shaw**  cshaw@awlaw.com, sakamine@awlaw.com

- **Clayton Alan Smith**  clayton.smith@millermartin.com, lisa.brown@millermartin.com,terrie.wimberly@millermartin.com

- **Shayna M. Steinfeld**  shayna@steinfeldlaw.com, paralegalnotices@gmail.com

- **David S. Weidenbaum**  david.s.weidenbaum@usdoj.gov

- **Dante Wen**  dwen@ktslaw.com

- **J. Robert Williamson**  rwilliamson@swlawfirm.com, centralstation@swlawfirm.com;aray@swlawfirm.com;hkepner@swlawfirm.com;fharris@swlawfirm.com;mlevin@swlawfirm.com


Dated: June 12, 2026                    */s/ Ceci Christy*
                                        Ceci Christy
                                        Georgia Bar No. 370092