**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| IN RE:<br><br>Waikoloa Village Lofts West, LLC, *et al.*,<br><br>Debtors,<br><br><br>Bank of America, N.A.,<br><br>Movant,<br><br>v.<br>The Gary and Janice Pinkston Family Trust,<br><br>Respondents. | CHAPTER 11<br><br>CASE NO. 26-20761-jrs<br><br>***Jointly Administered***<br><br><br>**CONTESTED MATTER** |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that on October 27, 2026, Bank of America, N.A., filed their MOTION FOR RELIEF FROM AUTOMATIC STAY, and related papers with the Court, attached herewith, seeking, among other things, an order for relief from the automatic stay.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold a hearing on the Motion for Relief from Automatic Stay, on **December 1, 2026**, the calendar call for which will be at **10:30 A.M.**, in **Courtroom 103, United States Courthouse, 121 Spring Street SE, Gainesville, Georgia 30501**, which calendar call may be attended in person or via the Court's Virtual Hearing Room. Except as explained in the hearing procedures on Judge Sacca's Chambers webpage, any matter held ready at the calendar call for the Court to hear shall be heard later that day in person at either 11 a.m. or 1 p.m. as mutually requested by the parties in the Courtroom listed above. Please check the "Bankruptcy Hearing Information" link at the top of the homepage of the Court's website, www.ganb.uscourts.gov, which includes a link to Judge Sacca's Chambers webpage, for more information and instructions on how to participate in Court hearings. You should also review the "Hearing Information" tab on Judge Sacca's Case 26-20761-jrs Doc. 153 Filed 09/02/26 Entered 09/02/2026 12:45:05 Desc Main Document Page 1 of 11 Chambers webpage for further information about the procedures for the hearing. If the parties do not mutually agree to have the matter heard in person at 11 a.m. (or such other time agreed to by the parties and approved by the Court, such as 11:30 a.m. that day), the matter will be heard in person at 1 p.m. that day.

If an objection or response is timely filed and served, the hearing will proceed as scheduled. **If you do not file a response or objection within the time permitted, the Court may grant the relief requested without further notice and without holding the scheduled hearing** provided that an order approving the relief requested is entered at least one business day

prior to the scheduled hearing. If no objection is timely filed, but no order is entered granting the relief requested at least one business day prior to the scheduled hearing, the hearing will be held as scheduled unless the Court directs otherwise.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one.**

If a hearing on the Motion cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty days of filing the Motion and agrees to a hearing on the earliest possible date. Movant consents to the automatic stay remaining in effect until the Court orders otherwise.

Dated: October 27, 2026.

**MILLER & MARTIN PLLC**

*/s/ William A. DuPre, IV*
William A. DuPré, IV
Georgia Bar No. 234882
bill.dupre@millermartin.com
Clayton A. Smith
Georgia Bar No. 196303
clayton.smith@millermartin.com
Suite 2100
1180 West Peachtree Street NW
Atlanta, Georgia 30309
(404) 962-6100
(404) 962-6300 (Facsimile)

*Attorneys for Movant Bank of America, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| IN RE:<br><br>Waikoloa Village Lofts West, LLC, *et al.*,<br><br>Debtors,<br><br>Bank of America, N.A.,<br><br>Movant,<br><br>v.<br>The Gary and Janice Pinkston Family Trust,<br><br>Respondents. | CHAPTER 11<br><br>CASE NO. 26-20761-jrs<br><br>***Jointly Administered***<br><br>**CONTESTED MATTER** |

**MOTION OF BANK OF AMERICA, N.A., FOR RELIEF FROM AUTOMATIC STAY**

Bank of America, N.A. (the "**Bank**") files this Motion for Relief from Automatic Stay and in support shows the following:

**<u>INTRODUCTION</u>**

1.

The Gary & Janice Pinkston Family Trust (the "**Trust**") is a California revocable trust that primarily holds ownership interests in several of the affiliated Debtors. All of these associated and jointly administered cases appear to have stemmed from a dispute between the Debtors and their mezzanine lender Meridian Pacific Holdings over a partially completed project in Hawaii.

Separate from and in addition to its ownership interests in the affiliated Debtors, the Trust holds an investment account with the Bank. That dispute has nothing to do with the Bank's loan to the Trust or the investment securities that secure the loan. That investment account and its

contents secure a credit line loan the Bank made to the Trust. The ultimate success or failure of the Trust's bankruptcy case and those filed by affiliated Debtors does not turn on the investment account.

For these reasons and as further explained below, Bank of America moves for relief from the automatic stay so that it may exercise its rights of setoff and other rights as a secured creditor under applicable law with respect to its collateral.

## JURISDICTION AND VENUE

2.

This Court has jurisdiction over this Objection under 28 U.S.C. §§ 157 and 1334.

3.

Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.

The Bank extended a $4.5 Million line of credit facility to the Trust as provided by the Credit Agreement dated as of August 2, 2023, a genuine copy of which is attached hereto as **Exhibit "A"** (the "Credit Agreement").

5.

To secure repayment and performance of all of the Trust's obligations to the Bank, the Trust pledged and granted to the Bank a properly perfected first priority security interest in all cash, securities and other assets held in certain securities accounts maintained with the Bank, including without limitation all income and proceeds from such accounts ("Pledged Accounts").

Credit Agreement Schedule A. *See also* N.C. Gen. Stat. § 25-9-314.[1]

6.

The Trust agreed, and is obligated under the Credit Agreement, to pay accrued interest on the principal balance of the Loan on or before the second day of every month (Interest Payment Date) until the Loan is fully and finally repaid.

7.

The Trust is further obligated to repay in full any outstanding Loan(s) with interest immediately upon demand by the Bank.

8.

The Trust filed its voluntary petition[2] for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, on May 14, 2026, as amended on May 19, 2026. (the "Petition Date").

9.

The Trust has made no interest payments or other payments on the Loan since a payment in the amount of $20,288.75 made on May 4, 2026. Due to its failure to make payments of interest as and when due for the months of June, July, August, September and October of this year, the Trust has been in continuous, uncured default under the terms of the Credit Agreement for five months and counting.

10.

The unpaid principal balance of the Loan as of the Petition Date was $4,500,000.00, plus accrued interest of $17,015.00. Since the Petition Date additional post-petition interest has accrued at the non-default rate of 5.48% in the amount of $108,001.25 as of September 30, 2026.

---

[1] To the extent not preempted by Federal law, North Carolina law governs the interpretation and enforcement of the Credit Agreement. Credit Agreement § 6.14.

[2] The Trust's bankruptcy case, No. 26-20777-jrs, is jointly administered with those of its associated Debtors under Case No. 26-20761-jrs.

The Bank is also entitled under the Credit Agreement to additional interest at the default rate, plus attorneys' fees, late fees, protective advances and other charges due under the Credit Agreement.

11.

The Trust also executed a guaranty of a $10,770,000.00 commercial real estate loan the Bank made to an affiliated entity, MP Elk Grove, LLC, which also filed for bankruptcy on May 14, 2026 (Case No. 26-20765-jrs). The Bank has already filed a motion for stay relief as to that loan and the real estate securing. (Doc. 153). A genuine copy of the Trust's Continuing and Unconditional Guaranty is attached as **Exhibit "B."**

12.

Under Section 7 of its Guaranty, the Trust granted to the Bank a continuing lien, security interest and right of setoff against any of the Trust's accounts maintained with the Bank, including without limitation the Pledged Accounts. The right to setoff further arises out of common law and is codified by California[3] statute. *See Campos v. Wells Fargo Bank, N.A.*, 345 B.R. 678, 683 (E.D. Cal. 2005) (citing Cal. Code Civ. Proc. § 431.70); *see also Roberts v. First-Citizens Bank & Tr. Co.*, 124 N.C. App. 713, 723, 478 S.E.2d 809, 815 (1996) (emphasizing North Carolina's recognition of the common law right to setoff) (Martin, J. concurring).

13.

The Trust's Schedule of Assets assert that the Pledged Accounts had a value, as of approximately June 14, 2026, of $5,659,156.42 (Case No. 26-20777-jrs, Doc No. 15 at 2).

[3] To the extent not preempted by Federal law, California law governs the interpretation and enforcement of the Guaranty. Guaranty § 22.

14.

No payments have been made on the MP Elk Grove loan since July 24, 2025, well over a year ago.

15.

The Trust has no operations or employees. (*See, e.g.*, Chapter 11 Monthly Operating Report for August 2026, Case Number 26-20777-jrs, Doc. No. 23).

**RELIEF FROM STAY**

16.

11 U.S.C. § 362(d)(1) allows relief from stay "for cause, including the lack of adequate protection of an interest in property of such party in interest."

17.

Section 362(d)(1) does not limit "cause" to a lack of adequate protection; instead, it requires a case-specific inquiry into whether continuing the stay would advance a legitimate bankruptcy purpose or merely prejudice the secured creditor. In conducting that inquiry, courts consider the debtor's good or bad faith, the injury to the debtor and other creditors if the stay is modified, the injury to the movant if the stay remains in place, the proportionality of those harms, and the broader purposes of the Bankruptcy Code. *In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013) (citing *Barclays–Am./Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.),* 871 F.2d 1023, 1026 (11th Cir. 1989); *In re C & S Grain Co.,* 47 F.3d 233, 238 (7th Cir. 1995); *Milne v. Johnson (In re Milne),* 185 B.R. 280, 283 (N.D. Ill. 1995) ("Factors generally looked to in determining whether to modify the stay for cause include interference with the bankruptcy, good or bad faith of the debtor, injury to the debtor and other creditors if the stay is modified, injury to the movant if the stay is not modified, and the proportionality of the harms

from modifying or continuing the stay.”)).

18.

Cause exists in this case under 11 U.S.C. § 362(d)(1) for relief from the automatic stay because:

(a) the Trust has not provided and is unable to provide the Bank with adequate protection;

(b) the Trust has no equity in the Pledged Accounts, because they secure two loans totaling over $15,270,000.00; and they are not necessary to an effective reorganization, as the Trust is a non-operating debtor with no reasonable prospect of reorganizing; and

(c) the Pinkston Trust is not managing its assets and affairs for the benefit of its estate and its creditors, but instead for the benefit of its insiders and affiliates.

19.

The prospect of the Debtors confirming any plan of reorganization in these cases appears remote, as the focus of this bankruptcy remains squarely focused on the conflict between the Debtors and their mezzanine lenders. Those lenders have recently filed a complaint alleging that the Debtors’ primary business activity over the last few years appears to have been to borrow as much money from as many lenders as possible and then fail repay their loan obligations. (*See* Doc. Nos. 136, 137). The Debtors have filed objections to those lenders’ claims. (*See* Doc. Nos. 131–134). Regardless of the ultimate merits of that litigation, the Debtors are not focused on managing the Trust estate for the benefit of its creditors, including Bank of America, and they are certainly not moving toward a plan capable of confirmation.

20.

Even if the Debtors’ prospects of reorganization were better than they in fact are, the

Trust has no equity in the Pledged Accounts and they are not necessary to any legitimate reorganization that might be achieved. The vast majority of the Pinkston Trust's assets are not in the Pledged Accounts but rather consist of ownership interests in the other Debtors. Those Debtors in turn primarily hold real estate assets, the disposition of which will ultimately decide the success or failure of the Debtors' cases.

21.

The Bank's setoff rights apply to the debt owed under the Guaranty, as well as to the debt owed under the Credit Agreement, as that debt is an independent and mutual pre-petition debt. *See In re Faasoa*, 576 B.R. 631, 637 (Bankr. S.D. Cal. 2017) ("a creditor must establish two elements before a setoff may be asserted: timing and mutuality.") Debts are mutual when, pre-petition, both parties had the "same right" to seek payment from the other party. *In re Ter Bush*, 273 B.R. 625, 629 (Bankr. S.D. Cal. 2002). "Moreover, the 'same right' concept 'subsumes the separate question of whether any of the obligations sought to be offset are owed jointly with some other entity.'" *Id.* (citing 5 *Collier on Bankruptcy* ¶ 553.03[3][d], at 553–39 (15th ed. Rev. 2001)). By virtue of MP Elk Grove's pre-petition default under its loan, the Guaranty established a pre-petition debt owed independently by the Trust to the Bank for that debt.

22.

The Trust granted the Bank a continuing lien and security interest in the Pledged Accounts under both the Credit Agreement and the Guaranty and expressly authorized the Bank to setoff the Trust's secured obligations using assets held in the Pledged Accounts.

23.

Under the terms of the Credit Agreement, the Bank has a right of setoff in the Pledged Accounts. *See* Ex. A, Credit Agreement § 6.9. The Bank also has a right of setoff in the Pledged

Accounts under Section 7 of its Guaranty. The right to setoff further arises out of common law and is codified by California[4] statute. *See Campos v. Wells Fargo Bank, N.A.*, 345 B.R. 678, 683 (E.D. Cal. 2005) (citing Cal. Code Civ. Proc. § 431.70).

24.

For these reasons and others to be shown at an evidentiary hearing on this motion, this Court should grant the Bank relief from the automatic stay under 11 U.S.C. § 362(a) to allow the Bank to exercise its contractual and common law right of setoff and other rights and remedies as a secured creditor under applicable law with respect to the Pledged Accounts.

**WHEREFORE**, the Bank prays that the Court:

(a) grant the Bank relief from the automatic stay to exercise its rights to setoff amounts owed with the Pledged Accounts; and

(b) grant the Bank such other and further relief as is just.

Respectfully submitted this 27th day of October, 2026.

**MILLER & MARTIN PLLC**

*/s/ William A. DuPre, IV*
William A. DuPré, IV
Georgia Bar No. 234882
bill.dupre@millermartin.com
Clayton A. Smith
Georgia Bar No. 196303
clayton.smith@millermartin.com
Suite 2100
1180 West Peachtree Street NW
Atlanta, Georgia 30309
(404) 962-6100
(404) 962-6300 (Facsimile)

*Attorneys for Bank of America, N.A.*

[4] To the extent not preempted by Federal law, California law governs the interpretation and enforcement of the Guaranty. Guaranty § 22.

**CERTIFICATE OF SERVICE**

This is to certify that on this 27th of October, 2026, a true and correct copy of the foregoing was served via the Court's electronic case filing system (CM/ECF) to all parties registered to receive such notice in the above-captioned case.

*/s/ William A. DuPre, IV*
William A. DuPre, IV

# EXHIBIT "A"

BANK OF AMERICA

# CREDIT AGREEMENT

This Credit Agreement, dated as of August 2, 2023, by and among the borrower(s) signing below (whether one or more, the "Borrower"), each guarantor signing below (a "Guarantor"), and each other person signing below solely as a pledgor of collateral (collectively, the Borrower, all of the Guarantors and such other persons are referred to as the "Credit Parties"), and Bank of America, N.A., a national banking association (together with its successor and assigns, the "Bank").

## PRELIMINARY STATEMENTS

1. The Borrower wishes to obtain a credit facility, the proceeds of which are intended to be used for lawful purposes that will benefit the Borrower.

2. Upon the terms and subject to the conditions set forth herein, the Bank is willing to consider requests by the Borrower for loans to the Borrower in an aggregate principal amount not to exceed the "Maximum Amount of the Facility" (as defined below).

3. **The Credit Parties acknowledge that loans under this credit facility are made at the sole and absolute discretion of the Bank and that the Bank may demand repayment of such loans at any time in its sole and absolute discretion.**

4. The following is a non-exhaustive summary of some basic terms of this Credit Agreement. This summary is not intended to set forth all material terms of the credit facility. The Credit Parties acknowledge that this summary is qualified by a reference to all terms set forth in this Credit Agreement and that the Bank has the right to unilaterally modify the terms, including without limitation, the Interest Rate and Applicable Margin, upon thirty days' prior written notice to the Borrower and, if applicable, the other Credit Parties as provided herein:

| | |
|---|---|
| **BORROWER:** | **Gary L. Pinkston and Janice C. Pinkston, Trustees of the Gary and Janice Pinkston Family Trust**<br>a California Revocable Trust<br>20 Tamalpais Ave.<br>Belvedere, CA 94920-2468<br>Phone: (415) 264-3621<br>Fax: ______________________ |
| **GUARANTOR(S):** | **Gary L. Pinkston**<br>20 Tamalpais Ave.<br>Belvedere, CA 94920-2468<br>Phone: (415) 264-3621<br>Fax: ______________________ |
| | **Janice C. Pinkston**<br>20 Tamalpais Ave.<br>Belvedere, CA 94920-2468<br>Phone: (415) 264-5107<br>Fax: ______________________ |

| | |
|---|---|
| **PLEDGOR(S):** | **Gary L. Pinkston and Janice C. Pinkston, Trustees of the Gary and Janice Pinkston Family Trust** |
| **MAXIMUM AMOUNT OF THE FACILITY:** | **$4,500,000.00, as such amount may be decreased from time to time by Bank in its sole discretion.** |
| **TYPE OF FACILITY:** | **DISCRETIONARY—LOANS EXTENDED IN THE SOLE AND ABSOLUTE DISCRETION OF THE BANK.** |
| **PRINCIPAL DUE DATE:** | **LOANS REPAYABLE IMMEDIATELY UPON DEMAND BY THE BANK.** |
| **INTEREST PAYMENT DATE:** | September 2, 2023, and each corresponding day (or if there is no corresponding day in any month when payment is due, then on the last day of such month) of each succeeding month thereafter, if not sooner demanded by Bank. |
| **INTEREST RATE:** | BSBY Daily Floating Rate plus the Applicable Margin<br><br>If requested by Borrower and agreed to by the Bank, Loans in a minimum amount of $100,000 may bear interest at the BSBY Rate for Interest Periods of one, three, or six months, in each case, plus the Applicable Margin. **The Borrower's election of an interest rate and an Interest Period other than the Daily Floating Rate may result in breakage fees if Loans are demanded or repaid prior to the end of the applicable Interest Period.**<br><br>The interest rate shall be increased to the Default Rate as specified herein.<br><br>All interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. |
| **APPLICABLE MARGIN:** | 1.5% |
| **MINIMUM INITIAL ADVANCE:** | If the Borrower is an individual or trust, the minimum initial advance shall be the greater of (i) $75,000 and (ii) the amount the Bank determines, in its sole discretion, is necessary to comply with applicable Law. In all other cases, the minimum initial advance shall be $25,000. |
| **PLEDGED COLLATERAL:** | The Pledged Accounts, including the cash, securities and other assets held in such accounts, and other collateral all as further described in this Credit Agreement and on Schedule A. No Pledged Collateral will be released from the Pledged Accounts, except as permitted by the Bank. |
| **LIQUIDATION OF PLEDGED COLLATERAL:** | **Immediately upon demand.** |
| **DISBURSEMENT AND IF INDICATED, DEBIT ACCOUNT WITH BANK:** | Account name: ____________________<br>Account no.: ____________________<br><br>☐ **Automatic debit** (If this box is checked, the Bank is authorized to debit the above account in accordance with the provisions of this Agreement) |
| **USE OF PROCEEDS:** | Loan proceeds may not be used directly or indirectly to purchase or carry any Margin Stock or to reduce or retire any indebtedness incurred for such purpose. |

**NOW, THEREFORE**, the Credit Parties and the Bank, intending to be legally bound, hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

**SECTION 1.1.** Defined Terms. As used in this Agreement, in addition to the terms defined in the introductory paragraph of this Agreement, the following terms shall have the following meanings:

"Act" has the meaning specified in Section 5.11(d).

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a relative, director, or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by," and "under common control with") of a Person means the possession, direct or indirect, of the power to vote 51% or more of the securities (which term includes capital stock, partnership interests, membership interests, or other equity interests) having ordinary voting power of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or similar equity interests, by contract or otherwise.

"Agreement" means this credit agreement, as amended, supplemented, or otherwise modified from time to time.

"Applicable Margin" means, with respect to Loans, that percentage per annum set forth in the Preliminary Statements.

"Banking Day" means, unless otherwise provided in this Agreement, a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to any BSBY Rate Loan or any Loan bearing interest at the BSBY Daily Floating Rate, in New York City.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BSBY Daily Floating Rate" means a fluctuating rate of interest which can change on each Banking Day. The rate will be adjusted on each Banking Day to equal the BSBY Screen Rate for U.S. Dollar deposits two Banking Days prior to the date of determination for a one month term beginning on that date; provided that if such rate is not published on such determination date then the rate will be the BSBY Screen Rate on the first Banking Day immediately prior thereto. If such rate is not available at such time for any reason or the Bank makes the determination to incorporate or adopt a new interest rate to replace the BSBY Daily Floating Rate in credit agreements, then the Bank may replace the BSBY Daily Floating Rate with an alternate interest rate and adjustment, if applicable, as reasonably selected by the Bank, giving due consideration to any evolving or then existing conventions for such interest rate and adjustment (any such successor interest rate, as adjusted, the "Daily Rate Successor Rate"). In connection with the implementation of the Daily Rate Successor Rate, the Bank will have the right, from time to time, in good faith to make any conforming, technical, administrative or operational changes to this Agreement as may be appropriate to reflect the adoption and administration thereof and, notwithstanding anything to the contrary herein or in any other loan document, any amendments to this Agreement implementing such conforming changes will become effective upon notice to the Borrower without any further action or consent of the other parties hereto. If at any time the BSBY Daily Floating Rate or any Daily Rate Successor Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"BSBY Rate" means, for any applicable interest period, the rate per annum equal to the BSBY Screen Rate two Banking Days prior to the commencement of such interest period with a term equivalent to such interest period; provided that if such rate is not published on such determination date then the rate will be the BSBY Screen Rate on the first Banking Day immediately prior thereto. If the BSBY Rate is not available at such time for any reason or the Bank makes the determination to incorporate or adopt a new interest rate to replace the BSBY Rate in credit agreements, then the Bank may replace the BSBY Rate with an alternate interest rate and

adjustment, if applicable, as reasonably selected by the Bank, giving due consideration to any evolving or then existing conventions for such interest rate and adjustment (any such successor interest rate, as adjusted, the "Successor Rate"). In connection with the implementation of the Successor Rate, the Bank will have the right, from time to time, in good faith to make any conforming, technical, administrative or operational changes to this Agreement as may be appropriate to reflect the adoption and administration thereof and, notwithstanding anything to the contrary herein or in any other loan document, any amendments to this Agreement implementing such conforming changes will become effective upon notice to the Borrower without any further action or consent of the other parties hereto. If at any time the BSBY Rate or any Successor Rate is less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"BSBY Rate Loan" has the meaning specified in Section 2.1(d).

"BSBY Screen Rate" means the Bloomberg Short-Term Bank Yield Index rate ("BSBY") administered by Bloomberg Index Services Limited and published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Bank from time to time).

"Code" means the Uniform Commercial Code as in effect from time to time in the State of North Carolina.

"Control Agreement" means collectively one or more control agreements with third parties, in each case, in form and substance satisfactory to the Bank.

"Daily Floating Rate" has the meaning specified in Section 2.1(c).

"Default Rate" means a rate of interest which is 6.0 percentage points per annum higher than the interest rate otherwise provided in this Agreement, unless the Bank is unable to determine the applicable BSBY Rate or BSBY Daily Floating Rate, in which case the "Default Rate" means the Prime Rate plus 6% per annum.

"Designated Account" has the meaning specified in Section 2.7(i).

"Dollars," "US" or "$" means lawful money of the United States of America.

"Due Date" has the meaning set forth in Section 2.7(i).

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America or any Governmental Authority succeeding to its functions.

"Governmental Authority" means any nation or government, any state or other political subdivision or agency thereof and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government including, without limitation, the Federal Reserve Board.

"Highest Lawful Rate" means, at any time during which any Obligations shall be outstanding hereunder, the maximum nonusurious interest rate that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under applicable Law, in any case after taking into account, to the extent permitted by applicable Law, any and all relevant payments or charges under this Agreement and the other Loan Documents, and any available exemptions, exceptions, and exclusions.

"Indemnified Party" has the meaning specified in Section 6.4(b).

"Insolvency Event" means, with respect to any Credit Party, the occurrence of any of the following: (i) such Credit Party shall be adjudicated insolvent or bankrupt, or shall generally fail to pay or admit in writing to its inability to pay its debts as they become due; (ii) such Credit Party shall seek dissolution, arrangement, winding-up or reorganization, or the appointment of a receiver, trustee, custodian, or liquidator for it or a substantial portion of its property, assets or business or to effect a plan or other arrangement with its creditors; (iii) such Credit Party shall make a general assignment for the benefit of its creditors, or consent to or acquiesce in the appointment of a receiver, trustee, custodian, or liquidator for a substantial portion of its property, assets, or business; (iv) such Credit Party shall file a voluntary petition under any bankruptcy, insolvency or similar Law; (v) such Credit Party, or a substantial portion of its property, assets, or business shall become the subject of an involuntary proceeding or petition seeking (A) to adjudicate it bankrupt or insolvent, or (B) any dissolution, reorganization, winding-up, arrangement, protection, relief, or composition of it or its indebtedness or the appointment of a receiver, trustee, custodian, or liquidator, or shall become subject to any writ, judgment, warrant

of attachment, execution, or similar process and such proceeding, petition, writ, judgment, warrant of attachment, execution, or similar process shall not have been released, vacated, withdrawn, dismissed, or bonded, as the case may be, within forty-five (45) days of the commencement thereof; or (vi) such Credit Party shall take any action to authorize any of the foregoing.

"Interest Coverage Loans" has the meaning specified in Section 2.1(b).

"Interest Payment Date" has the meaning specified in the Preliminary Statements.

"Interest Period" means, the period of time requested by the Borrower and agreed to by the Bank as the applicable interest period in connection with the making or the continuation of a Loan bearing interest at the Optional Rate, which shall be a period of one, three, or six months.

"Law" or "Laws" means any law (including common law), constitution, statute, treaty, convention, regulation, rule, ordinance, code, order, injunction, writ, decree, judgment, or order of any Governmental Authority or other determination by an arbitrator, court or Governmental Authority.

"Loan" and "Loans" has the meaning specified in Section 2.1(a).

"Loan Documents" means this Agreement, the Disclosure, Waiver of Conflict of Interest, Acknowledgment and Release executed in connection with this Agreement, and each other document, agreement and instrument from time to time executed by one or more of the Credit Parties or any other Person and delivered to the Bank in connection herewith.

"Margin Stock" has the meaning ascribed and assigned to such term in Regulation U.

"Material Adverse Effect" means a material adverse effect on (i) the rights and remedies of the Bank under any Loan Document or (ii) the ability of any Credit Party to perform its obligations under any Loan Document.

"Maximum Amount of the Facility" means that amount set forth in the Preliminary Statements. The Bank may elect to provide written notice of a decrease in the Maximum Amount of the Facility to the Credit Parties from time to time but no such notice is required and no change in the Maximum Amount of the Facility shall be deemed to create an obligation of the Bank to make any loan hereunder.

"Minimum Initial Advance" means the greater of (i) $75,000 and (ii) the amount the Bank determines, in its sole discretion, is necessary to comply with applicable Law.

"Notice of Borrowing" has the meaning specified in Section 2.2.

"Notice of Conversion or Continuation" has the meaning set forth in Section 2.3(b).

"Notice of Demand" has the meaning specified in Section 2.7(a).

"Obligations" means the obligations of the Credit Parties hereunder and under the other Loan Documents to the Bank of any kind, including, without limitation, any liability on any claim, whether or not the right of the Bank to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, or unsecured, and whether or not such claim is discharged, stayed, or otherwise affected by any Insolvency Event. Without limiting the generality of the foregoing, the Obligations of the Credit Parties include (i) the obligation to pay principal, interest, charges, expenses, fees, including, without limitation, attorneys' and other professionals' fees (including any allocated costs of the Bank's in-house counsel to the extent permitted by applicable Law) and disbursements, indemnities and other amounts payable by the Credit Parties under any Loan Document, and (ii) the obligation to reimburse any amount in respect of any of the foregoing that the Bank, in its sole discretion, may elect to pay or advance on behalf of any of the Credit Parties.

"Optional Interest Rate" has the meaning specified in Section 2.1(d).

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, trust (including a business trust), unincorporated association, joint venture, or other business entity, or a Governmental Authority.

"Pledged Accounts" means, collectively, the accounts, if any, of the Pledgors described on Schedule A (as hereafter amended or supplemented from time to time in accordance with the procedure set forth thereon or by other amendment) as being "pledged accounts."

"Pledged Collateral" means, collectively, the Pledged Accounts, all of the Pledgors' Property rights pertaining thereto, all Property which has been or may hereafter be delivered to, transferred to or deposited in or credited to such Pledged Accounts, and all of the other Property described on Schedule A (as hereafter amended or supplemented from time to time in accordance with the procedure set forth thereon) in which the Bank is being granted a security interest in order to secure the payment and performance of the Obligations.

"Pledgor" means a Credit Party that grants a security interest in its Pledged Collateral pursuant to this Agreement.

"Prime Rate" means, for any day, a fluctuating rate per annum equal to the rate of interest in effect for such day as publicly announced from time to time by the Bank as its "prime rate." The "prime rate" is a rate set by the Bank based upon various factors including the Bank's cost and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in the "prime rate" announced by the Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"Property" means goods and merchandise, funds, cash balances, "investment property" (including securities whether certificated, uncertificated and book-entry securities, security entitlements, securities accounts, commodity contracts, or commodity accounts) and other financial assets, "deposit accounts," "general intangibles," and "instruments" (as such terms are defined in the Code, and which terms shall be deemed to include all Pledged Accounts and all assets from time to time contained in any Pledged Accounts), accounts receivable, choses in action, and any and all other forms of property whether real, personal or mixed, together with the proceeds thereof, any right, title or interest therein or thereto, and any documents relative thereto.

"Regulation U" means Regulation U of the Federal Reserve Board, or any successor statute or regulation thereto, as in effect from time to time.

"Sanctions" has the meaning specified in Section 3.1(j).

**SECTION 1.2.** Other Definitional Provisions. Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in each other Loan Document.

(a) The words "hereof," "herein," "hereunder," and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, subsection, Schedule, Exhibit, and Preliminary Statement references are to this Agreement unless otherwise specified.

(b) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms and where the context requires, pronouns and modifiers in the masculine, feminine, or neuter genders shall be deemed to refer to or include the other genders.

**SECTION 1.3.** Computation of Time Periods. In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

## ARTICLE 2

## AMOUNTS AND TERMS OF LOANS

**SECTION 2.1.** Loan Requests.

(a) Subject to the terms and conditions hereof, the Borrower may request the Bank to make demand loans (each, a "Loan" and collectively, the "Loans") to the Borrower on any Banking Day in an aggregate principal amount which, after giving effect thereto, would not cause the aggregate principal amount of all outstanding Loans to exceed the Maximum Amount of the Facility. If there is more than one Borrower, any Borrower (or a person or persons authorized by any one of the Borrowers), acting alone, may request the Bank to make a Loan under this Agreement. Each Borrower will be liable for all extensions of credit made under this Agreement to any other Borrower. **The Bank may make Loans in its sole and absolute discretion, and may decline to make Loans, with or without cause and may terminate this credit facility at any time.**

(b) If any Borrower is a natural person or a trust and the Bank agrees to make a Loan hereunder, the initial Loan shall be in an amount equal to or greater than the Minimum Initial Advance. In all other cases, the initial Loan shall be in a minimum amount of $25,000. All subsequent Loans made hereunder shall be in a minimum amount of $25,000. Notwithstanding the immediately preceding sentence, Loans, the proceeds of which are used by the Borrower to pay interest on other Loans (collectively, "Interest Coverage Loans"), may be in amounts of less than $25,000.

(c) Except as set forth below, each Loan shall bear interest at the BSBY Daily Floating Rate plus the Applicable Margin (the "Daily Floating Rate").

(d) The Borrower may request, in lieu of the Daily Floating Rate, that any Loan bear interest at the BSBY Rate for an applicable Interest Period plus the Applicable Margin (the "Optional Interest Rate," and each such Loan bearing interest at the Optional Interest Rate shall be referred to as a "BSBY Rate Loan") by requesting such a Loan no later than 12:00 noon Eastern time on the Banking Day preceding the day on which BSBY will be set, as specified in the definition of BSBY Rate. For example, if there are no interfering holidays or weekend days in any of the relevant locations, the request must be made at least two (2) days before the applicable BSBY Rate takes effect. Each BSBY Rate Loan shall be in an amount not less than $100,000. For the avoidance of doubt, no Interest Coverage Loan shall bear interest at an Optional Interest Rate unless such Loan is extended as, or as part of, a BSBY Rate Loan in an amount not less than $100,000.

(e) **The Borrower expressly acknowledges that the Bank may decline to make any Loan (whether bearing interest at the Daily Floating Rate or at the Optional Interest Rate) in its sole and absolute discretion and at any time, whether or not the amount of the Loans outstanding at such time exceeds the Maximum Amount of the Facility.**

**SECTION 2.2.** **<u>Notices of Borrowing</u>.**

(a) Each Loan shall be requested by the Borrower pursuant to a notice (each notice, a "Notice of Borrowing") given to the Bank. The proposed date of any such Loan shall be a Banking Day. Each Notice of Borrowing shall specify therein (i) the proposed date of such Loan, (ii) the proposed aggregate principal amount of such Loan, (iii) whether the Loan is requested to be a BSBY Rate Loan, and (iv) in the case of a requested BSBY Rate Loan, the requested Interest Period for such Loan. Any Notice of Borrowing shall be irrevocable.

(b) Upon receipt of a Notice of Borrowing, the Bank may (a) notify the Borrower by telephone, or by any other means provided for in this Agreement, whether the Bank will make available the amount of the Loan requested (and in the case of a BSBY Rate Loan, for the Interest Period requested thereunder), on the date specified therefor or (b) advance the Loan requested without any other notification to Borrower, which advance shall be deemed to be the Bank's agreement to advance the Loan on the terms requested by Borrower. Notwithstanding the foregoing or anything else to the contrary contained herein, any failure of the Bank to provide such notice or to so fund such requested Loan shall be deemed to be a denial by the Bank of the Loan requested in such Notice of Borrowing.

(c) Loan advances will be deposited in the Disbursement and Debit Account set forth in the Preliminary Statements or shall be disbursed as otherwise agreed between the Borrower and the Bank.

(d) Any Notice of Borrowing shall be irrevocable and the Borrower shall be bound to continue in accordance therewith, subject only to the Bank's consent to the requested Loan in Bank's sole and absolute discretion.

**SECTION 2.3.** **<u>Notice of Conversion or Continuation of BSBY Rate Loans</u>.**

(a) At the end of each Interest Period of a BSBY Rate Loan, the interest rate for such Loan will revert to the Daily Floating Rate, unless the Borrower has designated, and the Bank has agreed to, another Optional Interest Rate for such Loan; provided, however, that if an Insolvency Event has occurred, any Obligation is not paid by the day on which same becomes due and payable, or such Loan becomes the subject of a Notice of Demand, such Loan may only be continued as a Loan bearing interest at the Daily Floating Rate.

(b) In the event the Borrower shall wish to convert any outstanding Loan to a BSBY Rate Loan or to elect to continue any Loan as a BSBY Rate Loan, the Borrower shall deliver a notice of conversion or continuation to the Bank (a "Notice of Conversion or Continuation"), no later than 12:00 noon Eastern time on the Banking Day preceding the day on which BSBY will be set, as specified in the definition of BSBY Rate. For example, if there are no intervening holidays or weekend days in any of the relevant locations, the request must be made at least two (2) days before the proposed conversion or continuation date. A Notice of Conversion or Continuation shall specify (i) the proposed conversion date on which a Loan bearing interest at the Daily Floating Rate shall be converted to a BSBY Rate Loan or the continuation date for an existing BSBY Rate Loan (which shall be a Banking Day), (ii) the amount of the Loan to be converted to or continued as a BSBY Rate Loan, which must be in a minimum amount of $100,000 and (iii) the requested Interest Period for such Loan.

(c) Upon receipt of the Notice of Conversion or Continuation, the Bank may notify the Borrower by telephone or by any other means provided for in this Agreement, whether the Bank will agree to the requested conversion or continuation of the BSBY Rate Loan and Interest Period or may convert to or continue such BSBY Rate Loan in accordance with such request without notice. The failure of the Bank to convert to or to continue the BSBY Rate Loan as requested in the Notice of Conversion or Continuation shall be deemed to be a denial by Bank of the requested Notice of Conversion or Continuation. If the Bank does not agree to the Interest Period requested, such Loan shall automatically be continued as a Loan bearing interest at the Daily Floating Rate.

(d) Any Notice of Conversion or Continuation shall be irrevocable and the Borrower shall be bound to continue in accordance therewith, subject only to the Bank's consent to the Interest Period requested by the Borrower.

**SECTION 2.4.** Evidence of Debt to the Bank. The Bank shall maintain in its records one or more accounts evidencing the Obligations, the amounts of Loans made by the Bank and of principal and interest payable and paid to the Bank from time to time under this Agreement. In any legal action or proceeding in respect of this Agreement, the Bank's records shall be conclusive evidence of the existence and amounts of the Obligations, absent manifest error. The Bank will not be obligated to provide written confirmations of specific Loan disbursements or payments.

**SECTION 2.5.** Use of Proceeds. The proceeds of the Loans shall be used by the Borrower for lawful purposes for the benefit of the Borrower and, if the Borrower is not a natural person, in accordance with the Borrower's organizational documents. The proceeds of the Loans MAY NOT BE used directly or indirectly to purchase or carry Margin Stock or reduce or retire indebtedness incurred for such purpose. In no event shall the proceeds of the Loans be used to purchase stock of Bank of America Corporation or its affiliated mutual funds or other securities issued or underwritten by the Bank's affiliates unless the Bank shall otherwise consent in writing. Each Notice of Borrowing shall be deemed to be a certification and representation by Borrower that the proceeds of the requested Loans will be utilized in accordance with this Section.

**SECTION 2.6.** Default Rate. Notwithstanding the rate of interest and the payment dates otherwise specified in this Agreement, if any principal, interest, fee, or other amount payable hereunder or under any other Loan Document is not paid by the day on which the same becomes due and payable, or there is an Insolvency Event, then, in the discretion of the Bank, interest shall accrue on all of the Obligations at the Default Rate, which shall be payable to the Bank immediately, without notice or demand of any kind. This may result in compounding of interest. This will not constitute a waiver of any breach of any of the provisions of this Agreement.

**SECTION 2.7.** Payments.

(a) **The Bank shall have the right to demand payment from the Borrower, at any time, of all or any part of each Loan made by it hereunder (regardless of whether such Loan was extended by the Bank at the Daily Floating Rate or the Optional Interest Rate) by delivering to the Borrower a demand for payment, which may be made by telephone, or in any other manner provided for in this Agreement (any such demand, whether in writing or by telephone, a "Notice of Demand").**

(b) Without limiting the right of the Bank to demand payment at any time of all or any part of each Loan held by it hereunder and interest accrued thereon: (i) interest accrued on each Loan shall be payable by the Borrower in arrears on each Interest Payment Date; and (ii) interest accrued on each Loan shall be payable on the date that all or any portion of the principal amount of such Loan is repaid to Bank, whether pursuant to a Notice of Demand or otherwise.

(c) The Borrower shall repay to the Bank the principal amount of each Loan and all other Obligations related thereto demanded under a Notice of Demand. Repayments of each Loan and the other Obligations related thereto shall be due immediately following delivery of a Notice of Demand.

(d) Upon the occurrence of any Insolvency Event, all of the Loans, all interest accrued thereon and all other Obligations shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind (including, without limitation, Notice of Demand), all of which are hereby expressly waived by the Credit Parties.

(e) The Borrower may prepay the principal amount of the Loans outstanding at any time, together with all accrued and unpaid interest thereon, in whole or in part, without premium or penalty thereon or prior notice thereof, provided that no partial prepayment may be made that causes the remaining unpaid principal balance of any Loan (other than an Interest Coverage Loan) to be less than $25,000, or that causes the remaining unpaid principal balance of any BSBY Rate Loan to be less than $100,000, and further provided that any BSBY Rate Loan that is repaid on any date other than the last day of the applicable Interest Period shall be accompanied by the prepayment fee described in the next Section.

(f) All payments by the Credit Parties hereunder shall be paid in full without set-off or counterclaim or without any deduction or withholding whatsoever, including, without limitation, for any and all present and future taxes.

(g) Whenever any payment hereunder shall be stated to be due on a day other than a Banking Day, such payment shall be made on the next succeeding Banking Day, and such extension of time shall in such case be included in the computation of the payment of interest. All payments received on a day which is not a Banking Day will be applied to the credit of the Borrower on the next Banking Day.

(h) Each payment by the Borrower will be made in U.S. Dollars and, if so elected by the Borrower, in immediately available funds by direct debit to a deposit account as specified below or, if the Borrower has not elected to make payments by direct debit, by mail to the Bank's address shown on the Borrower's statement or at one of the Bank's banking centers in the United States.

(i) If the box is checked authorizing automatic debit in the Preliminary Statements above and if the Borrower has not subsequently terminated such authorization, the Borrower expressly agrees that (i) repayments of Loans, accrued interest, and other Obligations due and payable hereunder, will be withdrawn from the Disbursement and Debit Account with the Bank set forth in the Preliminary Statements or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower (the "Designated Account"), and (ii) the Bank will debit the Designated Account on the date each payment of principal and interest and any other Obligation from the Borrower becomes due (the "Due Date"). If direct debit is in effect, the Borrower will maintain sufficient funds in the Designated Account to cover each debit. If there are insufficient funds in the Designated Account on the date the Bank enters any debit authorized by this Agreement, the Bank may reverse the debit. The Borrower may terminate any previously authorized direct debit arrangement at any time by sending written notice to the Bank at the address specified at the end of this Agreement.

(j) Prior to each Due Date, the Bank will mail to the Borrower a statement of the amounts that will be due on that Due Date. The bill will be mailed a specified number of calendar days prior to the Due Date, which number of days will be mutually agreed from time to time by the Bank and the Borrower.

The Bank may, in its sole discretion, accept a direct debit arrangement from any other Credit Party or other Person on the terms and conditions set forth in this Section 2.7 or as otherwise agreed to in writing by Bank.

SECTION 2.8. Prepayment of BSBY Rate Loans. Each repayment of a BSBY Rate Loan that is not made on the last day of the Interest Period for such BSBY Rate Loan, regardless of whether such payment is voluntary, a result of a Notice of Demand, an Insolvency Event, or otherwise, shall be accompanied, to the extent

permitted by applicable Law, by an amount sufficient to compensate the Bank for any loss, cost, or expense incurred by it as a result of the prepayment, including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Credit Parties shall also pay any customary administrative fees charged by the Bank in connection with the foregoing. For purposes of this Section, the Bank shall be deemed to have funded each Loan by a matching deposit or other borrowing in the applicable interbank market, whether or not such Loan was in fact so funded.

SECTION 2.9. Computations. All computations of interest shall be made by the Bank on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable. This results in more interest than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid. Each determination by the Bank of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error. The last day of each Interest Period and the actual days during each such Interest Period will be determined by the Bank using the practices of the interbank market. In case of immediately successive Interest Periods applicable to a Loan, each successive Interest Period shall commence on the day the next preceding Interest Period expires.

SECTION 2.10. Funding Authorization, Bank's Right to Require Written Confirmation. Bank may honor telephone or telefax or other written or electronic communication instructions for Notices of Borrowings, Notices of Conversions or Continuations or other instructions regarding the Loans or this Agreement given, or purported to be given, by any Credit Party or by any one of the individuals authorized to sign loan documents on behalf of any Credit Party, or any other individual designated by any one of such authorized signers or by the applicable Credit Party; provided that, the Bank may request written confirmation of any such direction from the Borrower or any other Credit Party. The Bank shall be entitled to rely conclusively on such individual's authority to request, convert, or continue such Loans until the Bank receives written notice to the contrary. The Bank shall have no duty to verify the authenticity of the signature on any written Notice of Borrowing (and/or Notice of Conversion or Continuation) and, with respect to an oral request for such a Loan (or a conversion or continuation), to the extent that the Bank has relied upon such oral request, the Bank shall have no duty to verify the identity of any Person representing himself/herself as the Borrower or as one of the officers, managers, members, partners, trustees, employees, or other individuals authorized to make such request on behalf of the Borrower or otherwise authorized by the Borrower. The Credit Parties will indemnify and hold the Bank harmless from all liability, loss, and costs in connection with any act resulting from (A) the Bank's complying with telephone or telefax or other written or electronic communication instructions and (B) the Bank's reliance on any Communication executed using an Electronic Signature, or in the form of an Electronic Record, that the Bank reasonably believes are made by the Borrower, any other Credit Party, or by any individual authorized by the Borrower or any other Credit Party to give such instructions. This Section will survive this Agreement's termination, and will benefit the Bank and its officers, employees, and agents. All telephonic communications with the Bank may be recorded by the Bank and each of the Credit Parties consents to such recording. If there is more than one Borrower, any Borrower (or Person or Persons authorized by one of the Borrowers), acting alone, can borrow up to the Maximum Amount of the Facility and each Borrower shall be liable for all extensions of credit made under this Agreement to any other Borrower.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

SECTION 3.1. Representations and Warranties of the Credit Parties. The Credit Parties make the following representations and warranties, all of which shall (i) survive the execution and delivery of this Agreement and each other Loan Document and (ii) be deemed to be repeated on the date of each Loan:

(a) Authority. The Credit Parties, if other than natural persons, (i) are partnerships, corporations, limited liability companies, trusts, or other entities, as set forth in the Preliminary Statements, (ii) are each duly organized, validly existing and, if applicable, in good standing under the Laws of its respective jurisdiction of organization as set forth in the Preliminary Statements, (iii) have the exact legal names as set forth in the Preliminary Statements, and (iv) have their principal place of business, or in the case of an individual, residence, located in the state of the address set forth in the Preliminary Statements unless otherwise indicated to the Bank in writing. Each Credit Party has the requisite power and authority to execute, deliver, and perform each of the Loan Documents to which it is a party.

(b) Enforceability. This Agreement and the other Loan Documents to which the Credit Parties are parties, are the legal, valid and binding obligations of the respective Credit Parties party thereto enforceable in accordance with their terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, or similar Laws affecting creditors' rights generally and (ii) general principles of equity.

(c) No Conflict. No Credit Party's execution, delivery or performance of any Loan Document to which it is a party contravenes (i) any document pursuant to which such Credit Party, if not a natural person, is organized or governed, (ii) any requirement of Law or (iii) any franchise, license, permit, indenture, contract, lease, agreement, instrument, or other commitment to which such Credit Party is a party or by which such Credit Party or any of its Properties are bound. The execution, delivery, and performance of the Loan Documents by the Credit Parties will not result in the imposition of any liens upon any Properties of the Credit Parties, except in favor of the Bank.

(d) Consents and Filings. No consent, authorization, or filing is required in connection with the execution, delivery and performance of this Agreement or any other Loan Document, except those that have been obtained or made.

(e) Solvency. The fair saleable value of the assets (after giving effect to all rights of subrogation, indemnification, and contribution and each Loan and the application of proceeds therefrom) of each Credit Party, considered separately for each such Person, exceeds all of such Credit Party's respective estimated liabilities including, without limitation, those to be incurred pursuant to this Agreement and the other Loan Documents and whether those liabilities are subordinated, unmatured, liquidated, or contingent. None of the Credit Parties, considered separately, (i) has unreasonably small capital in relation to the respective business in which it is or proposes to be engaged, or (ii) has incurred, after giving effect to the transactions contemplated by the Loan Documents and each Loan and the application of proceeds therefrom, debts beyond its ability to pay as such debts become due. No Credit Party intends to, nor believes that it will, incur debts beyond its ability to pay such debts as they become due.

(f) Accuracy and Completeness of Information. None of the reports and other information provided in writing by any of the Credit Parties to the Bank, including, without limitation, any questionnaires or applications submitted by the Credit Parties, in connection with the negotiation, preparation, or execution of this Agreement or any other Loan Document, contains any untrue statement of a fact material to the credit worthiness of any Credit Party or omits to state a fact that is necessary in order to make the statements contained therein not misleading.

(g) No Judgments or Litigation. No judgments, orders, writs, or decrees are outstanding against any of the Credit Parties or any of their Affiliates nor is there now pending or, to the best of any Credit Party's knowledge after diligent inquiry, threatened, any litigation, contested claim, investigation, arbitration, or governmental proceeding by or against any of the Credit Parties or any of their Affiliates that (i) could, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, or (ii) purports to affect the legality, validity, or enforceability of this Agreement or any other Loan Document or the consummation of the transactions contemplated hereby or thereby.

(h) Compliance with Law. None of the Credit Parties or any of their Affiliates has violated or failed to comply with any requirement of Law, which violation or failure to comply could, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(i) Brokerage Commissions. No Person is entitled to receive from any of the Credit Parties any brokerage commission, finder's fee or similar fee. or payment in connection with the consummation of the transactions contemplated by this Agreement. No brokerage or other fee, commission, or compensation is to be paid by the Bank by reason of any act, alleged act, or omission of any of the Credit Parties with respect to the transactions contemplated hereby.

(j) Government Sanctions. None of the Credit Parties nor any_of their respective affiliated entities, nor, to the knowledge of the Credit Parties, any owner, trustee, director, officer, employee, agent, affiliate, or representative of any Credit Party (i) is an individual or entity currently the subject of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor is any Credit Party located, organized, or resident in a country or territory that is the subject of Sanctions, or (ii) will, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint

venture partner, or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor, or otherwise) of Sanctions.

(k) Beneficial Ownership Certification. As of the date of this Agreement, the information included in the Beneficial Ownership Certification provided as part of the application of any entity Credit Party for this facility or otherwise is true and correct in all respects.

**SECTION 3.2.** Additional Representations, Warranties, and Covenants. Each of the Credit Parties makes the additional representations and warranties, if any, set forth, or referred to, in Article 5 (which shall also (i) survive the execution and delivery of this Agreement and each other Loan Document and (ii) be deemed to be repeated on the date of each Loan).

## ARTICLE 4

## GUARANTY

**SECTION 4.1.** Guaranty. In consideration of the advances to the Borrower by the Bank under this Agreement, each Guarantor hereby absolutely and unconditionally guarantees, as a guarantee of payment and not merely as a guarantee of collection, prompt payment when due, whether upon demand, upon acceleration in connection with an Insolvency Event or otherwise, and at all times thereafter, of any and all now or hereafter existing Obligations. All payments by a Guarantor hereunder shall be paid in full, without setoff or counterclaim.

**SECTION 4.2.** Waivers. Each Guarantor agrees that its obligations under this Article 4 and otherwise contained in this Agreement shall not be affected by: (i) the genuineness, validity, regularity, or enforceability of the Obligations or any of the Loan Documents, (ii) the existence, validity, enforceability, perfection, or extent of any collateral therefor (or by any manner of application of the proceeds therefrom to all or any of the Obligations or any manner of sale thereof); (iii) any change, restructuring, or termination of the corporate or other organizational structure or existence of any Credit Party; (iv) any failure of the Bank to disclose to such Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, Properties, or prospects of any other Credit Party now or hereafter known to the Bank (such Guarantor hereby unconditionally and irrevocably waiving any duty on the part of the Bank to disclose such information); (v) the failure of any other Person to execute or deliver this Agreement, any other Loan Document, or any other guaranty or agreement, or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Obligations; or (vi) any fact or circumstance relating to the Obligations which might otherwise constitute a defense to this Agreement. Each Guarantor unconditionally and irrevocably waives notice of the acceptance of its obligations under this Agreement and of the extension or continuation of the Obligations or any part thereof. Each Guarantor further unconditionally and irrevocably waives: (x) presentment, protest, notices of any kind, demand, and diligence by the Bank and action on delinquency in respect of the Obligations or any part thereof, including, without limitation, any provision of Law requiring the Bank to exhaust any right or remedy or to take any action against the Borrower, any other Guarantor or any other Person or Property before enforcing the provisions of this Agreement against it; (y) any defense arising by reason of any claim or defense based upon an election of remedies by the Bank that in any manner impairs, reduces, releases, or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Credit Parties or any other Person or any collateral; and (z) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder. Any Guarantor that is or may be subject to California law waives any rights and defenses that are or may become available to Guarantor by reasons of Section 2787 to 2855, inclusive of the California Civil Code.

**SECTION 4.3.** Guaranty Absolute. Each Guarantor guarantees that the Obligations will be paid strictly in accordance with the terms of this Agreement and the other Loan Documents, regardless of any Law, now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Bank with respect thereto. Each Guarantor agrees that its obligations under this Article 4 and otherwise contained in this Agreement are a continuing and irrevocable guaranty of all Obligations now or hereafter existing and shall remain in full force and effect until all Obligations are indefeasibly paid in full and this Agreement is irrevocably terminated. Notwithstanding the preceding sentence, each Guarantor agrees that its obligations under this Article 4 and elsewhere contained in this Agreement shall continue to be effective or be reinstated, as the case may be, if at

any time any payment of any portion of Obligations is rescinded or must otherwise be restored or returned upon an Insolvency Event or otherwise, as if such payment had not been made and whether or not the Bank has released Guarantor from its obligations under this Article 4 or elsewhere contained in this Agreement. Each Guarantor agrees that in the event that demand for payment, or acceleration of the time for payment, of any of the Obligations is stayed, upon the occurrence of an Insolvency Event or otherwise, all such amounts shall nonetheless be payable by it immediately upon demand by the Bank.

SECTION 4.4. Subrogation. Each Guarantor, until all of the Obligations have been indefeasibly paid in full and this Agreement has been terminated (and even though the total amount of the Obligations may be in excess of each such Guarantor's liability hereunder), waives, to the extent permitted by applicable Law, any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise), including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, arising from the existence or performance of this Article 4, other provisions of this Agreement, or any other Loan Document, and such Guarantor waives to the extent permitted by applicable Law any right to enforce any remedy that the Bank now has or may hereafter have against any other Credit Party, and waives any benefit of, and any right to participate in, any security now or hereafter held by the Bank.

SECTION 4.5. Modifications of Obligations. Each Guarantor hereby agrees that the Bank may at any time and from time to time, and without notice to it, make any agreement with any Credit Party or with any other Person liable on any of the Obligations or providing collateral as security for the Obligations, for the extension, increase, renewal, payment, compromise, discharge, or release of the Obligations or any collateral (in whole or in part), or for any modification or amendment of the terms thereof or of this Agreement, any other Loan Document or any other agreement evidencing the provision of collateral, or, to the extent provided herein, may take unilateral action to modify the terms of this Agreement or any related document, all without in any way impairing, releasing, discharging or otherwise affecting such Guarantor's obligations under this Article 4 or elsewhere contained in this Agreement. Further, each Guarantor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary its risks under the provisions of this Article 4 or elsewhere contained in this Agreement, or which, but for this provision, might operate as a discharge of it.

SECTION 4.6. Subordination. Each Guarantor agrees that any obligations of any other Credit Party to such Guarantor, now or hereafter existing, including but not limited to any obligations to such Guarantor as subrogee of the Bank or resulting from such Guarantor's performance under this Article 4, other provisions of this Agreement, or any other Loan Document, are hereby subordinated to the payment in full of the Obligations. In addition to each Guarantor's waiver of any right of subrogation as set forth in this Article 4 with respect to any obligations of another Credit Party to such Guarantor as subrogee of the Bank, each Guarantor agrees that, if the Bank so requests, such Guarantor shall not demand, take, or receive from any other Credit Party, by setoff or in any other manner, payment of any other obligations of another Credit Party to such Guarantor until the Obligations have been indefeasibly paid in full and this Agreement has been terminated. If any payments are received by any Guarantor in violation of such waiver or agreement, such payments shall be received by such Guarantor as trustee for the Bank and shall be paid over to the Bank on account of the Obligations, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Article 4, this Agreement, or any other Loan Document. Any security interest, lien, or other encumbrance that any Guarantor may now or hereafter have on any Property of another Credit Party is hereby subordinated to any security interest, lien, or other encumbrance that the Bank may have on any such Property.

SECTION 4.7. Acknowledgment. Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by this Agreement and the other Loan Documents and that the waivers and its agreements to the other terms and provisions set forth in this Article 4 and elsewhere in this Agreement and the other Loan Documents are knowingly made in contemplation of such benefits. If Guarantor is a married person residing in a community property state, Guarantor confirms that the transactions contemplated by this Agreement shall benefit the marital community and that the Bank shall have recourse to the Guarantor's separate property and community property, to the maximum extent permitted by law.

SECTION 4.8. Pledgors Who Are Not Guarantors. If a Pledgor is neither a Guarantor nor the Borrower, then, such Pledgor agrees to all of the waivers and all of the other terms and provisions of this Article 4 as if such Pledgor were a Guarantor, but notwithstanding anything to the contrary contained in this Agreement, except with respect to the Obligations arising under the provisions providing for indemnification of the Bank (and its Affiliates, officers, directors, employees, agents, and advisors) and breaches of any of such Pledgor's representations, warranties or covenants, in each case contained in this Agreement or any other Loan Document,

such Pledgor's liability for the Obligations shall be limited to its Pledged Collateral.

## ARTICLE 5

## SECURITY INTEREST

SECTION 5.1. Pledged Collateral. As security for prompt payment in full of the Obligations when due, the Bank shall have, and each Pledgor hereby irrevocably and unconditionally grants a continuing security interest in, and lien upon, and right of set-off against, and assigns and transfers to the Bank, all Property described under such Pledgor's name on Schedule A attached hereto and incorporated herein, as hereafter amended or supplemented from time to time in accordance with the procedure set forth thereon, including, without limitation, all Property described on a "Pledge Certificate" (as defined in, and delivered pursuant to, Schedule A) bearing its name. The parties hereto expressly agree that all rights, assets, and Property at any time held in or credited to any securities account constituting Pledged Collateral shall be treated as financial assets as defined in the Code. For the avoidance of doubt, each of the Credit Parties and the Bank acknowledge and agree that the provisions of this Article 5 and the other terms and provisions of this Agreement constitute a "security agreement" for purposes of the Code and for all other purposes. Pledgor shall execute and deliver a Form U-1 to the Bank in connection with this Agreement and shall cause such form to be updated as requested by Bank and as required by law.

SECTION 5.2. Exercise of Rights by Pledgor. So long as no Notice of Demand is outstanding and no Insolvency Event shall have occurred, each Pledgor shall be entitled to exercise all voting and other consensual rights pertaining to the Pledged Collateral beneficially owned by such Pledgor or any part thereof for any purpose not inconsistent with the terms of this Agreement or any other Loan Document; provided, however, that upon any Notice of Demand or any Insolvency Event, at the option of the Bank, upon notice to Pledgor, all rights of Pledgor to exercise the voting and other consensual rights to which it would otherwise be entitled to exercise pursuant to the foregoing provision shall cease, and the Bank shall thereupon have the sole right to exercise such voting and other consensual rights.

SECTION 5.3. Compliance with Laws, etc. So long as any of the Obligations under this Agreement shall remain unpaid, each Pledgor: (i) will comply in all material respects with all requirements of Law applicable to the Pledged Collateral, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments and charges imposed upon Pledgor or the Pledgor's Property by any Governmental Authority, except to the extent contested in good faith and by appropriate proceedings; and (ii) will not create or suffer to exist any lien, security interest or other charge or encumbrance, or any other type of preferential arrangement, upon or with respect to the Pledged Collateral, other than liens in favor of the Bank.

SECTION 5.4. Bank's Rights to Liquidate Pledged Collateral. Immediately upon any demand for payment under this Agreement, including, without limitation, pursuant to a Notice of Demand, or upon any Insolvency Event, the Bank shall have the right to sell or otherwise dispose of, or to cause any agent acting on its behalf hereunder (including any sub-custodian) to sell or otherwise dispose of, in accordance with this Section, such of the Pledged Collateral selected by the Bank in its sole discretion. In the event Bank exercises its rights pursuant to this Section, it shall apply the proceeds thereof to the Obligations then due and payable to the Bank under this Agreement, which proceeds shall be applied by the Bank to the Obligations in such order as it may see fit. Each Credit Party agrees that (i) Bank shall have the right to sell any of the Pledged Collateral without any notice, unless expressly required by applicable Law. Such right shall include, but not necessarily be limited to, the right to sell such Pledged Collateral without notice if there is a recognizable market therefor; (ii) in the event that notice is necessary or required by applicable Law, notice to the applicable Pledgor, given in the manner provided in the provisions of Article 6 of this Agreement for notices three (3) Banking Days prior to the date of public sale of Pledged Collateral or prior to the date after which private sale or any other disposition of Pledged Collateral will be made shall constitute reasonable notice; and (iii) without precluding any other methods of sale or other disposition, the sale or disposition of Pledged Collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event, the Bank may sell or otherwise dispose of Pledged Collateral at its option, on such terms as it may choose without assuming any credit risk and without obligation to advertise. If, in the opinion of the Bank, there is any question that a public sale or distribution of any Pledged Collateral will violate any securities Law, the Bank may offer and sell such Pledged Collateral in a transaction exempt from registration under securities Law, and any such sale made in good faith by the Bank shall be deemed "commercially reasonable."

**The Credit Parties understand and agree that sales or other dispositions by the Bank of all or portions of the Pledged Collateral may be affected by the Bank at times and in manners designed to address the Bank's credit concerns pursuant to this Agreement and such sales or other dispositions could result in materially less proceeds or more adverse tax consequences than if such sales or other dispositions had occurred at different times or in different manners.**

SECTION 5.5. No Impairment. All rights of the Bank and liens of the Bank shall continue unimpaired, and the Credit Parties shall be and remain bound by the Obligations and in accordance with the terms hereof, notwithstanding the release of any of the Pledged Collateral, or of any rights or interests therein, or any delay, extension of time, renewal, compromise, or other indulgence granted by the Bank in reference to any of the Obligations, or any promissory note, draft, bill of exchange, or other instrument or other obligations given in connection therewith or constituting a part of the Pledged Collateral; each Credit Party hereby waiving all notice of any such delay, extension, release, substitution, renewal, compromise, or other indulgence, and hereby consenting to be bound thereby as fully and effectually as if each Credit Party had expressly agreed thereto in advance.

SECTION 5.6. Certain Transfers. After a Notice of Demand or the occurrence of an Insolvency Event, the Bank may, at its option and without obligation to do so, transfer to or register in its name or the name of its nominee(s), all or any part of the Pledged Collateral with or without notice to any Credit Party and regardless of whether demand for payment of any of the Obligations has been made.

SECTION 5.7. Authority to File Documents. The Bank is authorized, at its option, to file in any jurisdiction any initial financing statements and amendments thereto that indicate collateral as any of the Pledged Collateral and contains any other information required for the sufficiency, or filing office acceptance, of any financing statement or amendment. Each Pledgor agrees to take any other action reasonably requested by Bank to insure the attachment, perfection and first priority of, and the ability of the Bank to enforce, the Bank's security interest in any and all of the Pledged Collateral, including, without limitation, executing such instruments, documents and papers which the Bank may request for such purpose.

SECTION 5.8. Attorney-in-Fact. The Bank is irrevocably appointed the attorney-in-fact of each Credit Party with full authority in the place and stead of such Credit Party, and in the name of such Credit Party, in the Bank's name or otherwise, from time to time in the Bank's discretion, to take any action and to execute any instrument, document, or agreement (including, without limitation, stock powers, financing statements, amendments thereto and continuation statements) which the Bank may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to perfect, preserve, and protect the security interest granted or purported to be granted hereunder, to exercise its rights with respect to subordination of obligations to such Credit Party by other Credit Parties and the liquidation of Pledged Collateral contained elsewhere in this Agreement and any of the other Loan Documents, and to deposit any Property received with respect to any Pledged Collateral into the Pledged Accounts of the applicable Pledgor; and each Credit Party agrees to pay the Bank on demand any expenses with respect thereto. Subject to the provisions contained elsewhere in this Agreement regarding the imposition of the Default Rate, any outstanding amount of such expenses shall bear interest from the date incurred until paid to Bank as if such amount were a Loan bearing interest at the Daily Floating Rate. The foregoing appointments are irrevocable and coupled with an interest and shall survive the death or disability of Pledgor and shall not be revoked without the Bank's written consent. To the extent permitted by applicable Law, Pledgor hereby ratifies all said attorney-in-fact shall lawfully do by virtue hereof.

SECTION 5.9. No Impairment of Right to Demand Payment by Bank. Nothing contained herein shall limit or otherwise affect in any way the right of the Bank to require, in accordance with the terms hereof, payment of any or all of the outstanding amount of the Obligations on demand at any time.

SECTION 5.10. Special Covenants Regarding Legal Status. Each of the Credit Parties, that is not a natural person, will not:

(a) allow its corporate or other legal existence to be other than duly organized, valid and, if applicable, in good standing under the Laws of its respective jurisdiction set forth in the Preliminary Statements;

(b) dissolve or liquidate, or merge, convert, or consolidate with or into any other Person, without the prior written consent of Bank;

(c) change its name or principal place of business without furnishing to Bank at least thirty (30) days prior written notice thereof;

(d) utilize any trade name not set forth in the Preliminary Statements without furnishing to Bank at least thirty (30) days prior written notice thereof; or

(e) divide itself into two or more limited liability companies or other legal entities (pursuant to a "plan of division" under Section 18-217 of the Delaware Limited Liability Company Act or a similar arrangement under any other applicable state statute).

SECTION 5.11. Additional Covenants with Respect to the Pledged Collateral and the Credit Parties. Each Pledgor hereby represents and warrants as follows:

(a) that all of the Property constituting Pledged Collateral is owned solely by the respective Pledgor thereof, whose name appears immediately above the description of or reference to such Pledged Collateral in Schedule A or in a "Pledge Certificate," as defined in, and delivered pursuant to, Schedule A, free and clear of any and all liens other than in favor of the Bank;

(b) there are no documents with respect to the Pledged Collateral filed in any jurisdiction naming any Pledgor as the debtor and a Person other than Bank as a secured party;

(c) the security interests granted pursuant to this Agreement constitute valid and enforceable first, prior liens on the Pledged Collateral, which liens will be perfected upon entering into this Agreement and the Control Agreement, if any;

(d) none of the Pledged Collateral constitutes "restricted securities", as such term is defined in Rule 144 of the Securities Act of 1933, as amended (the "Act"), or is subject to any restriction pursuant to Rule 145 of the Act, and no Credit Party is an "affiliate" of any issuer thereof, as such term is defined in Rule 144 of the Act;

(e) neither the pledge, foreclosure or sale upon foreclosure of any of the Pledged Collateral, nor the exercise of any of Bank's other rights with respect to the liquidation of such Pledged Collateral contained in any Loan Document is limited by contract, by the policies of any Person, including, without limitation, the issuer of securities included in the Pledged Collateral or any other requirement of Law;

(f) no Pledgor is a party to any agreement or contract with respect to the Pledged Collateral, except the Loan Documents, nor is any Pledgor subject to any agreements or contracts, except the Loan Documents, that could result in the creation of a lien or other charge or encumbrance upon or with respect to the Pledged Collateral; and

(g) all of the non-cash Pledged Collateral has been fully paid and non-assessable.

Each of the Credit Parties hereby affirms each of the representations, warranties, and covenants made by any such Credit Party in the Schedules and Supplements attached hereto and made part of this Agreement or hereafter executed and delivered by the parties which by their terms shall be deemed incorporated and made part of this Agreement.

SECTION 5.12. Maintenance of Pledged Collateral. The Credit Parties understand and acknowledge that: (a) it is their obligation to maintain Pledged Collateral with sufficient value to support the outstanding Obligations; (b) the Bank shall determine the value of the Pledged Collateral and the amount required to support the outstanding Obligations, in the Bank's sole and absolute discretion; (c) any such determination made by the Bank, may be modified in the Bank's opinion as circumstances warrant, and (d) any notification from the Bank (with the express understanding that no such notice is required) that the Pledged Collateral has an insufficient value shall be deemed to be a Notice of Demand hereunder. The Credit Parties acknowledge and understand that their compliance with the foregoing maintenance requirements shall not limit in any way the Bank's discretion to demand payment of any or all of the Obligations at any time or to refuse to extend Loans.

SECTION 5.13. Obligations of Married Persons. If Pledgor is a married person living in a community property state, Pledgor hereby confirms that Pledgor is acting on behalf of Pledgor's marital community, that the pledge benefits or is expected to benefit the marital community and is intended to bind Pledgor's separate and

community property and that no signature of Pledgor's spouse which has not been obtained is required to create a valid pledge hereunder.

## ARTICLE 6

## MISCELLANEOUS

**SECTION 6.1.** Amendments, Right of Bank to Unilaterally Terminate or Modify This Agreement. No amendment or waiver of any provision of this Agreement or any other Loan Document, or consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. For the avoidance of doubt, and without in any way limiting the rights of the Bank to demand repayment, terminate this Agreement and exercise its rights under this Agreement without any prior notice to the Credit Parties, the Bank may modify, amend or rescind any provision of this Agreement (including by adding terms of the same or a different nature) from time to time by giving the Credit Parties, at least thirty (30) days' notice in writing prior to the effective date and otherwise on such terms and conditions as may be required by applicable law or as stated in such notice.

To the extent expressly agreed to by the Bank in its discretion, any amendment or modification hereto maybe effected by an Electronic Record signed by the Bank or, if signatures of the Credit Parties are required by the Bank for such amendment or waiver, by the parties to such amendment or waiver using Electronic Signatures pursuant to the terms of this Agreement.

**SECTION 6.2.** Notices, Effectiveness. Unless otherwise provided in this Agreement, with, or in, another agreement between the Bank and the Credit Parties, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, if to a Credit Party, to its address set forth in the Preliminary Statements, and if to the Bank, to its address set forth on the signature page of this Agreement, or sent by facsimile to the respective fax numbers set forth in the Preliminary Statements or listed on the signature page, or to such other addresses or fax numbers as the Bank and the Credit Parties may specify from time to time in writing. Notices and other communications sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day after deposit with the overnight courier, (c) other methods of hand-delivery (including telegram, lettergram, or mailgram) shall be deemed delivered when delivered, and (d) facsimile shall be deemed delivered when transmitted. To the extent that oral notification is provided for or agreed to herein, such oral notification may be made by telephone to any of the number(s) set forth in the Preliminary Statements or as set forth in the Bank's records for any Credit Party; provided that any oral notification in person or at any other telephone number shall constitute notification hereunder.

In lieu of a written or oral notice, notices and/or communications from the Bank to any Credit Party may, to the extent permitted by law, be delivered electronically (i) by transmitting the communication to the electronic address provided by the Credit Party or to such other electronic address as the Credit Parties may specify from time to time in writing, or (ii) by posting the communication on a website and sending the Credit Parties a notice to the Credit Parties' postal address or electronic address telling the Credit Parties that the communication has been posted, its location, and providing instructions on how to view it (any such notice, an "Electronic Notice"). Electronic Notices shall be effective when the communication, or a notice advising of its posting to a website, is sent to the applicable Credit Parties' electronic address.

**SECTION 6.3.** No Waiver or Limitations; Remedies. No failure on the part of the Bank to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. Nothing herein shall be deemed to limit Bank's right to demand payment of a Loan at any time. The remedies herein provided are cumulative and not exclusive of any remedies provided by Law.

**SECTION 6.4.** Costs, Expenses.

(a) Each Credit Party agrees to pay, on demand by Bank, the costs and expenses of the Bank in connection with the closing of the Loan, including the preparation, execution, delivery, and administration of the Loan Documents and the fees and expenses of the Bank. Each Credit Party also agrees to pay, on demand by

Bank, the costs and expenses of the Bank with respect to (i) the perfection, protection, or preservation of rights or interests, under the Loan Documents, (ii) any modification or amendment of the Loan Documents, (iii) negotiations with the Credit Party or with other creditors of the Credit Party or any of its Affiliates arising out of any default in performance by any Credit Party hereunder or with respect to presenting claims in or otherwise participating in or monitoring any matter arising out of or in connection with an Insolvency Event, and (iv) the enforcement of the Loan Documents, whether in any action, suit, litigation, matter arising out of or in connection with an Insolvency Event or otherwise, in each case, including, without limitation, the fees and expenses of counsel and other professionals for the Bank with respect thereto. For the avoidance of doubt, and without limiting the generality of the foregoing, such costs and expenses shall include, without limitation, attorneys' fees, related or incidental to the care, holding, retaking, preparing for sale, selling or collection of or realization upon any of the Pledged Collateral or relating or incidental to the establishment or preserving or enforcement of the rights of the Bank hereunder or in respect of any of the Pledged Collateral, and obtaining legal advice as to any of the foregoing, including, without limitation, all actions taken in accordance with this Agreement with respect to filing of financing statements and amendments thereto or otherwise to ensure the attachment of a first priority security interest in the Pledged Collateral. Subject to the provisions regarding the imposition of the Default Rate, any outstanding amounts of such expenses shall, at the option of the Bank, bear interest, from the date incurred until paid to Bank, as if such amounts were a Loan bearing interest at the Daily Floating Rate.

(b) Each Credit Party agrees to indemnify and hold harmless the Bank and each of its Affiliates and its officers, directors, employees, agents, and advisors (each, an "Indemnified Party") from and against, and to reimburse each Indemnified Party, upon its demand, for, any and all claims, damages, losses, liabilities, and expenses (including, without limitation, fees and expenses of counsel and other professionals) that may be incurred by or asserted or awarded against any Indemnified Party or to which any Indemnified Party may become subject, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with this Agreement, any other Loan Document, any document or instrument delivered in connection herewith, or the transactions contemplated hereby, or any Loan, whether or not such investigation, litigation, or proceeding is brought by any Credit Party or its directors, shareholders, trustees, or creditors or an Indemnified Party or any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated, except to the extent such claim, damage, loss, liability, or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Each Credit Party also agrees that no Indemnified Party shall have any liability to any Credit Party for special, indirect, consequential, or punitive damages arising out of or otherwise relating to any of the transactions contemplated herein or in any other Loan Document or the actual or proposed use of the proceeds of the Loans, except for damages to the extent determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. No Credit Party shall interpose any defense to the payment of the Obligations based upon any statute of limitations. No provision in this Agreement or in any of the other Loan Documents and no course of dealing among the parties shall be deemed to create any fiduciary duty by the Bank to any Credit Party.

(c) If any Credit Party fails to pay when due any costs, expenses, or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Credit Party by the Bank, in its sole discretion, and any amount so paid by Bank shall be immediately reimbursed to it by the Credit Parties and, subject to the provisions regarding the imposition of the Default Rate, shall bear interest, from the date so paid by Bank until repaid by the Credit Parties to Bank as if such amount were a Loan bearing interest at the Daily Floating Rate.

(d) Each Credit Party agrees that its obligations under this Section shall survive termination of the Agreement.

SECTION 6.5. Binding Effect. This Agreement shall become effective when it shall have been executed by each of the Credit Parties and Bank and thereafter shall be binding upon and inure to the benefit of each Credit Party and the Bank and their respective successors and assigns, except that no Credit Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Bank.

SECTION 6.6. Successors and Assigns. This Agreement is binding on the Credit Parties' and the Bank's successors and assignees. The Credit Parties agree that they may not assign this Agreement without the Bank's prior consent. The Bank may sell participations in or assign this Agreement and the Loans, and may exchange information about the Credit Parties with actual or potential participants or assignees. If a participation

is sold or a Loan is assigned, the purchaser will have the right of set-off against the Credit Parties. If Bank assigns or transfers its rights under this Agreement, and if Bank or any of its Affiliates is a securities intermediary (as referred to in the Code) for any or all of the Pledged Collateral, the Pledgor agrees that the Bank, in such capacity, is irrevocably directed by the Pledgor to comply with instructions or entitlement orders with respect to such Pledged Collateral originated by any assignee or transferee of this Agreement without further consent from the Pledgor.

SECTION 6.7. Electronic Records and Signatures. This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "Communication"), including Communications required to be in writing, may, if agreed by the Bank, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf. The Credit Parties agree that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on the Credit Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of the Credit Parties enforceable against the Credit Parties in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to the Bank. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Bank may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of the Bank's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Bank is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Bank pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Bank has agreed to accept such Electronic Signature, the Bank shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Credit Party without further verification and (b) upon the request of the Bank any Electronic Signature shall be promptly followed by a manually executed, original counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

SECTION 6.8. Conversion to Paper Original. At the Bank's discretion the authoritative electronic copy of this Agreement ("Authoritative Copy") may be converted to paper and marked as the original by the Bank (the "Paper Original").

Unless and until the Bank creates a Paper Original, the Authoritative Copy of this Agreement:

(1) shall at all times reside in a document management system designated by the Bank for the storage of authoritative copies of electronic records, and
(2) is held in the ordinary course of business.

In the event the Authoritative Copy is converted to a Paper Original, the parties hereto acknowledge and agree that:

(1) the electronic signing of this Agreement also constitutes issuance and delivery of the Paper Original,
(2) the electronic signature(s) associated with this Agreement, when affixed to the Paper Original, constitutes legally valid and binding signatures on the Paper Original, and
(3) the Credit Parties' obligations will be evidenced by the Paper Original after such conversion.

SECTION 6.9. Exercise of Rights by Bank; Rights of Set-Off. In addition to any rights now or hereafter granted under applicable Law or otherwise, and not by way of limitation of any such rights, the Bank and each of its Affiliates are hereby authorized by each of the Credit Parties at any time and from time to time, if the Bank has made a demand for payment under this Agreement, or if any Credit Party is not in compliance with any of the terms of this Agreement that have not been waived by the Bank, or if an Insolvency Event has occurred, to the fullest extent permitted by Law, to set off and otherwise apply any and all deposits (general or special, time or

demand, provisional or final) then held by, and other indebtedness then owing to, the Bank or such Affiliate to or for the credit or the account of the Borrower or any Guarantor against any and all of the Obligations now or hereafter existing under this Agreement which have been demanded or are otherwise due. The Bank shall promptly notify the applicable Credit Party after any such setoff and application; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.

**SECTION 6.10.** Maximum Rate. Notwithstanding anything to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Credit Parties and the Bank hereby agree that all agreements between them under this Agreement and the other Loan Documents, whether now existing or hereafter arising and whether written or oral, are expressly limited so that in no contingency or event whatsoever shall the amount paid, or agreed to be paid, to the Bank for the use, forbearance or detention of the money loaned to the Borrower and evidenced hereby or thereby, or for the performance or payment of any Obligation contained herein or therein, exceed the Highest Lawful Rate. If due to any circumstance whatsoever, fulfillment of any provisions of this Agreement or any other Loan Document at the time performance of such provision shall be due shall exceed the Highest Lawful Rate, then, automatically, the Obligation to be fulfilled shall be modified or reduced to the extent necessary to limit such interest to the Highest Lawful Rate, and if from any such circumstance the Bank should ever receive anything of value deemed interest by applicable Law which would exceed the Highest Lawful Rate, such excessive interest shall be applied to the reduction of the principal amount then outstanding hereunder or on account of any other then outstanding Obligations and not to the payment of interest. All sums paid or agreed to be paid to the Bank for the use, forbearance or detention of the Obligations, to the extent permitted by applicable Law, shall be amortized, prorated, allocated and spread throughout the full term thereof, until payment in full thereof, so that the actual rate of interest on account of the Obligations does not exceed the Highest Lawful Rate throughout the entire term thereof. If, after giving effect to the preceding terms of this Section, any Credit Party has paid interest in excess of the Highest Lawful Rate, such excess shall be refunded to such Credit Party. The terms and provisions of this Section shall control over every other provision of this Agreement, the other Loan Documents, and all other agreements between the Credit Parties and the Bank.

**SECTION 6.11.** Severability. Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**SECTION 6.12.** Joint and Several Liability. Except as expressly provided herein, every Person signing this Agreement as a Credit Party agrees to be, jointly and severally, fully and personally responsible for the full payment of all amounts due hereunder and the performance of all other promises and obligations made in this Agreement.

**SECTION 6.13.** Dispute Resolution. This Section, including the subsections below, is referred to as the "Dispute Resolution Provision." The Bank, the Credit Parties (and any other party subject to this Agreement) agree that this Dispute Resolution Provision is a material inducement for the parties entering into this Agreement.

(a) This Dispute Resolution Provision concerns the resolution of any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses (individually or collectively, a "Claim" or "Claims") between the Bank, on the one hand, and the Credit Parties, or any of them, on the other hand (each side being, for the purposes of this Dispute Resolution Provision, a "Party" and the two sides together being the "Parties"), regardless of whether based on federal, state, local or foreign law, statute, ordinance, regulation, contract, tort, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent at the time of this Agreement, including but not limited to Claims that arise out of or relate to: (i) this Agreement (including any renewals, extensions, or modifications); or (ii) any document related to this Agreement. For the purposes of this Dispute Resolution Provision only, the terms "Bank" or Party or Parties (to the extent referring to or including the Bank) shall include any parent corporation, subsidiary, or affiliate of the Bank.

(b) Any Claim brought by any Party in a California state court shall be resolved by a general reference to a referee (or a panel of referees) as provided in California Code of Civil Procedure Section 638, unless such reference is rejected, not enforced, or is otherwise unavailable. The referee (or presiding referee of the panel) shall be a retired Judge or Justice of the California state court system. The referee(s) shall be selected by mutual written agreement of the parties. If the parties do not agree, the referee(s) shall be selected by the Presiding Judge of the Court (or his or her representative) as provided in California Code of Civil Procedure

Section 640. The referee(s) shall hear and determine all issues relating to the Claim, whether of fact or of law, and shall do so in accordance with the laws of the Governing Law State and the California rules of evidence and civil procedure, and shall report a statement of decision. The referee(s) shall be empowered to enter equitable as well as legal relief, provide all temporary or provisional remedies, enter equitable and legal orders that will be binding on the parties, and rule on any motion which would be authorized in court litigation, including without limitation motions to dismiss, for summary judgment, or for summary adjudication. The referee(s) shall award legal fees and costs (including the fees of the referee(s)) relating to the judicial reference proceeding, and to any related litigation or arbitration, in accordance with the terms of this Agreement. The award that results from the decision of the referee(s) shall be entered as a judgment in the court that appointed the referee(s), in accordance with the provisions of California Code of Civil Procedure Sections 644(a). Pursuant to California Code of Civil Procedure Sections 645, the parties reserve the right to seek appellate review of any judgment or order, including but not limited to, orders pertaining to class certification, to the same extent permitted in a court of law. The Parties agree that judicial reference pursuant to this subsection is the preferred method of dispute resolution of all Claims brought by any Party in a California state court. The Parties therefore agree that injunctive relief, including a temporary restraining order, without the posting of any bond or security, shall be appropriate to enjoin the prosecution of any arbitration proceeding where the Claims at issue are subject to (and as long as they remain subject to) judicial reference pursuant to this subsection, provided that a Party moves for such relief within thirty (30) days of its receipt of a demand for arbitration of such a Claim.

**(c) With the sole exception of Claims subject to reference under Subsection 6.13(b) above, the Parties agree that at the request of any Party to this Agreement, the Claim shall be resolved by binding arbitration in accordance with Subsections 6.13(c)-(m) herein. The Claim shall be governed by the controlling laws as stated in Section 6.14 below. The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "Act"), shall apply (and the Parties stipulate that the arbitration act or chapter of any individual state shall not apply) to the construction, interpretation, and enforcement of this Dispute Resolution Provision, as well as to the confirmation of or appeal from any arbitration award. Provided, however, that if any of the Credit Parties are non-U.S. residents or otherwise have contacts or assets such that the Bank may desire to enforce an arbitration award outside of the U.S., then the "New York Arbitration Convention" (the Convention on the Recognition and Enforcement of Foreign Arbitral Awards) shall apply to the extent necessary, including with regard to the confirmation of and appeal from any award.**

(d) Arbitration proceedings will be determined in accordance with the Act, the then-current Commercial Financial rules and procedures of the American Arbitration Association or any successor thereof ("AAA") (or any successor rules for arbitration of financial services disputes), and the terms of this Dispute Resolution Provision. In the event of any inconsistency, the terms of this Dispute Resolution Provision shall control. The arbitration shall be administered by the Parties and the arbitrator(s) and not by the AAA and shall be conducted, unless otherwise required by law, at a location selected solely by the Bank in any U.S. state where real or tangible personal property collateral for this credit is located or where any of the Credit Parties has a residence or place of business. If there is no such state, the Bank shall select a location in the state specified in Section 6.14 below. Each of the Credit Parties agrees that it shall be deemed to have received proper notice (including pursuant to the Act or the New York Arbitration Convention, as applicable) with respect to any part of the arbitration proceeding if it has received notice pursuant to the Notices provision of this Agreement.

(e) (i) The arbitrator(s) will be selected pursuant to the AAA "Arbitrator Select: List and Appointment" process, to be initiated by the Bank with an initial request for a list of ten (10) arbitrators. If the Credit Parties fail to execute the submission forms, they authorize the Bank and its representatives to execute the forms on their behalf. If the AAA "Arbitrator Select: List and Appointment" process is unavailable, the Bank shall initiate any successor process offered by the AAA or a similar process offered by any other nationally recognized alternative dispute resolution organization.

(ii) A Party shall be entitled to take no more than five (5) fact depositions, one or more of which may be taken in accordance with Fed. R. Civ. P. 30(b)(6), plus depositions of any experts designated by the other Party, each of seven (7) hours or less, during pre-hearing discovery. The arbitrator(s) shall enforce the "Apex" doctrine with regard to requested depositions of high-ranking executives of the Bank.

(iii) There shall be no written discovery requests except a Party may serve document requests on the other Party not to exceed thirty (30) in number, including subparts. The requests shall be served within forty-five (45) days of the appointment of the arbitrator(s) and shall be responded to within twenty-one (21) days of service.

(f) The arbitrator(s) shall consider and rule on motions by the Parties to dismiss for failure to state a claim; to compel; and for summary judgment, in a manner substantively consistent with the corresponding Federal Rules of Civil Procedure. The arbitrator(s) will give effect to the limitations on causes of action and damages against the Bank as stated in Subsection 6.4(b) above. In addition, the arbitrator(s) will give effect to applicable statutes of limitation in determining any Claim (except Claims by the Bank for payment of the Obligations (see Subsection 6.4(b) above)) and shall dismiss the Claim if it is barred by the statutes of limitation.

(g) The arbitrator(s) shall have the power to award legal fees and costs relating to the arbitration proceeding and any related litigation or arbitration, pursuant to the terms of this Agreement including Section 6.4 above, with credit allowed for any such costs previously paid by the respective party or parties. The arbitrator(s) shall provide a written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(h) This Dispute Resolution Provision does not limit the right of any Party to: (i) exercise self-help remedies, such as, but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(i) Subject to Subsections 6.13(b) and 6.13(h) above, if any Party fails to demand arbitration of Claims within ninety (90) days after the filing of the court action involving those Claims, such failure shall be a waiver of the right to arbitration.

(j) The arbitration proceedings shall be private. All documents, transcripts, and filings received by any Party shall not be disclosed by the recipient to any third parties other than to affiliates or to attorneys, accountants, auditors, and financial advisors acting in the course of their representation, or as otherwise ordered by a court of competent jurisdiction or required by law, rule or regulation. Any settlement or award also shall be kept confidential, except to the extent required to submit it to a court for confirmation or to pursue enforcement. The Parties agree that injunctive relief, including a temporary restraining order, from a trial court is the appropriate relief for breach of this paragraph, and they waive any security or the posting of a bond as a requirement for obtaining such relief. Notwithstanding the foregoing, nothing in this Agreement shall prohibit any of the parties from disclosing any award, settlement, arbitration proceedings, or underlying facts and circumstances in response to an inquiry by a self-regulatory organization or regulatory or government agency.

(k) Any arbitration or trial by a judge or referee of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). **THE CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.** Regardless of anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court and not by an arbitrator. The Parties acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the Parties and is nonseverable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the Parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. **THE PARTIES ACKNOWLEDGE AND AGREE THAT UNDER NO CIRCUMSTANCES WILL A CLASS ACTION BE ARBITRATED.**

(l) By agreeing to binding reference or arbitration herein, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties, to the extent permitted by applicable Law irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. To the extent permitted by applicable Law, this waiver of jury trial shall remain in effect even if the Class Action Waiver is limited, voided, or found unenforceable. **WHETHER THE CLAIM IS DECIDED BY ARBITRATION OR BY TRIAL BY A JUDGE OR REFEREE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY APPLICABLE LAW.**

(m) Each of the Credit Parties expressly and irrevocably waives any rights to commence any action, suit, or other dispute resolution procedure against the Bank arising out of or relating to this Agreement except in accordance with this Dispute Resolution Provision. Each of the Credit Parties also agrees that any action, suit, or other dispute resolution procedure commenced by it in violation of this Dispute Resolution Provision shall at the

request of the Bank be subject to immediate dismissal by the presiding judge, tribunal, or administrative body and/or referral to arbitration hereunder (pursuant to the Act or the New York Arbitration Convention, as applicable). In any proceeding filed in accordance with this Dispute Resolution Provision, each of the Credit Parties expressly and irrevocably consents to personal jurisdiction and venue in such forum selected by the Bank; and waives any and all rights to contest jurisdiction and venue and the convenience of any such forum including any and all rights to remove such action to a different forum.

**SECTION 6.14.** __GOVERNING LAW__. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, FEDERAL LAW, AND, TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, THE LAWS OF THE STATE OF NORTH CAROLINA, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PROVISIONS THEREOF.

**SECTION 6.15.** __Borrower Information; Patriot Act; Beneficial Ownership Regulation; Reporting to Credit Bureaus.__

(a) Promptly upon the request of the Bank, the Borrower shall provide to the Bank, and the Bank shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act; and, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall deliver a Beneficial Ownership Certification to the Bank or otherwise confirm the information required thereby in form acceptable to the Bank and shall keep the Bank informed of any material changes to the information provided.

(b) Each Credit Party authorizes the Bank or anyone authorized by the Bank, from time to time and for so long as the credit facility established under this Agreement is available or any amount is outstanding hereunder, to contact such Credit Party's employer directly regarding such Credit Party's employment and to make any and all inquiries and to obtain such credit and other reports as the Bank deems necessary or advisable to verify the accuracy of the information in this Agreement and any documentation provided in connection with this Agreement, to review the Loans and the credit facility established under this Agreement, to determine the Credit Parties' creditworthiness and for any other legitimate purpose associated with the Loans or the credit facility established under this Agreement. Each Credit Party further agrees that the Bank, or anyone authorized by the Bank, may provide information to others, such as a credit reporting agency or a collection agency, regarding Bank's transactions and experiences with such Credit Party. At the request of any Credit Party, the Bank will tell the Credit Party whether a consumer credit report was obtained and will also provide the name and address of the consumer reporting agency that provided such consumer credit report.

**SECTION 6.16.** __FINAL AGREEMENT.__ (a) THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

(b) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(c) FOR THE AVOIDANCE OF DOUBT, THE OBLIGATIONS WILL NOT BE EVIDENCED SEPARATELY BY A PROMISSORY NOTE OR NOTES.

**SECTION 6.17. STATE SPECIFIC DISCLOSURES.**

| STATE SPECIFIC DISCLOSURES FOR INDIVIDUALS RESIDING IN AND/OR ENITITIES OR TRUSTS LOCATED OR ORGANIZED UNDER THE STATE INDICATED BELOW, AS APPLICABLE | |
|---|---|
| Connecticut | __APPLICABLE TO CREDIT PARTIES ENTERING INTO COMMERCIAL PURPOSE TRANSACTIONS:__ EACH CREDIT PARTY EXPRESSLY ACKNOWLEDGES THAT THE CREDIT AGREEMENT AND EACH TRANSACTION RELATED TO IT IS A "COMMERCIAL TRANSACTION" WITHIN THE MEANING OF CHAPTER 903A OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED. EACH CREDIT PARTY HEREBY VOLUNTARILY AND KNOWINGLY WAIVES ANY AND ALL RIGHTS WHICH ARE OR MAY BE CONFERRED UPON IT UNDER CHAPTER 903A OF SAID STATUTES (OR ANY OTHER FEDERAL OR STATE LAW AFFECTING PREJUDGMENT REMEDIES) TO ANY NOTICE OR HEARING OR PRIOR COURT |

| | |
|---|---|
| | ORDER OR THE POSTING OF A BOND PRIOR TO BANK'S OBTAINING A PREJUDGMENT REMEDY. EACH CREDIT PARTY ACKNOWLEDGES THAT HE/SHE OR IT, AS THE CASE MAY BE, HAS BEEN ADVISED BY COUNSEL OF ITS CHOICE OR HAS HAD THE OPPORTUNITY TO RETAIN COUNSEL OF ITS CHOICE WITH RESPECT TO THIS TRANSACTION AND THE CREDIT AGREEMENT. |
| Iowa | IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THE CREDIT AGREEMENT (TOGETHER WITH THE EXHIBITS AND SCHEDULES HERETO) SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THE CREDIT AGREEMENT MAY BE LEGALLY ENFORCED. BANK MAY CHANGE THE TERMS OF THE CREDIT AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT. |
| Missouri | APPLICABLE TO CREDIT PARTIES ENTERING INTO CONSUMER PURPOSE TRANSACTIONS: ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT. |
| Missouri | APPLICABLE TO CREDIT PARTIES ENTERING INTO COMMERCIAL PURPOSE TRANSACTIONS: ORAL *OR UNEXECUTED* AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT. |
| New Mexico | APPLICABLE TO CREDIT PARTIES ENTERING INTO COMMERCIAL PURPOSE TRANSACTIONS: EACH CREDIT PARTY WHO SIGNS BELOW ACKNOWLEDGES THE PROVISIONS OF SECTION 58-6-5 NMSA 1973 COMP., WHICH REQUIRE A CONTRACT, PROMISE, OR COMMITMENT TO LOAN MONEY, OR TO GRANT, EXTEND, OR RENEW CREDIT, OR ANY MODIFICATION THEREOF, IN AN AMOUNT GREATER THAN TWENTY FIVE THOUSAND DOLLARS ($25,000), NOT PRIMARILY FOR PERSONAL, FAMILY, OR HOUSEHOLD PURPOSES, TO BE IN WRITING AND SIGNED BY THE PARTY TO BE CHARGED OR THAT PARTY'S AUTHORIZED REPRESENTATIVE. |
| North Carolina | NO COMMERCIAL LOAN COMMITMENT FOR A LOAN IN EXCESS OF FIFTY THOUSAND DOLLARS ($50,000) SHALL BE BINDING UNLESS THE COMMITMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND. THE TERM "COMMERCIAL LOAN COMMITMENT" MEANS AN OFFER, AGREEMENT, COMMITMENT, OR CONTRACT TO EXTEND CREDIT PRIMARILY FOR BUSINESS OR COMMERCIAL PURPOSES AND DOES NOT INCLUDE CHARGE OR CREDIT CARD ACCOUNTS, PERSONAL LINES OF CREDIT, OVERDRAFTS, OR ANY OTHER CONSUMER ACCOUNT. |
| Ohio | THE OHIO LAWS AGAINST DISCRIMINATION REQUIRE THAT ALL CREDITORS MAKE CREDIT EQUALLY AVAILABLE TO ALL CREDIT WORTHY CUSTOMERS, AND THAT CREDIT REPORTING AGENCIES MAINTAIN SEPARATE CREDIT HISTORIES ON EACH INDIVIDUAL UPON REQUEST. THE OHIO CIVIL RIGHTS COMMISSION ADMINISTERS COMPLIANCE WITH THIS LAW. |
| Oregon | UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY THE BANK CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY ANY DEBTOR'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY THE CREDIT PARTY TO BE ENFORCEABLE.<br><br>DO NOT SIGN THIS APPLICATION AND AGREE TO THE TERMS IN THIS CREDIT AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO BEFORE READING IT. THE CREDIT AGREEMENT PROVIDES FOR THE PAYMENT OF A BREAKAGE FEE PENALTY IF A |

| | |
|---|---|
| | CREDIT PARTY WISHES TO REPAY A BSBY RATE LOAN PRIOR TO THE DATE PROVIDED FOR SUCH REPAYMENT IN THE CREDIT AGREEMENT. |
| South Dakota | ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER SOUTH DAKOTA LAW. |
| Texas and Louisiana | THIS CREDIT AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. |
| Vermont | THIS IS A DEMAND LOAN AND SO MAY BE COLLECTED BY THE BANK AT ANY TIME. A NEW LOAN MUTUALLY AGREED UPON AND SUBSEQUENTLY ISSUED MAY CARRY A HIGHER OR LOWER RATE OF INTEREST. |
| Washington | ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW. |

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement under seal, or caused this Agreement to be executed under seal by their respective duly authorized officers as of the date first above written.

Borrower/Pledgor(s):

_______________________________ (Seal)
Gary L. Pinkston, Trustee of the Gary and Janice Pinkston Family Trust under Trust Agreement dated January 18, 2008, as amended and restated in its entirety under Trust Agreement dated December 10, 2012, as amended

_______________________________ (Seal)
Janice C. Pinkston, Trustee of the Gary and Janice Pinkston Family Trust under Trust Agreement dated January 18, 2008, as amended and restated in its entirety under Trust Agreement dated December 10, 2012, as amended

Guarantor(s):

_______________________________ (Seal)
Gary L. Pinkston, Individually

_______________________________ (Seal)
Janice C. Pinkston, Individually

Bank:

**Bank of America, N.A.**

By: _______________________________ (Seal)
Adrienne Schwartz, Senior Vice President

Address where notices to the Bank are to be sent:

Bank of America, N.A.
Gateway Village - 900 Building
NC1-026-06-06
900 W. Trade Street
Charlotte, NC 28255

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following three notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

**(1) USA PATRIOT ACT NOTICE**

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information. The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

***Notices #2 and #3 apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(2) U.S. AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #3 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(3) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed in this document are providing this notice #3.
- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.
- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.
- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.
- You may tell us your choice to limit marketing offers, and you may tell us the choices for other customers who are joint account holders with you.
- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.
- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals

and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000.**

**Bank of America Companies:**

This notice applies to all Bank of America U.S. legal entities that utilize the names:

Bank of America
Banc of America
U.S. Trust
Merrill

These entities include banks and trust companies; credit card companies; brokerage and investment companies; and insurance and securities companies. In addition, this notice applies to the following Bank of America U.S. companies:

Managed Account Advisors LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.

**Upcoming Withdrawal Notice from Bank of America, N.A.**

In accordance with applicable requirements, if you provide us with a payment authorization or instruction, or send us a check to make a payment on your Private Client Line, Bank of America, N.A. will attempt to withdraw such payment in accordance with the terms of your authorization or as indicated on the check you provide. The withdrawal will pull from the account you specify and will be in the amount you have authorized in your payment authorization or check. The authorization you give to us may be in your attached Private Client Line loan agreement (as hereafter amended, modified or supplemented, the "Note") or in a separate payment authorization, instruction, or check that you provide to us.

Nothing set forth in this Withdrawal Notice affects your right to terminate any automated payment authorization provided to the Bank in accordance with the Note or other payment authorization agreement, nor any terms or conditions of the Note or other agreements with Bank of America, N.A. Please contact your Private Bank client team if you have any questions or need to stop any automated withdrawals, or please call 800.878.7878. The institution where you have your account from which funds will be drawn for such withdrawal may also be able to assist you and may separately assess fees for overdrafts or failed withdrawals.

Please note that, in accordance with the terms of your Note, your monthly payments may fluctuate based on a variety of factors, including the total outstanding principal balance on your loan, the interest rate on your loan for your billing period, and any additional amounts you choose to pay on your loan, as applicable. Your total payment will be applied to principal, interest and fees, in accordance with the terms of your Note. Please refer to your Note for a description of how your principal, interest and fees are calculated. You can also contact your Private Bank client team to request a copy of your Note or for information about how your total payment will be applied.

If you make any interest-only payments, your principal balance will stay the same and you will not be closer to paying off your loan. For additional details, please refer to your Note, or contact us for additional information.

Bank of America Private Bank is a division of Bank of America, N.A., and other subsidiaries of Bank of America Corporation.
Bank of America, N.A., Member FDIC.
© 2019 Bank of America Corporation. All rights reserved.

**SCHEDULE A**
**TO**
**CREDIT AGREEMENT**

**Description of Pledged Collateral**

Capitalized terms used in this Schedule A but not separately defined in this schedule shall have the respective meanings ascribed to such terms in the Credit Agreement to which this Schedule A is attached. Terms used in this Schedule A which have a meaning defined in the Code, and are not otherwise specifically defined in the Credit Agreement, shall have the respective meanings ascribed to them in the Code.

I. Name of Pledgor: Gary L. Pinkston and Janice C. Pinkston, Trustees of the Gary and Janice Pinkston Family Trust

(The term Pledgor in this Roman Numeral Section shall refer only to the Persons named immediately above. However, if more than one Pledgor is named above because the Pledged Collateral set forth below is owned jointly, as tenants in common or as tenants by the entirety, then the term "Pledgor" shall include any one or more of such Pledgors.)

A. Pledged Collateral: All of the following:

1. Pledged Account(s): All of the accounts set forth below:

(a) The following listed account(s):

(i) Account number(s) ending in [redacted] held by Bank as agent or custodian for Pledgor under an agreement for custody, safekeeping, investment management, investment advisory, or similar services between Pledgor and Bank.

(b) All successor and replacement accounts, regardless of the numbers of such accounts or the offices at which such accounts are maintained, including any linked or related deposit or securities accounts held by any affiliate of Bank of America Corporation receiving assets or proceeds of the accounts described above, or any related account held by any entity as clearing broker for any of the accounts.

2. All rights of the Pledgor in connection with the Pledged Accounts, including any rights against any securities intermediary, any such Affiliate of the Bank or any clearing broker in connection with the Accounts.

3. All investment property, security entitlements, financial assets, certificated securities, uncertificated securities, money, deposit accounts, instruments, certificates of deposit, general intangibles, puts, calls and options and all other investments or Property of any sort now or hereafter held, maintained or administered in, or credited to, the Pledged Accounts; but excluding collective investment funds managed by Bank, including without limitation any interest in variable amount notes, commonly known as "master notes"; and excluding anything construed as real property under applicable state law.

4. All present and future income, proceeds (including identifiable cash proceeds), earnings, increases, and substitutions from or for the Pledged Collateral of every kind and nature, including without limitation all payments, interest, profits, distributions, benefits, rights, options, warrants, dividends, stock dividends, stock splits, stock rights, regulatory dividends, subscriptions, monies, claims for money due and to become due, proceeds of any insurance on the Pledged Collateral, shares of stock of different par value or no par value issued in substitution or exchange for shares included in the Pledged Collateral, and all other property Pledgor is entitled to receive on account of such Pledged Collateral, including accounts, documents, instruments, chattel paper, and general intangibles.

B. Additional Pledged Collateral. It is contemplated by the parties that the Pledgor may, from time to time pledge additional account(s) maintained with the Bank or its Affiliates and all Property and assets held, maintained or administered therein, or credited thereto, certain other investment property and all proceeds thereof as security for the Obligations and the Bank may, in its sole discretion, agree to accept such additional account(s) and/or assets as Pledged Collateral (such additional accounts and/or assets that are accepted as Pledged

Collateral being referred to collectively as the "Additional Pledged Collateral"). In addition, the Pledgor may from time to time in each case with the prior written consent of the Bank withdraw account(s) as Pledged Collateral; or substitute new account(s) for existing account(s) as Pledged Collateral. At the time of each addition, withdrawal, or modification of any account(s) and/or other assets as Pledged Collateral, the account(s) and/or other assets added, withdrawn, or modified as Pledged Collateral shall be identified on a Pledge Certificate substantially in the form of the Pledge Certificate attached hereto as Schedule 1 (each a "Pledge Certificate"), signed by the Pledgor and delivered to and accepted by the Bank in writing. Upon such acceptance by the Bank, this Schedule A shall be deemed amended and supplemented by such Pledge Certificate. All such Additional Pledged Collateral shall be deemed "Pledged Accounts" (if such Additional Pledged Collateral is an account) and "Pledged Collateral" as defined in this Agreement. The Bank shall have no obligation to obtain the consent, or give notice to, any other Credit Party, of any addition, withdrawal, or substitution of any account(s) and/or other assets as Pledged Collateral.

**This Schedule A is acknowledged and agreed by Borrowers/Pledgors as of date of Credit Agreement.**

Pledgor:

_______________________________ (Seal)
Gary L. Pinkston, Trustee of the Gary and Janice Pinkston Family Trust under Trust Agreement dated January 18, 2008, as amended and restated in its entirety under Trust Agreement dated December 10, 2012, as amended

_______________________________ (Seal)
Janice C. Pinkston, Trustee of the Gary and Janice Pinkston Family Trust under Trust Agreement dated January 18, 2008, as amended and restated in its entirety under Trust Agreement dated December 10, 2012, as amended

_______________________________ (Seal)
Gary L. Pinkston, Individually

_______________________________ (Seal)
Janice C. Pinkston, Individually

Bank:

**Bank of America, N.A.**

By: _______________________________
Adrienne Schwartz, Senior Vice President

**SCHEDULE 1**
**TO SCHEDULE A**
**TO CREDIT AGREEMENT**

**FORM OF PLEDGE CERTIFICATE**

Reference is hereby made to that certain Credit Agreement, dated as of August 2, 2023 (the "Credit Agreement"), among the undersigned ("Pledgor"), ______________________ (remaining Credit Parties) and Bank of America, N.A. ("Bank"). This Pledge Certificate is delivered pursuant to Schedule A to Credit Agreement (Description of Pledged Collateral). All capitalized terms used and not otherwise defined herein shall have their respective meanings as set forth in the Credit Agreement.

[___] The Pledgor hereby certifies that concurrently with the delivery of this Pledge Certificate, the Pledgor is designating the following account(s) and/or other assets (the "Additional Pledged Collateral") as Pledged Collateral:

[Here Describe]

and/or

[___] The Pledgor is withdrawing the following account(s) and/or other assets currently constituting Pledged Collateral:

[Here Describe]

[If an account is being added, the following will be added to the certificate:]
The Pledgor hereby irrevocably and unconditionally grants a security interest in, a lien upon and the right of set-off against, and assigns and transfers to Bank the above-listed Additional Pledged Collateral and, for all accounts described above, all Property and assets held, maintained or administered therein, or credited thereto, and all proceeds thereof to secure the Obligations. The Pledgor acknowledges and agrees that the Pledged Collateral covered by and further described in the Credit Agreement includes, without limitation, such Additional Pledged Collateral. The Pledgor hereby represents and warrants that all of the representations and warranties contained in the Credit Agreement are true and correct in all material respects on the date hereof as though made as of the date hereof. The Pledgor acknowledges and agrees that the Additional Pledged Collateral listed above shall be covered by, and subject to, the Disclosure, Waiver of Conflict of Interest, Acknowledgement and Release previously executed by Pledgor in favor of the Bank with respect to the Credit Agreement. Except as expressly set forth above, the Credit Agreement shall continue in full force and effect and is hereby ratified and affirmed.

[If the pledge certificate is only being used to remove an account, the following will be added to the certificate:]
The Pledgor hereby represents and warrants that all of the representations and warranties contained in the Credit Agreement are true and correct in all material respects on the date hereof as though made as of the date hereof. Except as expressly set forth above, the Credit Agreement shall continue in full force and effect and is hereby ratified and affirmed.

This Pledge Certificate may be in the form of an Electronic Record and may be executed using Electronic Signatures (including, without limitation, facsimile and .pdf) and shall be considered an original, and shall have the same legal effect, validity and enforceability as a paper record. This Pledge Certificate may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Pledge Certificate. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by Bank of this Pledge Certificate that has been manually signed on paper and which has been converted into electronic form (such as scanned into PDF format), or this Pledge Certificate that has been electronically signed and which has been converted into another format, for transmission, delivery and/or retention. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

[Signature blocks for Pledgor and Bank will be added when form is utilized]

BANK OF AMERICA

## DISCLOSURE, WAIVER OF CONFLICT OF INTEREST, ACKNOWLEDGMENT AND RELEASE

**Executed in connection with that certain Credit Agreement dated August 2, 2023 among the parties signing below ("this Credit Agreement").**

**By entering into this Credit Agreement, you are establishing, guaranteeing, or providing a pledge in connection with a line of credit (the "Credit") secured by account(s) with Bank of America, N.A. (the "Bank") or Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") where the Bank, Merrill or its affiliates (collectively, "BAC") may be providing investment and/or trust services to you or one of the other Credit Parties in connection with such account(s). It is important that you fully understand the rules and risks involved in borrowing against marketable securities.**

You understand that there are risks involved in borrowing against marketable securities and that there are potential conflicts of interest in BAC's relationships with you. You should carefully consider how credit and the use of credit secured by marketable securities fits your own investment philosophy, investment objectives, risk tolerance, liquidity needs and related factors as well as whether you are comfortable with the potential conflict of interest created in connection with the Credit, including without limitation, the following:

**BAC will serve in a dual capacity, creating a potential conflict of interest.** To the extent that BAC is providing investment/trust services to you in connection with the account(s) pledged to the Bank to secure this Credit Agreement, BAC will serve in a dual capacity as a result of your investment services/trust relationship and this loan, which can create a conflict between your interest and the interests of the Bank. The credit facility evidenced by the Credit Agreement is being offered solely by the Bank and has not been offered or arranged by any other affiliate of the Bank, including any of its broker-dealer affiliates.

**Bank will act to protect itself as lender, not as your trustee, investment manager, advisor, or custodian.** The Bank, as lender, shall have and may exercise the same rights and powers as a lender that is not acting as a trustee and/or investment manager, advisor, or custodian. Such rights and powers, including the disposition and sale of any and all assets pledged as collateral, may be contrary to your interests and/or investment objectives. Therefore, the Bank's role as lender will take priority over any role of BAC as trustee and/or investment manager, advisor, or custodian. Any action taken by the Bank against investment/trust assets pursuant to this Credit Agreement shall not be a breach of any fiduciary duties that BAC may owe to you under the terms governing your investment/trust/custody account(s).

**Credit secured by marketable securities can increase your level of market risk.** Borrowing against marketable securities may allow you to keep more dollars invested in marketable securities rather than liquidating your investments to meet your cash needs. Therefore, your exposure to market volatility increases – a declining market could result in even greater losses. A decline in the value of your securities may require you to provide additional funds or eligible securities to the Bank in order to avoid the forced sale of those securities or other securities in your account.

**The downside is not limited to the collateral value in your pledged account.** If the securities in your pledged account decline in value, so does the value of the collateral supporting your loan. When the value of the collateral falls below the maintenance requirements established by the Bank, the Bank can move to protect its position. In order to cover collateral deficiencies, the Bank may issue you a collateral call – a request for additional cash or eligible securities – or sell securities from your pledged account. If a sale does not cover the deficiency, the Borrower and any Guarantor will be responsible for any shortfall. In addition, there may be adverse tax and investment consequences to you if securities in your pledged account are sold or liquidated by the Bank to cure a collateral deficiency or other default. The Bank has no obligation to exercise its remedies against the collateral before pursuing any obligor of the Credit.

**Risk Mitigation.** You should carefully consider, and discuss with your investment advisors where appropriate, strategies to address risks of collateral calls. Carefully considering the diversification, quality and type of assets

pledged by you, as well as the amount that you borrow, might be a risk mitigation strategy for you. For example, a diversified portfolio of securities with historically low volatility might provide more protection against collateral calls than a portfolio with a concentrated position of one security, asset class, or sector. It is also important to maintain resources to address potential collateral calls and absorb losses from market declines.

**"Purpose Credit" may be subject to lower advance and call rates and other regulatory restrictions.** If the Federal Reserve Form U-1 executed by the Borrower and Pledgor in connection with the Credit indicates that the loan proceeds will be used to purchase or carry Margin Stock (as defined therein), the Bank will generally impose lower advance and may impose lower call provisions on your credit facility. If the Credit has not been designated as a "purpose credit," on the Federal Reserve Form U-1, then the proceeds of the Credit may not be used to purchase or carry Margin Stock.

**Bank may initiate the sale of any securities in your account, without contacting you, to meet a collateral call.** The Bank may attempt to involve you in the case of a collateral deficiency; however, market conditions may require the Bank to quickly sell any of your securities without prior notice to you and without your consent. Because the securities are collateral for the loan, the Bank has the right to decide which security to sell in order to protect its interests. Even if the Bank has contacted you and provided a specific date by which you can meet a collateral call, the Bank can still take necessary steps to protect its financial interests, including immediately selling the securities without prior notice to you. The investment/trust assets in your account(s) pledged to the Bank may be liquidated in any order to satisfy a collateral deficiency. The selection and/or sale of the assets by the Bank to satisfy a collateral deficiency or other default shall not constitute any exercise of fiduciary power by the Bank or breach of its fiduciary duties.

**Bank may increase its collateral maintenance requirements at any time and is not required to provide you with advance written notice.** Even if you have been provided certain indicative collateral requirements, the Bank may apply different maintenance requirements to the assets in your accounts and/or may change its maintenance requirements at any time and such changes to the collateral requirements may take effect immediately and may result in the issuance of a collateral call or a liquidation of the securities as described in the prior paragraph. You should not rely on any indicative collateral requirements in entering into this Credit Agreement.

**THIS IS AN UNCOMMITTED, DEMAND FACILITY. This Credit Agreement authorizes the Bank to demand payment in full at any time, regardless of whether sufficient collateral value exists to support your loans. The Bank has no obligation to make loans to you under this Credit Agreement, regardless of the value of the collateral you have pledged to us and the Bank has no obligation to allow those loans to remain outstanding.**

**Many assets held in your accounts may have no collateral value.** BAC may recommend and/or make investments in your account(s) pledged under this Credit Agreement which are not given any collateral value by the Bank for purposes of this Credit Agreement. Acceptance of assets held in your account as acceptable collateral does not mean that there is a market for such assets or that any affiliate of the Bank will purchase such asset. The Bank may determine in its sole discretion to give collateral value to certain securities or other investment property issued by the Bank or its affiliates that are pledged to secure the Loans under the Credit Agreement. The Bank may make such determination based upon a number of factors that it considers relevant, including the Bank's assessment of its affiliates' policies and procedures regarding providing liquidity to such securities or investment property.

**Incentive to Client Representatives.** Your client representative will be compensated based on the loan revenue of the Bank from the transactions contemplated by the Credit Agreement and your client representative may receive greater compensation for larger outstanding Loans under the Credit Agreement and higher interest rate spreads. Accordingly, client representatives may receive a greater compensation if you borrow more under the Credit Agreement and if you are charged a higher interest rate spread.

In addition, your client representative may receive compensation based on the amount of assets held in the collateral accounts pledged to secure the obligations under the Credit Agreement. This means that your client representative may benefit from your borrowing under the Credit Agreement rather than liquidating assets held in the collateral account(s) and may receive less compensation if you reduce the Loans outstanding under the Credit Agreement. In addition, your client representative may receive compensation for assets purchased by you in the collateral accounts.

**You are not entitled to an extension of time on a collateral call.** While an extension of time to meet collateral requirements may be available to customers under certain conditions, you do not have a right to the extension. As noted above, in certain instances, you may not even receive a collateral call before liquidation of assets in your account(s) and the Bank can demand repayment in full even if sufficient collateral is maintained.

**Your ability to withdraw assets will be subject to consent of the Bank.** As a result of the pledge of your account(s), you will not be able to withdraw assets from such pledged account(s) unless the Bank consents in its sole discretion. In addition, if your Credit Agreement allows use of the Loan proceeds to purchase or carry Margin Stock, the Bank will be subject to regulatory restrictions on allowing withdrawals from your account.

**Alternative credit arrangements available.** You are aware that there may be alternative credit arrangements available from BAC or from other financial institutions that provide more definite terms, greater flexibility with respect to collateral and other terms and other benefits. You have determined that this Credit Agreement is best suited to your credit needs.

**Benefits to Bank and BAC.** The Bank intends to derive a profit from this Credit Agreement. This profit is based, in whole or in part, upon the rate of interest and/or fees, if any, charged in connection with this Credit Agreement and will be in addition to any fees and charges relating to the investment and/or trust services. The Applicable Margin added to your underlying interest rate as provided in the Credit Agreement is a component of your total interest rate and is determined by the Bank based on its pricing parameters and is set forth in the Credit Agreement. To determine your Applicable Margin, the Bank may consider, in its sole discretion, the total eligible assets in your overall Bank of America relationship. If you subsequently qualify for a lower or higher Applicable Margin based on a change in your overall relationship, your Applicable Margin may not be automatically updated. The Bank may vary the parameters for determining the Applicable Margin at any time and may modify the terms of the Credit Agreement as provided therein. Discounts from the standard parameters for determining the Applicable Margin may be available in specific situations that meet established guidelines set by the Bank. You should discuss how your Applicable Margin and/or fees were determined with your client representative.

In addition, the Bank may execute transactions, whether initiated by you or by the Bank in a liquidation, through an affiliate of the Bank ("Affiliated Broker"). The Affiliated Broker will receive commissions comparable to those charged by other broker dealers for comparable transactions, to be paid out of the assets of your account(s) pledged hereunder. The Bank may use the facilities of a national securities exchange to effect transactions. The payment of these commissions will be in addition to, and will not offset or reduce, the fees and expenses payable to the Bank for its handling of this Credit Agreement or to BAC for the investment and/or trust services.

In consideration for receiving commissions from the account(s) pledged hereunder, and other accounts managed by BAC, broker-dealers who execute transactions for the account(s), including Affiliated Brokers, may provide to BAC (or to affiliated or unaffiliated agents retained by BAC to provide investment advice) research, products, and services that will assist the Bank or its agents in providing investment advice. Not all of such research, products, and services will be of benefit to BAC or its agents in managing the accounts whose trades generated such commissions, and some of such research, products and services may benefit other accounts managed by BAC or its agents.

By your signature below, you hereby acknowledge and agree as follows:

- **YOU HAVE READ THIS CREDIT AGREEMENT, INCLUDING WITHOUT LIMITATION, THIS DISCLOSURE, WAIVER OF CONFLICT OF INTEREST, ACKNOWLEDGMENT AND RELEASE ("WAIVER") CAREFULLY AND DISCUSSED THE SAME WITH SUCH ADVISORS, INCLUDING YOUR ATTORNEY, AS YOU DEEM APPROPRIATE. YOU UNDERSTAND THE TERMS AND CONDITIONS OF THIS CREDIT AGREEMENT AND WAIVER.**

- **You have made an independent decision that entering into the Credit Agreement and, if applicable, pledging your accounts at BAC, and the related risks and benefits are appropriate for your needs and/or for your account at BAC.**

- With respect to any of your BAC accounts pledged pursuant to the Credit Agreement, you hereby direct the Bank, in its capacity as investment manager, advisor, trustee or custodian, or other BAC affiliate, to allow the pledge of your account(s) to the Bank, as lender, to secure the extensions of credit under the

Credit Agreement, and to follow the directions of the Bank, as lender, with respect to the account(s) without further consent from you.

- Notwithstanding anything in the agreement(s) governing the investment and/or trust services to the contrary, all provisions of such agreement(s) that directly or indirectly prohibit any extension of credit, guaranty, grant of a security interest in assets, any withdrawal of assets without the consent of the Bank, or any other term or condition of this Credit Agreement or Waiver, are hereby amended to the extent necessary and permissible to permit this Credit Agreement and Waiver, and any subsequent modification, increase or amendment thereof, to be fully effective in accordance with its terms.

- In the event of any conflict or inconsistency between the terms and provisions of the agreement(s) governing the investment and/or trust services and the terms and provisions of this Credit Agreement or Waiver, the terms and provisions of the Credit Agreement and Waiver shall control.

**Acting for yourself and your heirs, personal representatives, successors and assigns (including without limitation, to the extent permitted by law and governing trust documents any future beneficiaries of any trust), you hereby waive any conflict of interest that the Bank or BAC may have or any other allegation of a breach of fiduciary duty with respect to all matters directly or indirectly arising from or relating to this Credit Agreement and Waiver, including the administration of the loan and the enforcement of this Credit Agreement. You further agree to release, indemnify, and hold harmless the Bank and BAC, in their corporate capacities, and as investment manager, investment advisor, custodian, and/or trustee, if applicable, and each of their respective officers, employees, agents, parents, affiliates, successors and assigns, from and against any claim, action, liability, loss, damage, or expense, of any nature whatsoever, arising out of or relating to any allegation of a conflict of interest or breach of fiduciary duty as a result of any action taken by Bank as permitted by this Credit Agreement.**

This Waiver may be in the form of an Electronic Record and may be executed using Electronic Signatures (including, without limitation, facsimile and .pdf) and shall be considered an original, and shall have the same legal effect, validity and enforceability as a paper record. This Waiver may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Waiver. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by Bank of this Waiver that has been manually signed on paper and which has been converted into electronic form (such as scanned into PDF format), or this Waiver that has been electronically signed and which has been converted into another format, for transmission, delivery and/or retention. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

In witness whereof, this Waiver has been executed under seal as of the date of this Credit Agreement.

Borrower/Pledgor(s):

_______________________________ (Seal)
Gary L. Pinkston, Trustee of the Gary and Janice Pinkston Family Trust under Trust Agreement dated January 18, 2008, as amended and restated in its entirety under Trust Agreement dated December 10, 2012, as amended

_______________________________ (Seal)
Janice C. Pinkston, Trustee of the Gary and Janice Pinkston Family Trust under Trust Agreement dated January 18, 2008, as amended and restated in its entirety under Trust Agreement dated December 10, 2012, as amended

Guarantor(s):

_______________________________ (Seal)
Gary L. Pinkston, Individually

_______________________________ (Seal)
Janice C. Pinkston, Individually

Received and accepted this August 2, 2023.

Bank of America, N.A., as lender and as trustee/investment manager and/or custodian

By: _______________________________
Adrienne Schwartz, Senior Vice President

**EXHIBIT "B"**

Bank of America

BORROWER: MP Elk Grove LLC

GUARANTOR: Gary and Janice Pinkston Family Trust

## CONTINUING AND UNCONDITIONAL GUARANTY

1 The Guaranty. For valuable consideration, the undersigned ("Guarantor") hereby unconditionally guarantees and promises to pay promptly to Bank of America, N.A., its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of MP Elk Grove LLC, a California limited liability company ("Borrower"), to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the Indebtedness and for all swap, derivative, foreign exchange or hedge or other similar transaction or arrangement ("Swap Obligations") now or hereafter owing from Borrower to Bank. No Guarantor will be deemed to be a guarantor of any Swap Obligation to the extent that such Guarantor is not an Eligible Contract Participant at the time such guaranty becomes effective with respect to such Swap Obligations as set forth in the Commodities Exchange Act (7 U.S.C., Sec. 1, et. seq.). The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. If multiple individuals or entities sign this Guaranty, their obligations under this Guaranty shall be joint and several. "Indebtedness" shall mean and includes any and all advances, debts, obligations and liabilities of Borrower, or any of them, previously, now or later made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including Swap Obligations and obligations under any deposit, treasury management or other similar transaction or arrangement, and whether any of the Borrowers may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or later becomes unenforceable.

2. Obligations Independent. The obligations under this Guaranty are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

3. Rights of Bank. Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest, or otherwise change the terms of any Bank Agreements;

(b) receive and hold security for the payment of this Guaranty or any

Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

4. Guaranty to be Absolute. Guarantor agrees that until the Indebtedness has been paid in full in immediately available funds and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner vary, discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional. This is a guaranty of payment and not merely a guaranty of collection. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower to Bank is rescinded or must be returned by Bank to Borrower, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation; and any guaranty of any indemnities, shall survive any termination of this Guaranty. In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions, and (ii) loans or advances made to or for the account of Borrower after the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrower prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness later incurred by Borrower to Bank. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

5. Guarantor's Waivers of Certain Rights and Certain Defenses. Guarantor waives:

(a) any right to require Bank to:

(i) proceed against Borrower or any other person;

(ii) marshal assets or proceed against or exhaust any security held from any of the Borrowers or any other person;

(iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person;

(iv) take any other action or pursue any other remedy in Bank's power; or

(v) make any presentment or demand for performance, or give any notice of nonperformance, acceleration, protest, notice of protest or notice of dishonor

hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness, or give any notice of acceptance of this Guaranty, or notices of any fact that might increase Guarantor's risk.

(b) any defense to its obligations under this Guaranty based upon or arising by reason of:

(i) any disability or other defense of Borrower or any other person;

(ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of Borrower or any other person;

(iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower;

(iv) the application by Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor;

(v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower;

(vi) any impairment of the value of any interest in any security for the Indebtedness, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security;

(vii) any modification of the Indebtedness, in any form whatsoever, including any modification made after revocation hereof to any Indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Indebtedness, including increase or decrease of the rate of interest;

(viii) any requirement that Bank give any notice of acceptance of this Guaranty;

(ix) any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower;

(x) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty; or

(xi) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement.

(c) until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though

the Indebtedness may be in excess of Guarantor's liability hereunder, to the extent permitted by applicable law, any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise).

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

6. General Partner Liability and Waivers of Other Rights and Defenses.

(a) If Borrower is a partnership and Guarantor is a general partner of that partnership, then Guarantor shall not be liable under this Guaranty for any portion of the Indebtedness that is secured by real property; provided, however, that Guarantor shall remain liable under partnership law for all the Indebtedness.

(b) Guarantor waives any rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.

(c) Guarantor waives all rights and defenses that Guarantor may have because any of the Indebtedness is secured by real property. This means, among other things:

(i) Bank may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and

(ii) if Bank forecloses on any real property collateral pledged by Borrower: (1) the amount of the Indebtedness may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) Bank may collect from Guarantor even if Bank, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower; and

(iii) if Bank consents to a sale of the real property for less than the remaining amount of the Indebtedness due at the time of sale, the amount of Guarantor's obligation for Indebtedness guarantied hereunder shall be reduced only by the amount of sales proceeds applied against the Indebtedness, even if such consent destroyed rights Guarantor may have to collect from Borrower, and notwithstanding Section 580e of the California Code of Civil Procedure or any other statute.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because any of the Indebtedness is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, 580e or 726 of the California Code of Civil Procedure.

(d) Guarantor waives any right or defense it may have at law or equity, including California Code of Civil Procedure Section 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

7. Lien and Setoff. Guarantor grants to Bank a continuing lien, security interest, and right of setoff as security for all of Guarantor's liabilities and obligations to Bank, whether now existing or later arising, upon and against all the deposits, credits, collateral and property of Guarantor (other than clients' trust and other fiduciary accounts or escrows) now or hereafter in the possession, custody, or control of Bank or any entity under the control of Bank of America Corporation and its successors and assigns or in transit to any of them. At any time, without further demand or notice (any such notice being expressly waived by Guarantor), Bank may set off the same or any part thereof and apply the same to any liability or obligation of Guarantor even though unmatured and regardless of the adequacy of any other collateral securing this Guaranty. **TO THE EXTENT PERMITTED BY LAW, ANY AND ALL**

**RIGHTS TO REQUIRE BANK TO EXERCISE ITS REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LIABILITIES PRIOR TO EXERCISING ITS RIGHT OF SET OFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF GUARANTOR, ARE VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVED.**

8. Subordination. Any obligations of Borrower to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

9 Revocation of Guaranty.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, nor shall it affect Guarantor's obligations with respect to any indemnities, executed prior to Bank's receipt of such notice.

(b) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, ownership or composition or structure of Borrower, or the dissolution of Borrower.

10. Extent of Guaranty. If Guarantor is a subsidiary or affiliate of Borrower, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

11. Taxes.

(a) Guarantor represents and warrants that it is organized and resident in the United States of America. All payments by Guarantor hereunder shall be paid in full, without setoff or counterclaim or any deduction or withholding whatsoever, including, without limitation, for any and all present and future taxes. If Guarantor must make a payment under this Guaranty, Guarantor represents and warrants that it will make the payment from one of its U.S. resident offices to Bank so that no withholding tax is imposed on the payment. Notwithstanding the foregoing, if Guarantor makes a payment under this Guaranty to which withholding tax applies or if any taxes (other than taxes on net income (i) imposed by the country or any subdivision of the country in which Bank's principal office or actual lending office is located and (ii) measured by the United States taxable income Bank would have received if all payments under or in respect of this Guaranty were exempt from taxes levied by Guarantor's country) are at any time imposed on any payments under or in respect of this Guaranty including, but not limited to, payments made pursuant to this paragraph, Guarantor shall pay all such taxes to the relevant authority in

accordance with applicable law such that Bank receives the sum it would have received had no such deduction or withholding been made (or, if Guarantor cannot legally comply with the foregoing, Guarantor shall pay to Bank such additional amounts as will result in Bank receiving the sum it would have received had no such deduction or withholding been made). Further, Guarantor shall also pay to Bank, on demand, all additional amounts that Bank specifies as necessary to preserve the after-tax yield Bank would have received if such taxes had not been imposed.

(b) Guarantor shall promptly provide Bank with an original receipt or certified copy issued by the relevant authority evidencing the payment of any such amount required to be deducted or withheld.

12. Information Relating to Borrower. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Bank Agreements as Guarantor deems necessary and appropriate, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications to the Bank Agreements. Guarantor further acknowledges that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower. "Bank Agreements" shall mean all agreements, documents, and instruments evidencing any of the Indebtedness, including but not limited to all loan agreements between Borrower and Bank and promissory notes from Borrower in favor of Bank, and all deeds of trust, mortgages, security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

13. Borrower's Authorization. Where Borrower is a corporation, partnership, or limited liability company, it is not necessary for Bank to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty, subject to any limitations on Guarantor's liability set forth in this Guaranty.

14. Guarantor Information; Reporting to Credit Bureaus. Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor shall provide such financial statements and other financial information about Guarantor as Bank may request from time to time. Guarantor agrees that Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Indebtedness and/or Guarantor as is consistent with Bank's policies and practices from time to time in effect. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state. Guarantor further agrees to provide the information required of Guarantor, and maintain the financial covenants applicable to Guarantor, as set forth in that certain Loan Agreement of even date herewith by and between Bank and Borrower.

15. Change of Status. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantor's obligations under this Guaranty are assumed by the new business entity

16. Remedies. If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder or shall breach or fail to comply with any term or provision of this Guaranty, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided in this Guaranty; and

(c) set off and apply any and all deposit accounts of Guarantor held by Bank or its affiliates against any and all obligations of Guarantor owing to Bank. The set-off may be made irrespective of whether or not Bank shall have made demand under this Guaranty, and although such obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit accounts and without regard for the availability or adequacy of other collateral. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books after such default.

17. Notices. Unless otherwise provided in this Guaranty or in another agreement between the Bank and the Guarantor, all notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax number(s) listed on the signature page, or to such other addresses as the Bank and the Guarantor may specify from time to time in writing (any such notice a "Written Notice"). Written Notices shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered. In lieu of a Written Notice, notices and/or communications from the Bank to the Guarantor may, to the extent permitted by law, be delivered electronically (i) by transmitting the communication to the electronic address provided by the Guarantor or to such other electronic address as the Guarantor may specify from time to time in writing, or (ii) by posting the communication on a website and sending the Guarantor a notice to the Guarantor's postal address or electronic address tellihg the Guarantor that the communication has been posted, its location, and providing instructions on how to view it (any such notice, an "Electronic Notice"). Electronic Notices shall be effective when the communication, or a notice advising of its posting to a website, is sent to the Guarantor's electronic address.

18. Successors and Assigns. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations, sell participations in, or assign the Indebtedness and this Guaranty, in whole or in part and may exchange information about Guarantor to any actual or potential participants or assignees.

19. Amendments, Waivers, and Severability. No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver of such rights, remedies or powers, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

20. Costs and Expenses. Guarantor agrees to pay all reasonable attorneys' fees and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against Guarantor under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

21. Representations and Warranties. When Guarantor signs this Guaranty, and until the Indebtedness is repaid in full and any commitments or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor makes the following representations and warranties:

(a) If Guarantor is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

(b) This Guaranty, and any instrument or agreement required hereunder, are within Guarantor's powers, have been duly authorized, and do not conflict with any of its organizational papers.

(c) In each state in which Guarantor does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

(d) All financial and other information that has been or will be supplied to Bank is sufficiently complete to give Bank accurate knowledge of Guarantor's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Guarantor. If Guarantor is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

(e) There is no lawsuit, tax claim or other dispute pending or threatened against Guarantor which, if lost, would impair Guarantor's financial condition or ability to repay the Indebtedness, except as have been disclosed in writing to Bank.

(f) Guarantor is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to Bank.

(g) Guarantor has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to Bank.

(h) There is no event which is, or with notice or lapse of time or both would be, a default by Guarantor under this Guaranty or under any other instrument or agreement executed in connection with the Indebtedness or this Guaranty.

(i) Guarantor will not be rendered insolvent by the execution, delivery, and performance of its obligations under this Guaranty.

(j) Guarantor, if a natural person, has obtained any spousal or other consents or waivers which may be required by applicable law.

22. Governing Law. Except to the extent that any law of the United States may apply, this Guaranty shall be governed and interpreted according to the laws of California (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of Bank under federal law.

23. Venue and Jurisdiction. Guarantor agrees that any action or suit against Bank

arising out of or relating to this Guaranty shall be filed in federal court or state court located in the Governing Law State. Guarantor agrees that Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against Guarantor in a venue outside of the Governing Law State If Bank does commence an action or suit arising out of or relating to this Guaranty, Guarantor agrees that the case may be filed in federal court or state court in the Governing Law State. Bank reserves the right to commence an action or suit in any other jurisdiction where Borrower, any Guarantor, or any collateral has any presence or is located. Guarantor consents to personal jurisdiction and venue in such forum selected by Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to Bank's acceptance of this Guaranty

24. Dispute Resolution Provision. This paragraph, including the subparagraphs below, is referred to as the "Dispute Resolution Provision." Bank and Guarantor (and any other party to this Guaranty) agree that this Dispute Resolution Provision is a material inducement for their entering into this Guaranty.

(a) Scope. This Dispute Resolution Provision concerns the resolution of any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses (collectively, a "Claim" or "Claims") between Bank, on the one hand, and Guarantor, on the other hand (each side being, for the purposes of this Dispute Resolution Provision, a "Party" and the two sides together being the "Parties"), regardless of whether based on federal, state, or local law, statute, ordinance, regulation, contract, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent at the time of this Guaranty, including but not limited to Claims that arise out of or relate to: (i) this Guaranty (including any renewals, extensions or modifications); or (ii) any document related to this Guaranty. For the purposes of this Dispute Resolution Provision only, the terms "Bank" or Party or Parties (to the extent referring to or including Bank) shall include any parent corporation, subsidiary or affiliate of Bank.

(b) Judicial Reference. Any Claim brought by any Party in a California state court shall be resolved by a general reference to a referee (or a panel of referees) as provided in California Code of Civil Procedure Section 638. The referee (or presiding referee of the panel) shall be a retired Judge or Justice of the California state court system. The referee(s) shall be selected by mutual written agreement of the parties. If the parties do not agree, the referee(s) shall be selected by the Presiding Judge of the Court (or his or her representative) as provided in California Code of Civil Procedure Section 640. The referee(s) shall hear and determine all issues relating to the Claim, whether of fact or of law, and shall do so in accordance with the laws of the Governing Law State and the California rules of evidence and civil procedure, and shall report a statement of decision. The referee(s) shall be empowered to enter equitable as well as legal relief, provide all temporary or provisional remedies, enter equitable and legal orders that will be binding on the parties, and rule on any motion which would be authorized in court litigation, including without limitation motions to dismiss, for summary judgment, or for summary adjudication. The referee(s) shall award legal fees and costs (including the fees of the referee(s)) relating to the judicial reference proceeding, and to any related litigation or arbitration, in accordance with the terms of this Guaranty. The award that results from the decision of the referee(s) shall be entered as a judgment in the court that appointed the referee(s), in accordance with the provisions of California Code of Civil Procedure Sections 644(a). Pursuant to California Code of Civil Procedure Sections 645, the parties reserve the right to seek appellate review of any judgment or order, including but not limited to, orders pertaining to class certification, to the same extent permitted in a court of law.

(c) Arbitration Provisions. The Parties agree that judicial reference pursuant to Subsection (b) above is the preferred method of dispute resolution of all Claims, when available. The Parties therefore agree that injunctive relief, including a temporary restraining order, without the posting of any bond or security, shall be appropriate to enjoin the prosecution of any

arbitration proceeding where the Claims at issue become subject to (and as long as they remain subject to) judicial reference pursuant to Subsection (b) above, provided that a Party moves for such relief within thirty (30) days of its receipt of a demand for arbitration of a Claim. However, with respect to any Claim brought in a forum other than a California state court, or brought in a California state court but judicial reference pursuant to Subsection (b) above is not available or enforced by the court, the arbitration provisions in this Subsection (c) (collectively, the "Arbitration Provisions") shall apply to the Claim. In addition, if either of the Parties serves demand for arbitration of a Claim in accordance with these Arbitration Provisions, and the other Party does not move to enjoin the arbitration proceeding within thirty (30) days of receipt of the demand, the right to judicial reference shall be waived and the Claim shall remain subject to these Arbitration Provisions thereafter. The inclusion of these Arbitration Provisions in this Guaranty shall not otherwise be deemed as any limitation or waiver of the judicial reference provisions. The Arbitration Provisions are as follows:

(i) For any Claim for which these Arbitration Provisions apply (as defined in the immediately preceding paragraph), the Parties agree that at the request of any Party to this Guaranty, such Claim shall be resolved by binding arbitration. The Claims shall be governed by the laws of the Governing Law State without regard to its conflicts of law principles. The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "Act"), shall apply to the construction, interpretation, and enforcement of these Arbitration Provisions, as well as to the confirmation of or appeal from any arbitration award.

(ii) Arbitration proceedings will be determined in accordance with the Act, the then-current Commercial Finance rules and procedures of the American Arbitration Association or any successor thereof ("AAA") (or any successor rules for arbitration of financial services disputes), and the terms of these Arbitration Provisions. In the event of any inconsistency, the terms of these Arbitration Provisions shall control. The arbitration shall be administered by the Parties and not the AAA and shall be conducted, unless otherwise required by law, at a location selected solely by Bank in any U.S. state where real or tangible personal property collateral for this credit is located or where Guarantor has a place of business. If there is no such state, Bank shall select a location in the Governing Law State.

(iii) If aggregate Claims are One Million Dollars ($1,000,000) or less:

(A) All issues shall be heard and determined by one neutral arbitrator. The arbitrator shall have experience with commercial financial services disputes and, if possible, prior judicial experience, and shall be selected pursuant to the AAA "Arbitrator Select: List and Appointment" process, to be initiated by Bank. If the AAA "Arbitrator Select: List and Appointment" process is unavailable, Bank shall initiate any successor process offered by the AAA or a similar process offered by any other nationally recognized alternative dispute resolution organization.

(B) Unless the arbitrator has a dispositive motion under advisement or unforeseeable and unavoidable conflicts arise (as determined by the arbitrator), all arbitration hearings shall commence within ninety (90) days of the appointment of the arbitrator, and under any circumstances the award of the arbitrator shall be issued within one hundred twenty (120) days of the appointment of the arbitrator.

(C) A Party shall be entitled to take no more than two (2) fact depositions, one or both of which may be taken in accordance with Fed. R. Civ. P. 30(b)(6), plus depositions of any experts designated by the other Party, each of seven (7) hours or less, during pre-hearing discovery.

(D) There shall be no written discovery requests except a Party may serve document requests on the other Party not to exceed twenty (20) in number, including subparts. The requests shall be served within forty-five (45) days of the appointment of the arbitrator and shall be responded to within twenty-one (21) days of service.

(iv) If aggregate Claims exceed One Million Dollars ($1,000,000):

(A) The issues shall be heard and determined by one neutral arbitrator selected as above unless either Party requests that all issues be heard and determined by three (3) neutral arbitrators. In that event, each Party shall select an arbitrator with experience with commercial financial services disputes, and the two arbitrators shall select a third arbitrator, who shall have prior judicial experience. If the arbitrators cannot agree, the third arbitrator shall be selected pursuant to the AAA "Arbitrator Select: List and Appointment" process, to be initiated by Bank.

(B) Unless the arbitrator(s) have a dispositive motion under advisement or other good cause is shown (as determined by the arbitrator(s)), all arbitration hearings shall commence within one hundred twenty (120) days of the appointment of the arbitrator(s), and under any circumstances the award of the arbitrator(s) shall be issued within one hundred eighty (180) days of the appointment of the arbitrator(s).

(C) A Party shall be entitled to take no more than five (5) fact depositions, one or more of which may be taken in accordance with Fed. R. Civ. P. 30(b)(6), plus depositions of any experts designated by the other Party, each of seven (7) hours or less, during pre-hearing discovery.

(D) There shall be no written discovery requests except a Party may serve document requests on the other Party not to exceed thirty (30) in number, including subparts. The requests shall be served within forty-five (45) days of the appointment of the arbitrator(s) and shall be responded to within twenty-one (21) days of service.

(v) Where a Party intends to rely upon the testimony of an expert on an issue for which the Party bears the burden of proof, the expert(s) must be disclosed within thirty (30) days following the appointment of the arbitrator(s), including a written report in accordance with Fed. R. Civ. P. 26(a)(2)(B). The arbitrator(s) shall exclude any expert not disclosed strictly in accordance herewith. The other Party shall have the right within thirty (30) days thereafter to take the deposition of the expert(s) (upon payment of the expert's reasonable fees for the in-deposition time), and to identify rebuttal expert(s), including a written report in accordance with Fed. R. Civ. P. 26(a)(2)(B).

(vi) The arbitrator(s) shall consider and rule on motions by the Parties to dismiss for failure to state a claim; to compel; and for summary judgment, in a manner substantively consistent with the corresponding Federal Rules of Civil Procedure. The arbitrator(s) shall enforce the "Apex" doctrine with regard to requested depositions of high-ranking executives of both Parties. The arbitrator(s) shall exclude any Claim not asserted within thirty (30) days following the demand for arbitration. This shall not prevent a Party from revising the calculation of damages on any existing theory. All discovery shall close at least one (1) week before any scheduled hearing date, and all hearing exhibits shall have been exchanged by the same deadline or they shall not be given weight by the arbitrator(s).

(vii) Except as waived by Guarantor in this Guaranty, the arbitrator(s) will give effect to applicable statutes of limitation in determining any Claim and shall dismiss the Claim if it is barred by the statutes of limitation. For purposes of the application of any statutes of limitation, the service of a written demand for arbitration or counterclaim pursuant to the Notices provision of this Guaranty is the equivalent of the filing of a lawsuit. At the request of any Party made at any time, including at confirmation of an award, the resolution of a statutes of limitation defense to any Claim shall be decided de novo by a court of competent jurisdiction rather than by the arbitrator(s). Otherwise, any dispute concerning these Arbitration Provisions or whether a Claim is arbitrable shall be determined by the arbitrator(s), except as otherwise set forth in this Dispute Resolution Provision

(viii) The arbitrator(s) shall have the power to award legal fees and costs relating to the arbitration proceeding and any related litigation or arbitration, pursuant to the terms of this Guaranty. The arbitrator(s) shall provide a written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(ix) The filing of a court action is not intended to constitute a waiver of the right of any Party, including the suing Party, thereafter to require submittal of the Claims to arbitration, unless the Party fails to make such demand for arbitration within ninety (90) days following the filing of the court action.

(x) The arbitration proceedings shall be private. All documents, transcripts, and filings received by any Party shall not be disclosed by the recipient to any third parties other than attorneys, accountants, auditors, and financial advisors acting in the course of their representation, or as otherwise ordered by a court of competent jurisdiction. Any award also shall be kept confidential, although this specific requirement shall be void once the award must be submitted to a court for enforcement. The Parties agree that injunctive relief, including a temporary restraining order, from a trial court is the appropriate relief for breach of this paragraph, and they waive any security or the posting of a bond as a requirement for obtaining such relief.

(d) Self-Help. This Dispute Resolution Provision does not limit the right of any Party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights; or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(e) Class Action Waiver. Any arbitration or court trial (whether before a judge or jury or pursuant to judicial reference) of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). **THE CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.** Regardless of anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court or referee and not by an arbitrator. The Parties to this Guaranty acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the Parties and is nonseverable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the Parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. **THE PARTIES ACKNOWLEDGE AND AGREE THAT UNDER NO CIRCUMSTANCES WILL A CLASS ACTION BE ARBITRATED.**

(f) Jury Waiver. By agreeing to judicial reference or binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury as permitted by law in respect of any Claim. Furthermore, without intending in any way to limit the provisions hereof, to the extent any Claim is not submitted to judicial reference or arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury to the extent permitted by law in respect of such Claim. This waiver of jury trial shall remain in effect even if the Class Action Waiver is limited, voided or found unenforceable. **WHETHER THE CLAIM IS DECIDED BY JUDICIAL REFERENCE, BY ARBITRATION, OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS DISPUTE RESOLUTION PROVISION IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW. EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (iii) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

25. Electronic Records and Signatures. This Guaranty and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Guaranty (each a "Communication"), including Communications required to be in writing, may, if agreed by the Bank, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf. The Guarantor agrees that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on the Guarantor to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to the Bank. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Bank may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of the Bank's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Bank is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Bank pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Bank has agreed to accept such Electronic Signature, the Bank shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Guarantor without further verification and (b) upon the request of the Bank any Electronic Signature shall be promptly followed by a manually executed, original counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

26. Application of Singular and Plural. In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower, or when this Guaranty is executed by more than one Guarantor, the word "Borrower" or "Borrowers" and the word "Guarantor"

respectively shall mean all or any one or more of them as the context requires.

27. Final Agreement. This Guaranty and any related security agreements or other agreements required by this Guaranty constitute the entire agreement between Guarantor and Bank with respect to the subject matter of this Guaranty and with respect to the credit facilities provided by Bank to Borrower and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Guaranty and any other agreements required by this Guaranty, this Guaranty will prevail.

Executed as of July 27, 2022.

Gary L. Pinkston, Trustee of the Gary and Janice Pinkston Family Trust u/d/t dated January 18, 2008, as amended and restated of December 10, 2012 and as amended on May 22, 2013

Janice C. Pinkston, Trustee of the Gary and Janice Pinkston Family Trust u/d/t dated January 18, 2008, as amended and restated of December 10, 2012 and as amended on May 22, 2013

Address for notices to Bank:
Bank of America, N.A.
Private Bank
12830 El Camino Real, Suite 300
San Diego, California 92130

With a copy to:

Bank of America, N.A.
Gateway Village-900 Building
NC1-026-06-06
900 W. Trade Street
Charlotte, North Carolina 28255

Address for notices to Guarantor:
Gary and Janice Pinkston Family Trust
20 Tamalpais Avenue
Belvedere, California 94920-2468

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

***These notices apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):***

**(1) U.S. AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.

- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.

- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.

- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.

- You may tell us your choice to limit marketing offers, and you may tell us the choices for other customers who are joint account holders with you.

- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.

- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000.**

**Bank of America Companies:**

This notice applies to all Bank of America U.S. legal entities that utilize the names:

Bank of America
Banc of America

U.S. Trust
Merrill

These entities include banks and trust companies; credit card companies; brokerage and investment companies; and insurance and securities companies. In addition, this notice applies to the following Bank of America U.S. companies:

Managed Account Advisors LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.